1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Jane Doe
9461 Charleville Blvd #259
Beverly Hills, CA 90212
310 498-7975
in *sui juris*

**FILED**
Superior Court of California
County of Los Angeles

NOV 15 2021

Sherri R. Carter, Executive Officer/Clerk of Court
By: _____, Deputy
Cristina Grijalva

IN AND FOR THE SUPERIOR COURT OF CALIFORNIA,

IN LOS ANGELES COUNTY, WEST DISTICT

| | |
|---|---|
| JANE DOE, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>CURTIS R. OLSON, an individual; LEONARD KYLE DYKSTRA, an individual; RYAN VOGT-LOWELL, an individual and in his capacity as an officer of the court; ERIC KENNEDY, an individual and in his capacity as an officer of the court; ASHLEY MILNES, an individual and in his capacity as an officer of the court; BUCHALTER, P.C., a California professional corporation; LAMDIEN LE, an individual and in his capacity as an officer of the court; SLAUGHTER, REAGAN & COLE, LLP, a Limited Liability Partnership: MARLENE BURRIS, an individual and in her judicial officer capacity as a court reporter; DEBRA RIVERA, an individual and in her judicial officer capacity as a court reporter; MICHAEL CONVEY, as an individual and in his official capacity as Justice of the Superior Court of Los Angeles County; EMILY SPEAR, as an individual and in her official capacity as Justice of the Superior Court of Los Angeles County and as Deputy District Attorney of Los Angeles County; CINDY KIM an individual and in her judicial officer capacity as Court Clerk; and Judicial Assistant; DEPUTY SHERIFF OFFICER DOE KOO an individual and his official Deputy Sheriff capacity and in DOES 1-40, inclusive,<br><br>Defendants | **Case No. 19STCV41255**<br>Action Based On Civil Code §1708.85<br><br>**VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF AND DAMAGES:**<br>1. **FRAUD UPON THE COURT**<br>2. **DEPRIVATION OF CIVIL RIGHTS** 42 U.S.C. § 1983Substantive and Procedural Due Process<br>3. **CONSPIRACY TO VIOLATE CIVIL RIGHTS** 42 U.S.C. § 1983<br>4. **DENIAL OF EQUAL PROTECTION;** 42 U.S.C. § 1983 under 14th Amendment<br>5. **UNRUH CIVIL RIGHTS ACT**<br>6. **VIOLATION BANE ACT**<br>7. **VIOLATION RALPH ACT**<br>8. **MISPRISION OF FELONY** 18 U.S.C. § 4<br>9. **OBSTRUCTION OF JUSTICE** 18 USC § 1503 Cal. Penal Code 132, 134, 135 PC<br>10. **DISCRIMINATION BASED ON SEX RACE & ETHNICITY;**<br>11. **RETALIATION;**<br>12. **STALKING;**<br>13. **INTRUSION INTO PRIVATE AFFAIRS; STALKING;**<br>14. **NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS;**<br>15. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS;**<br>16. **CIVIL CONSPIRACY**<br>17. **WITNESS TAMPERING; AND**<br>18. **UNJUST ENRICHMENT**<br>19. **SEXUAL HARASSMENT**<br>20. **DECLARATORY JUDGMENT ACT**<br><br>**DEMAND FOR TRIAL BY JURY** |

1    **NOW COMES the Plaintiff, Jane Doe** (the "Plaintiff, "Jane Doe" or "Doe"), who

2    complains and alleges against Defendants as follows:

3    **INTRODUCTION**

4    1. Defendant, **Lenny Dykstra**, the infamous, professional baseball player is the linchpin to

5    multifaceted retaliation scheme and judicial cover-up scheme by criminally corrupt, judicial

6    officers, attorneys and others, who conspired to deny Jane Doe justice under the color of law and

7    protected, aided and abetted, child pornographer and sexual abuser Defendant, **Curtis R. Olson,**

8    a multi-millionaire real estate mogul from facing accountability to his victim, Jane Doe, an *in*

9    *forma pauperis* litigant and disabled mixed race woman of color, who dared speak truth to power

10   by exercising her first amendment right to redress her grievances in a court of law.

11   2.   Defendant Curtis R. Olson's ("Olson") huge monetary resources and his vast and deviant

12   corrupt network coupled with corrupt and racist judges continually thwarted the level playing

13   field for Jane Doe's access to ethical, just, fair and impartial judicial courts. Doe's experiences

14   are the same as other victims of powerful men chronicled by *New York Times* investigative

15   reporters Jodi Kantor and Megan Twohey, who said, "Institutions looked the other way…,

16   people bend to power…, there is a boarder abuse of power, the basic structures and systems are

17   *still* in place, and it is not clear that we have yet found a way to solve this problem."

18   3. In 2020, it has become an accepted fact that American institutions, including the justice

19   system, are plagued by systemic race, gender, class and other biases that allow the privileged few

20   to operate above the law, while inflicting horrific abuses upon the unfortunate others who cross

21   their paths (hereafter **"Systemic Bias").** Once seemingly taboo, the issue of Judicial Corruption

22   was thrust into the mainstream news with the June 30, 2020 publication of the Reuters News

23   Special Report, "Thousands of U.S. judges who broke laws or oaths remained on the bench."[1]

24   The national conversation has now shifted from, "Does Systemic Bias exists?" to "What are we

going to do about Systemic Bias?"

4. Jane Doe figured out the basic structures and systems that are *still* in place that allow the Family Courts to be rigged, a likely hangover from the white supremacists' British courts to protect the aristocracy and uber rich like Olson.

Family Courts are set up for rigging in the following nine ways:

(a)   No jury all decisions are made by one judge.

(b)   Family Courts provide for free their own "special" court reporter, who is the only person protecting the court transcripts' accuracy and owns the original transcript data.

(c)   Court reporters no longer use the old fashion steno machines in which each keystroke is locked in.  Today, court reporters type court transcripts on laptops with software that also produces an audio recording of the proceedings that is the private property of the court reporter. This modern software allows court reporters to easily change transcripts like any word processor, nothing is locked in. Thus, any word(s) in any transcript can be easily and quickly changed, with no trace of the original text except for the audio-recording.

(d)   One would think, the easy answer would be to simply subpoena the court reporter's audio recording but no court in the United States will grant any litigant access to even a copy of the court reporter's audio recording. Jane Doe's research has taken her all across the county talking to dozens of abused litigants, who attest that their court transcripts were altered and they diligently sued/subpoenaed the courts and court reporters to get the original audio recordings and appealed and petitioned the Supreme Courts in their respective states, but all cases across the country were denied and/or dismissed.

---

[1] Thousands of U.S. judges who broke laws or oaths remained on the bench

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF AND DAMAGES

(e)    Further, most trial courts do not allow anyone to record in the courtroom. Therefore, the only audio recording of a court proceeding is the private property of the court reporter, and completely out of the reach of anyone.  Courts give thin self-serving excuses why no one can record or have a copy of the court reporter's audio recording, but this lack of transparency is a farce, set up to only protect the corrupt judicial system and their rich privileged cohorts.

(f)    Court reporters are wide open for corruption because there is no required ethical training. They earn about $50,000 dollars a year, so a billionaire's bribe and/or pressure from a judge to alter a transcript is an easy temptation especially when they know the evidence of the counterfeit transcript is completely under their control, and they will never have to turn it over.  Thus, they have got all bases covered.

Further, the general public erroneously think a court reporter has a lot of power and could expose a judge for *suggesting* he/she alter a transcript, but Family Court judges carefully select their court reporters, choosing hardened criminal players willing to counterfeit transcripts at their bidding. An insider Big Law attorney has admitted to Jane Doe that they witnessed a federal prosecution judge instructing a court reporter to criminally alter transcripts, in a criminal case to prevent the framed victim from having legal arguments on appeal, so this attorney verified to Doe that he knew this sort of thing goes on and he said, he had no doubt that Judge Convey and Judge Spear were guilty as he has witnessed this sort of thing with his own eyes.

But as soon as the judge instructs the court reporter to alter the transcript, the original text is deleted and replaced. There is no trace, no evidence so this witnessing attorney could never prove his allegations. Further, since attorneys are underlings to judges, essentially lower in rank, they have no power to confront judges or the larger

Link :/www.reuters.com/investigates/special-report/usa-judges-misconduct/

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF AND DAMAGES

RICO judicial system, which would destroy their careers and potentially get them killed.

(g)     The Incredulous Factor, the public at large including most attorneys are unaware of the structure and systems *still* in place.  When Jane Doe reported the situation to people, they were shocked to hear that there is no mechanism in place to protect the integrity of accurate court transcripts –people just assume structures are in place to protect transcripts. Instead, it's the opposite the structures and systems are *still* in place to allow embedded corruption with impunity.

Evil depends on people finding it hard to believe, so they dismiss it. Yet, with all the available technology to record and create true and accurate court transcripts that could be instantly emailed to parties with the original audio recording, we appear to be in the dark ages.  Transcripts could be cost effectively delivered directly and immediately following any court proceeding to each party's email, thereby bypassing tampering.

Why does the public accept that transcripts from court reporters still function on the honor system? In other words the judiciary is set up to give all this power to some stranger, who may have hidden loyalties, who hold people's lives in their hands, and have the ability to alter court transcripts in secret, with no trace and the public is supposed to have faith in the "honor system" of some strange court reporter?

(h)     Mainstream media will not investigate or expose the phenomenon of widespread counterfeit court transcript, although they have all known about it for decades. There is essentially *no* truly independent mass media in the United States at present. The corporate media is in the business of *power and control*, **not** *truth to hold power to account*. They achieve this by defining — in an Orwellian sense — what the very nature of truth is. To them, "truth" is whatever *authority tells you it is*. Anyone

who rejects their authority to define reality — and asserts their sovereign right to think for themselves — is ridiculed and ostracized. These failed media institutions are primarily agents of lawless power, not individual liberty.

There is a simplistic view of society that "dark power" is confined to small-scale "conspiracies," and that these cannot coalesce and become a cancer of criminal culture. Exposure would be too easy: one whistleblower, and the media would pick up on it. The existence of totalitarian societies shows this to be false: dark power can grow to displace the light, via violence, subversion and deception.

(i)      The judicial system is set up to cruelly keep everyone in line.  When the few honest courageous attorneys try to expose court corruption they are disbarred and even imprisoned as retaliation like the case of attorney Richard Fine, who was thrown in jail over a year when he tried to expose city/judiciary bribery corruption or the dramatic case of Native American, Russell Jay Gould, who was unlawfully imprisoned, starved and tortured. Therefore, attorneys literally fear for their life and with good cause, pressuring them to become complicit in a conspiracy of silence.  Thus, there are no checks and balances –zero--with regards to Family Court transcripts.

These nine factors, position Family Courts for corruption, with the ability to counterfeit transcripts, psychopathic hater judges act-out and punish minorities and poor people and relish in their sadistic abuse as they have done to women of color, Jane Doe and her mother.

Jane Doe sought a restraining order to protect her from Olson's sexual harassment and retaliation but now she is blindsided, having to fight a den of viper judges and court reporters committing heinous felonies to protect Olson.  Really –this is our judiciary? Jane Doe and her mother have become enslaved to this judicial corruption.

**This absolute power absolutely corrupts.**

## Nature of Action

5. In May of 2015, Jane Doe began seeking police protection, contacting the Los Angeles Police Department (LAPD) numerous times regarding Curtis R. Olson, her former landlord and employer's sexual assault, stalking, peeping, harassment and secretly placing a filming device into Jane Doe's bathroom and bedroom among other incidents. After numerous visits and reports the LAPD advised Jane Doe to get a restraining order.

6. Jane Doe had never sought a restraining order before and was afraid because Olson had admitted to her that he was a member of a powerful secret society old boys' club.  Further, Doe was warned not to seek justice against Olson because he could "buy judges, police and politicians" by Olson's former wife.  Likewise, Olson's Big Law Buchalter attorney, Eric Kennedy threatened that his client, would spend any amount of money to win the lawsuits.

7. However, after yet another frantic call to the LAPD, the police officer again strongly recommended Doe get a restraining order. Jane Doe explained she did not know how to do this and did not any money to hire an attorney.  Jane Doe was directed to an advocate to help her file a temporary restraining order.  In December 2015, Jane Doe obtained a mediated "Stay Away" restraining order agreement against Olson.

8. In December 2016, Jane Doe filed a civil action against Olson and others for damages based on Olson's sexual assault of Doe, as well as Olson and others' years-long campaign of harassment, defamation and discrimination against her, (hereafter referred to "Sex Abuse Suit").

## Olson's Retaliation Scheme
## to Force Jane Doe to Dismiss her Sex Abuse Suit Against Him

9. Shortly after Jane Doe filed her Sex Abuse Suit, Olson and his conspirators began an underhanded and nefarious retaliation scheme to intimidate Doe to dismiss her Sex Abuse Suit against Olson. One aspect was using Leonard "Lenny" Dykstra ("Dykstra") under false pretenses to infiltrate Doe's life as an enemy agent spy for Olson to gang stalk, harass, solicit, criminally

frame and demoralize her, including texting racial slurs, "the monkey" and "Spear chucker" that espouse the white supremacist idea that minorities are stupid, savage and uncivilized. When Jane Doe tried to get away from Dykstra, he sent the intimidating text, "I'm not done with you yet." Olson also employed stalkers, who cased Doe's neighborhood in search of her. Warned her life was in danger, Jane Doe went into hiding in fear of her life. Although Doe had already obtained a "Stay Away" order against Olson the LAPD recommended Doe seek a second restraining order to stop Olson's use of harassing third parties.

### Olson's Cover-up Scheme of his Retaliation

*The cover-up is always worse than the crime, but the crime was pretty bad.*

10.   Jane Doe turned with faith to America's last bastion of justice, the United States judicial courts.  However, in an unconscionable abuse of judicial authority and Systemic Bias, the Defendants banded together in their secret society old boys' club and legal fraternity of judges protecting judges, funded by Olson to deny Jane Doe justice and railroad and sadistically punish her in the "preserve reverse."

11.   The judicial cover-up scheme to defraud were for the purpose of depriving Jane Doe's equal protection under the law by robbing her rights to fair and impartial court hearings. This was accomplished by denying and violating Doe's America disabilities accommodations; and committing illegal acts of intimidation, threats, violence, excessive force; and fraud upon the court; and by illegally counterfeiting numerous court transcripts that destroyed evidence by removing dozens of words that proved and supported Jane Doe's restraining order case. Then adding/altering words that changed the meaning of sentences that not only exonerated Olson but hid the truth of Olson's "golf buddy" connection to Dykstra and protected the judicial officers; resulting in the denial of Jane Doe's second restraining order, which otherwise would have granted her the protection of a restraining order against Olson and her attorney's fees and costs.

12.   Instead in the perverse reverse, Olson was awarded $356,000 in attorney's fees, costs

and sanctions, against indigent Jane Doe for her simply seeking restraining order protection. Olson and his Big Law Buchalter attorney Eric Kennedy ("Kennedy") achieved this outrageous judgment award by submitting fraudulent evidence, in violation of Penal Code 134, that falsely misled the court and incriminated Jane Doe, which constitutes a fraud upon the court.

13.   Further, shocking the conscience, Defendants have also resorted to violence to intimidate Jane Doe and witnesses.  To date, two witnesses have been poisoned, one of the poisoned witnesses was later found dead, cause unknown, but found under extremely suspicious circumstances.  Another of the poisoned witnesses had an armed attempt on his life and fled refusing to testify.  Another witness was murdered, shot in cold blood, case unsolved.

14.   Judge Emily Spear resorted to violence setting Jane Doe's hearing last, in an empty courtroom she (1) conspired with the courtroom Deputy Sheriff Koo to intimidate Doe by having Koo stand in the weaver position directly behind Doe, mocking that he would shoot her in the back while she testified and (2) Judge Spear attempted to frame Doe and "throw her in jail on contempt" based on Spear's made-up story with no evidence and no constitutional protections afforded to Doe.  Then Judge Spear wrote that purported "finding" in the court's minute order, to smear Doe in the court record, one among many inaccurate and defamatory "findings."

15.   Further, Judge Spear denied Doe disabilities accommodations under the American Disability Act ("ADA") and had unauthorized *ex parte* communications regarding Doe's confidential ADA requests with Olson's attorney Ashley Milnes of Buchalter. Further, Judge Spear's court clerk, Cindy Kim against ADA laws, sent Kennedy, Doe's private medical records, which he promptly posted on the internet to Doe's great humiliation.

16.   Jane Doe is not an attorney and is mostly self-represented because she cannot afford legal counsel. She is overwhelmed with nightmare massive legal motions and confusing rules of court, that have turned her life into a living hell and destroyed her health. Although one branch of the judicial court system continues to grant Doe fee waivers upon her proof that she is

indigent, the Defendant family court judges continually ignore her indigent status, which is prohibited by the "court of equity" rules of court, and established case law, *and* per Code of Civil Procedure 527.6, where attorney's fees are discretionary, to heap hundreds of thousands of dollars of attorney's fees, costs and sanctions judgments against her, totaling $356,000 and growing, which Doe will never be able to pay. These financially ruinous judgments are tantamount to enslaving Jane Doe to life in a debtor's prison for simply seeking restraining order protection.

17.   Further the judges' rulings continuously violate procedural due process, black letter law, and California state law forcing Doe to appeal every ruling.  Normally, Doe's remedy is simply to appeal but not when there is a consorted effort by Defendants to gang up on Doe to overwhelm her *and* violate her ADA accommodations *and* violate her personal safety with excessive force, fully weaponizing the judicial system to harass and traumatize her.  This is an unconscionable abuse of the judicial system.

18.   Then once these abuses, rigged hearings and Systemic Bias rulings were created in the court record --triply weaponizing the judicial system, Olson filed a new lawsuit alleging fraud against Doe's mother, a widow in her 80s, Doe's former employer, an irrevocable Trust and its beneficiary, a small church, and Jane Doe.

19.   Olson's grand scheme and motive is to (1) steal the church's real estate property (and/or Max Wilcox, the Trustor's property) (2) physically, mentally and emotionally exhaust and pressure Jane Doe and her mother into bankruptcy and/or homelessness and effectively crush their ability to seek any justice and all with the aiding and abetting of Defendants.

20.   Further, Olson and his co-conspirators' overarching retaliatory motive is to teach these uppity minority women, Doe and her mother, (who, as a child, was oppressed by the racist Jim Crow laws in Texas) that in the face of protected old boys' club members; white supremacy and privilege take precedence over justice, so shut-up and get to the back of the bus!

**Purpose of the Action**

21. This is an action to right Systemic Bias and fraud-based rulings and impeach counterfeit court transcripts; and thereby set aside, vacate void *ab inito* orders, findings and judgments of Judge Convey, Judge Spear, Judge Gregory Weingart and Judge Wendy Wilcox in restraining order, family court, and dismiss in its entirety Olson's lawsuit, before Judge Theresa Beaudet, a as every judicial finding, ruling and order in these cases rests upon the Fruit of a Poisonous Tree.

22. Further, Doe seeks justice from the violations of her Constitutional rights to redress her grievance in a court of law, Olson's frauds upon the court, ADA violations, discrimination and Olson's third-party harassers, Lenny Dykstra et al.

**Historic Opportunity to Address Systemic Bias & Corruption**

23. These multiple Frauds Upon the Court are unconscionable schemes calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of a party's claim or defense.  Furthermore, tampering with the administration of justice involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. The founding fathers constitutionally provided for societal institutions to ensure the peaceful and civil resolving of disputes amongst citizens, free from violence. If American citizens believe there is no justice within the judicial system, then it's a slippery slope into vigilante justice and violent acting out of frustrations by the general public.

**Parties, Venue, and Jurisdiction**

24. Plaintiff Jane Doe is a citizen of the United States and resides in Los Angeles County, California, and proceeds using the pseudonym Jane Doe, pursuant to Civil Code § 1708.85(f)(1).

25. Plaintiff is informed and believes and thereupon alleges that at all times herein mentioned, Defendant Leonard Kyle Dykstra ("Dykstra") is a citizen of the United States and at

all times relevant hereto resided in Los Angeles, California.

26. Plaintiff is informed and believes and thereupon alleges that at all times herein mentioned, Defendant Curtis R. Olson ("Olson") is a citizen of the United States and at all times relevant hereto resides in Los Angeles and/or Orange County, California.

27. Plaintiff is informed and believes and thereupon alleges that at all times herein mentioned, Defendant Ryan Vogt-Lowell ("Vogt-Lowell") is a citizen of the United States and at all times relevant hereto was, an individual and an attorney licensed to practice law in California, and at all times herein mentioned, Ryan Vogt-Lowell was a partner and/or agent of Nexus Companies a Corporation doing the things herein alleged was acting within the scope of such employment and agency.

28. Plaintiff is informed and believes and thereupon alleges that at all times herein mentioned, Defendant Eric Kennedy ("Kennedy") is a citizen of the United States and at all times relevant hereto was, an individual and an attorney licensed to practice law in California, and at all times herein mentioned, Kennedy was a partner and/or agent of Buchalter a Professional Corporation, and in doing the things herein alleged was acting within the scope of such employment and agency.

29. Plaintiff is informed and believes and thereupon alleges that at all times herein mentioned, Defendant Ashley Milnes ("Milnes") is a citizen of the United State and at all times relevant hereto was, an individual and an attorney licensed to practice law in California, and at all times herein mentioned, Milnes was a partner and/or agent of Buchalter a Professional Corporation, and in doing the things herein alleged was acting within the scope of such employment and agency.

30. Plaintiff is informed and believes and thereupon alleges that at all times herein mentioned, Buchalter is a Professional Corporation organized and existing under the laws of California with its principal place of business in Los Angeles, California.

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF AND DAMAGES

31. Plaintiff is informed and believes and thereupon alleges that at all times herein mentioned, Defendant Lamdien Le ("Le") is, and at all times relevant hereto was, an individual and an attorney licensed to practice law in California, and at all times herein mentioned, Le was a partner and/or agent of Slaughter, Reagan & Cole, LLP, and in doing the things herein alleged was acting within the scope of such employment and agency.

32. Plaintiff is informed and believes and thereupon alleges that at all times herein mentioned, Slaughter, Reagan & Cole is a Limited Liability Partnership organized and existing under the laws of California with its principal place of business in Los Angeles, California.

33. Plaintiff is informed and believes and thereupon alleges that at all times herein mentioned, Defendant Marlene Burris ("Burris") is a citizen of the United States and at all times relevant hereto was an individual and in her judicial officer capacity as a court reporter in the County of Los Angeles, State of California and in doing the things herein alleged was acting within the scope of such employment and agency.

34. Plaintiff is informed and believes and thereupon alleges that at all times herein mentioned, Defendant Debra Rivera ("Rivera") is, is a citizen of the United States and at all times relevant hereto was an individual and in her judicial officer capacity as a court reporter in the County of Los Angeles, State of California and in doing the things herein alleged was acting within the scope of such employment and agency.

35. Plaintiff is informed and believes and thereupon alleges that at all times herein mentioned, Defendant Michael Convey ("Judge Convey") is a citizen of the United States and at all times relevant hereto was individually and in his official capacity as Justice of the Superior Court of Los Angeles County, State of California and in doing the things herein alleged was acting within the scope of such employment and agency.

36. Plaintiff is informed and believes and thereupon alleges that at all times herein mentioned, Defendant Emily T. Spear ("Judge Spear") is a citizen of the United States and at all

times relevant hereto was individually and in her official capacity as Justice of the Superior Court of Los Angeles County, State of California and Deputy District Attorney of Los Angeles County and in doing the things herein alleged was acting within the scope of such employment and agency.

37. Plaintiff is informed and believes and thereupon alleges that at all times herein mentioned, Defendant Cindy Kim ("Kim") is a citizen of the United States and at all times relevant hereto was individually and in her official capacity as Court Clerk and/or Judicial Assistant/ Officer of the Superior Court of Los Angeles County, State of California and in doing the things herein alleged was acting within the scope of such employment and agency.

38. Plaintiff is informed and believes and thereupon alleges that at all times herein mentioned, Defendant Sheriff Doe Koo ("Koo"), who's first name is unknown at this time, is a citizen of the United States and at all times relevant hereto was individually and in his official capacity as Deputy Sheriff Officer and Bailiff in Family Court at the Superior Court of Los Angeles County, State of California and in doing the things herein alleged was acting within the scope of such employment and agency.

39. Plaintiff is unaware of the true names and capacities of the defendants sued herein as Does 1 through 20, inclusive, and therefore sues these defendants by such fictitious names pursuant to the *California Code of Civil Procedure* § 474. Each allegation alleged herein against any named defendant is alleged against each doe. Plaintiff will seek leave of court to amend this complaint when their identities have been ascertained. Plaintiff is further informed and believes, and thereon alleges, that each of the defendants fictitiously named herein is legally responsible for the events that have been referred to herein and have proximately caused Plaintiff damages as alleged.

40. Plaintiff is informed and believes and thereon alleges, that at all times herein mentioned, each of the Defendants and Does 1 through 20, and each of them, were the agents and/or

employees of each of the remaining Defendants, and in doing the things herein alleged, were acting within the course and scope of said agency and/or employment, in that the actions of each of the Defendants as herein alleged were authorized, approved, and/or ratified by each of the other Defendants as principals and/or employers.

41. All acts herein alleged, unless otherwise specified, occurred in the State of California. As such, the Court has personal jurisdiction over Defendants in this matter pursuant to *Code of Civil Procedure* §410.10.   This Court has jurisdiction over the causes of action herein asserted pursuant to the California Constitution, Article VI, Section 10, because this case is a cause not given by statute to other trial courts.

42. Venue is proper in this Court in the County of Los Angeles, State of California under code of Civil Procedure 395(a) because defendants either reside or maintain executive offices in this County and also a because a substantial portion of the wrong doings occurred in this County and one or more of the causes of action stated herein arose in this County and this judicial district.

43. The damages sought exceed $25,000; therefore, this case is properly brought in the superior court as a case of unlimited jurisdiction.

## The Background History Facts

44. In summary, in 2002, Jane Doe met Olson regarding a condo-conversion project of an eight-unit Historic Westwood Los Angeles residential apartment property, (the "Property") of which Jane Doe was a rental tenant.  Doe's business associate Max Wilcox ("Wilcox") contributed the initial escrow funds to secure the Property's purchase for the condo-conversion project and under contract would have the right to one of the condo units.  Olson purchased the Property as the main investor in the condo-conversion project and became Jane Doe's landlord and hired her to be the property manager and contracted with her to work on the condo-

conversion project with certain obligations.  Shortly thereafter, Olson began making romantic and sexual advances towards Jane Doe.

45. Although, Olson was married with young children and his wife was expecting their third child, and they lived a few hours' drive away in Orange County; Olson decided to move into one of the apartment units at the Property, near Jane Doe's unit (about 26 feet).  Jane Doe refused Olson's advances, where upon he became incensed, saying he thought she was "supposed to be part of the deal."  Olson then promptly fired her as property manager, violated California housing ordnances to throw her out of the apartment, intimidated and threatened to sue her and evict her 6-pound multi-poo puppy.

46. However, still under contractual obligations Jane Doe could not just abandon the condo-conversion project without incurring economic hardships and losing Wilcox's investment.  An executive at Olson's real estate company, Nexus told Jane Doe that Olson was very angry with her, but that Olson would eventually calm down. The executive advised Jane Doe to avoid Olson and only contact the executive regarding the Property. Doe avoided Olson.

47. In 2005, the condo –conversion was complete and per contractual agreement Olson transferred per grant deed, a one-bedroom 966 sq. ft. condominium to Wilcox. Wilcox hired Jane Doe as his property manager, where she rented it out or rented it herself or made it available when Wilcox stayed in Los Angeles.  In 2009, Wilcox put his condo into an LLC and in 2012, he arranged for his condo to be placed into an irrevocable trust, ATW Trust ("Trust") for its church beneficiary.  Jane Doe became a trustee on the Board of trustees.

48. Many years passed, Jane Doe rarely saw Olson and things appeared to calm down. Jane Doe moved away from Los Angeles and the Trust's property was rented out to various tenants. In or about 2014, Jane Doe moved back to Los Angeles and when the Trust property became available, Jane Doe made an agreement with the Board of trustees to rent it.  At that point, Doe had not seen Olson in years.

49. Then one late afternoon in May of 2015, Olson, knocked on Jane Doe's front door professing to "extend an olive branch." Olson acted like he had gotten over his past sexual interest in Jane Doe and just wanted to be friendly neighbors. Olson also admitted that he had made a mistake in taking away the residents' legal right of way to access the Property's basement storage spaces, by track mapping the entire basement to him. Olson apologized and settled this long-standing unresolved matter by informing Jane Doe that all residents now have a legal right of way to use the basement as a common area. Pleasantly surprised, Jane Doe let her guard down. Olson then invited Jane Doe to a social gathering in the courtyard of at the Property. Disarmed and believing Olson promises, Jane Doe joined the get-together.

50. Although Olson mentioned something indicating that other residents would also be joining, initially only one resident, Douglas Econn was present and then the gathering moved to Olson's condo unit. At some point, Douglas Econn left, but made a comment that he was coming back. Olson was drinking what appeared to be wine and offered Jane Doe a glass, which she refused. During conversation, Olson told Jane Doe that he is a member of a secret society old boys' club. Olson invited Jane Doe to view his "art collection" a book of photographs that turned out to be sexually provocative with violent fetish images. Doe had no interest in this type of "art." Olson then showed Doe a YouTube comedy clip called Hot and Crazy Matrix, which Doe did not find funny. Although Jane Doe expected other residents to show-up, no one else showed up, and Jane Doe was left alone with Olson.

51. Jane Doe began to feel uncomfortable and decided to leave. Then suddenly, like a horror movie, Olson ripped off his sheep's mask, the wolf emerged, and he sexually attacked her, jumping on top of her and pushing her down onto the sofa. Jane Doe fought for her life, manhandled and bruised, she fell off the sofa onto the floor and escaped. She ran back to her rental home in a state of shock, completely blindsided. A foreboding fear traumatized and confused Jane Doe as she was whiplashed from a hopeful state of peace to a dangerous war

footing with Olson, a wealthy, powerful, unscrupulous man with a vast social network via his secret society old boys' club, which afford him corrupt influence and a personal belief that he is above the law. Jane Doe reported Olson's sexual assault and battery to the LAPD.

52. Olson's appeared to became possessed with a vindictive obsession to punish Jane Doe, now for twice sexually rejected him combined with his fetish for pornographic and degrading nude photographs, drove Olson to launch a vile campaign of sexual violence and harassment against Jane Doe, with the aid and abetting of his co-conspirators, which included but not limited to placing a filming device in her bathroom to procure nude images of Doe and Doe's house guest a 15-year-old girl, who became victim Doe 2 in the Sex Abuse Suit.

53. Jane Doe, and minor victim Doe 2 reported the crimes to the Los Angeles Police Department, who advised Jane Doe to get a restraining order, and as mentioned above Doe was afraid to get a restraining order because she feared it could potentially make matters worse and she could not afford an attorney and she had no idea how to go about getting a restraining order as she had never done it before.

54. However, Olson's harassments continued to escalate, into creeping around her back walkway peeping into her bathroom, death threats, chasing her around the Property, threats to break into her storage unit and throw her things in the trash, screaming vulgar obscenities, swearing and calling her "crazy" from his second story window as she walked to and from her front door on the first floor, screaming and harassing Doe guests and threatening minor victim Doe 2 to put her in jail. Each time Jane Doe made frantic calls to the police and even the Property manager said Olson was out of control and advised Doe to call the police. The police also became upset about the situation and frequent calls and strongly recommended Doe get a restraining order. After being directed to an advocate Doe sought and obtained a temporary restraining order. The detective prepared Doe's case for the Los Angeles Sex Crimes Division. In December 2015, Jane Doe obtained a 3-year "Stay Away" mediated restraining order

1 | agreement against Olson.

2 |     55. An LAPD detective involved in Jane Doe's case expressed disappointment when he

3 | informed Doe that the Sex Crimes Division decided not to press charges, and dropped her case,

4 | even though in his professional opinion there was enough evidence for a conviction of Olson.

5 | The detective also confided that Olson's wealth and racism appeared to be elements that led to

6 | the refusal to investigate and prosecute her strong case.

7 |     56. Next, Jane Doe sought help through HUD and DFEH, who only take a handful of cases a

8 | year.  Upon review of Jane Doe's strong case, HUD took her case and was always available

9 | when she called with a question.  However, a few months later, HUD suspiciously shelved her

10 | case, refused to return any communications including emails and phone calls and strangely

11 | became hostile to Jane Doe's witnesses.  Doe was informed and believes that Olson and/or a

12 | subsidiary or strawman of his real estate company entered into construction contracts with HUD,

13 | creating a conflict of interest that effectively shut down HUD's investigation into the Doe's case

14 | and then whitewashed it.

15 |     57. Beginning from about 2005 and continuing to this present day, Jane Doe has battled

16 | horrific defamation and false light rumors that she was a prostitute, bad person and con artist,

17 | among other negative defamatory statements, which continually destroyed her reputation, social

18 | relationships and economic livelihood to make an income. Profoundly hurt, Jane Doe became

19 | depressed as she found herself blacklisted.  She did not suspect or imagine that this defamation

20 | was spawned from Olson.  About a decade later after it began, Jane Doe discovered that Olson

21 | was the mastermind behind the vicious prostitute defamation.

22 |     58. Compounding the prostitution defamation, Jane Doe continued to be the victim of

23 | discrimination and sexual harassment ratified policies of the Homeowner's Association ("HOA")

24 | of which Olson as President of the Property's HOA and/or its alter ego, basically called the shots

25 | from behind the scenes.  Doe reasonably believed that Olson and his minions would never leave

her alone, because Olson was able to afford a white privilege old boys club pass and escape accountability, just like Jeffery Epstein and other insolated powerful men, who abuse with impunity.  Jane Doe was abandoned by government law enforcement agencies (HUD/DFEH) and the Los Angeles Sex Crimes Division that were supposed to protect the little victims like Doe. Meanwhile, Olson was emboldened to continue torturing Jane Doe, with new schemes tantamount to domestic terrorism.

59. With no options left, Jane Doe, (and later Doe 2 joined) sought justice in our last bastion, the United States judicial courts, filing a civil complaint against Olson and his co-conspirators, *Doe v Olson,* Case No. SC126806 on December 9, 2016.  This horror story is more fully documented in the Amended Complaints, with causes of action: possession/ transmission of child pornography, sexual battery, sexual harassment and defamation among other claims. (Hereafter referred to the "Sex Abuse Suit")

60. After the Sex Abuse Suit began to be served, in February 2017, Olson utilized his vast wealth and club network connections to strategize nefarious plots to destroy Jane Doe's life and contingency plans to influence or buy his way out of accountability with the judicial court system.  Also, in or about early 2017, Olson had about seven video surveillance cameras installed at the Property.  Jane Doe protested their installation because she was concerned, he would use them to spy on her and her friends' comings and goings. The HOA manager, Elisa Monroy stated under oath that Olson stepped down from his position as President of the HOA, and he no longer had access to the surveillance cameras. Later, evidence proved Ms. Monroy committed perjury to protect, aid and abet Olson- bending to power.

### FACTS COMMON TO ALL CAUSES OF ACTION

### PART I.  Unlawful Retaliation Schemes

### Plan A.   Intimidate-Threaten Jane Doe

61. The insurance company representing the Property's HOA engaged attorney **Lamdien Le**

("Le") of **Slaughter Regan and Cole** to represent Olson. Attorney Lamdien Le emailed Jane Doe insisting she voluntarily dismiss her Sex Abuse Suit. On March 8, 2017, Le also contacted Jane Doe on the phone to intimidate and threaten her to dismiss her underlying Sex Abuse Suit. Jane Doe told Le she was afraid of Curt [Olson] because he had already threatened her that "he would make her stop breathing" and she was afraid if she dismissed the Sex Abuse Suit, she would be wide open for Olson to kill her by having her run over with a car.

62. Le threatened, "Well If you are worried about Curt [Olson] hurting you, it is more likely that he *will* do something to you –ah hurt you –if You Do Not Dismiss the Case!"  Stunned, Jane Doe was traumatized by Le's unethical intimidation on behalf of Olson and could not sleep. On March 9, 2017 at 11:02 pm, Jane Doe emailed Le and his law firm regarding the incident, but no one responded. Jane Doe reported Le's threats to the police and presented her restraining order agreement against Olson. The LAPD made a report and informed Doe that (1) the restraining order agreement was *an agreement* instead of an actual restraining order, thus the police could not enforce it. When Doe acquired the restraining order agreement, she thought it had the same power as any other restraining order from the court to empower the police to act. (2) The LAPD also noted that a restraining order would need to include third parties.

63. Shortly thereafter, Jane Doe met Le in the hallway of the Santa Monica Courthouse. Le admitted he made the threats then attempted to downplay it saying, he was just joking when he informed her "Olson would hurt her if she did not dismiss her case." Jane Doe asked Le if he had received her emails regarding the matter. Le admitted he did. Jane Doe explained in the emails how upset and uncomfortable she felt and asked if Le would recuse himself. Le refused and obfuscated the issue reiterating that it was "just his sense of humor when he made the "*hurt you*" comment" and then adding insult to injury, Le criticized Jane Doe for her lack of humor. Although fearful for her life, Jane Doe refused to dismiss the Sex Abuse Suit.  When Le's threats, on behalf of Olson, failed, Olson employed Plan B.

## Plan B.  Olson's SLAPP Cross-Complaint

64. Next, Olson hired Big Law Buchalter attorney Eric Kennedy, who filed a cross-complaint on or about, May 18, 2017, to dismiss Jane Doe's Sex Abuse Lawsuit.  Kennedy lied to Doe that his process server had a signature from Jane Doe from service at the Property.  Jane Doe never signed a receipt for Olson's cross-complaint. Kennedy, who had never met Jane Doe in person, argued that he "*watched her on the surveillance cameras, sign a receipt.*"  First, neither Olson nor Kennedy were supposed to have access to the Property's video cameras to spy on Jane Doe. Jane Doe asked Kennedy to provide a copy of her supposed signature, to date Kennedy has never provided this purported forged signature. Nevertheless, not dodging service, Jane Doe requested Kennedy simply mail her the cross-complaint and she would accept service.

65. Olson cross-complaint contended the three-year restraining order agreement was akin to a business contract meant to stop ones right to speak in a civil suit for damages, even though there was no release of claims, and it was without prejudice. Further restraining order courts do not have the jurisdiction to give damages claims or take them away per statute Civ. Code Proc. 527.6(w), stating that litigants have the right to seek other civil remedies.

66. In fact, during the mediation, Doe complained to the mediator that Olson often screamed vulgarities down at her from his second story window that faced her first-floor front door as she exited and entered her rental home. Doe asked the mediator if he could put something into the restraining order agreement that would stop Olson's verbal humiliating harassment of her. The mediator said he could add standard non-disparage language meant only to defuse parties' intrapersonal speech, that would prohibit Olson's verbal onslaughts. Further, the mediator assured Doe that the non-disparage clause could in no way bar her right to sue for damages or limit in any way, her litigation privilege for the very same acts that the restraining order agreement was sought i.e., the non-disparage clause was **never** meant to be in a business context limiting speech or a final overall settlement of every and/or any potential future claim. The

mediator also said that everything he explained to Doe about the parameters of the agreement, he also explained to Olson and his counsel, including that the agreement did not bar damages claims

67. On June 6, 2017, Olson moved to dismiss Doe's Sex Abuse Suit via *ex parte*.  In the court hallway while waiting, Kennedy strangely looked at Jane Doe cross-eyed and boasted that he was dismissing her case. Kennedy continued basically indicating that he and/or through Olson's power had somehow conspired with Judge Karlan. It was very strange. Kennedy gloated, stating that it was a "*done deal*, as soon as the hearing starts it would be over for your case." Jane Doe got the impression that Kennedy was indicating that he had bribed Judge Karlan.

68. This was very frightening as Doe remembered Olson's wife warning in 2005, if she dared to sue Curt [Olson], she would never win because "he can buy judges…."  Also, about this time, Doe read a US News story that Olson's company Nexus's top employee, Richard Meaney was arrested by the FBI and indicted for bribing a politician, and Olson was civilly sued by the City of Palm Springs for the same issues of corruption and bribery, particularly because Olson directly benefited from the bribe by procurement of real estate property below market value.

69. However, at the *ex parte* hearing, Judge Karlan refused to bend to power. Judge Karlan announced his courtroom was a "court of law" and then he kindly asked Jane Doe to explain her Sex Abuse Suit.  Judge Karlan denied Olson's *ex parte* to dismiss and warned that these types of cases often go to trial and juries take them seriously, thus he encouraged settlement.  Jane Doe requested the chance to do an anti-SLAPP and was allowed. Unbeknownst to Jane Doe, Judge Karlan is an expert on anti-SLAPP and teaches it at Pepperdine law school.

70. Unexpectedly, Kennedy would not accept the denial of the *ex parte* and acted outraged as if Olson did indeed have a "done deal."  Kennedy insistently kept giving oral arguments, but Judge Karlan had made up his mind and ruled. Kennedy's tone was disrespectful, he would not leave and kept restating his oral argument and flashing papers about. Finally, Judge Karlan just demanded Kennedy get out of his courtroom. Then either at that hearing or another soon

thereafter, Kennedy again refused to accept the ruling and evidently made a face at Judge Karlan. Whereupon Judge Karlan promptly admonished Kennedy for making an inappropriate face at him and barked, "get out of my courtroom!" Plan B failed.

71. Around this time, the attorney for the insurance company, Le offered Jane Doe a settlement, which she accepted, and they began discussing the details. Then shortly thereafter Le suddenly pretended that he had never mentioned a settlement offer. Later via conversations with Le, he admitted Kennedy had taken over and was controlling Olson's litigation strategy and had stopped the settlement as there was no financial benefit for Kennedy/Buchalter to settle when deep pocket Olson as their cash cow was ready and willing to bankroll their Machiavellian plots.

### Plan C.   Lenny Dykstra Enemy Agent Spy

72. In 2017, Jane Doe as trustee for the Trust was renting-out its property on Airbnb and lived nearby and during the day she often stopped by to take care of the property, and Doe had set-up an office area in the living room with all her files to work on her Sex Abuse Suit. Olson and his co-conspirators set a trap for Dykstra to infiltrate Jane Doe's life to: spy, harass, abuse, solicit, frame as a prostitute, gang stalk, steal documents and demoralize her.

73. On or about May 20, 2017, Lenny Dykstra contacted Jane Doe under the assumed name of "Kyle" via Airbnb to rent a bedroom. However, Airbnb service was supposed to screen and prevent people from using false or assumed names, unless an individual submitted a forged government identification that went undetected by Airbnb. Jane Doe always further screened potential renters and spoke at length with "Kyle" before finally agreeing to let him rent the bedroom.

74. Dykstra as "Kyle" fabricated stories that he had just sold his house in Beverly Hills and was wrapping up business and planning on moving to New York City, when in fact it was discovered later that Dykstra did not own a house to sell and was living in a guest house for free

1  just a few blocks away the whole time.  Dykstra also said he was very busy, but after he moved

2  in, he appeared to have lots of time to talk to Jane Doe.

3      75. At first, Dykstra was extremely kind, charming and ingratiated himself to Jane Doe. He

4  played the part of a sincere religious person, who said he attended bible study classes and invited

5  Jane Doe to join him.

6      76. On the first or second day, Dykstra noticed Jane Doe in the living room at her desk

7  working on some legal documents and he asked her in casual conversation, what she was

8  working on. Jane Doe told Dykstra she was involved in a lawsuit.  Dykstra said he knew a lot

9

10  about lawsuits and offered to help Jane Doe.  Jane Doe showed Dykstra her complaint against

11  Olson. Dykstra read some of it, but he never mentioned that Curtis Olson was his close friend

12  and "golf buddy."  Dykstra asked Jane Doe how she was going to prove various elements in her

13  case.  Jane Doe showed Dykstra some of her evidence. Dykstra also asked Jane Doe, about the

14  owner of the condo property.

15      77. Then Dykstra became very negative saying Doe's Sex Abuse Suit would get thrown out

16  on summary judgment, it was a waste of time and that she should "just drop it."  Dykstra could

17  never give Jane Doe any specific reason why it would get thrown out.  Jane Doe emailed a legal

18  advisor and inquired about Dykstra's comments. The legal advisor replied to generally ignore

19  non-attorneys, as they don't know the law.  Strangely, Dykstra continued to repeat to Jane Doe,

20  multiple times, every day and increasingly became more insistent and ruder that she should

21  "drop the *stupid* lawsuit!" Dykstra showed zero concern or sympathy or outrage for the abuses

22  Olson put his victims through. Jane Doe gave Dykstra the benefit of the doubt as many people

23  have the attitude that one should never sue for any reason.

24      78. Dykstra encouraged Jane Doe to do something else more positive then sue. Jane Doe

25  mentioned to Dykstra that she wanted to write a book and Dykstra encouraged her to do so,

26  mentioning that he knew some good publishers and would help her—but first, she needed to

27

28

"drop the stupid lawsuit!"

79. Also, around the second day of Dykstra's rental he asked Jane Doe if he could hire her to be his personal assistant. Jane Doe asked what that would entail; Dykstra said getting him a cup of coffee and helping him with purchasing incidentals like ice. Jane Doe agreed to get Dykstra coffee, but he did not have any money on him and offered to pay her back later. Later, Dykstra texted Jane Doe, "Ok got you that money."

80. The next day, Dykstra believed the rental had water damage and told Doe he could help her get an insurance policy that would payout $5000 to $7000 a month for one year for water damage repairs. Dykstra asked her to take down some insurance adjustor's name and contact him. Doe asked Dykstra to just email her the information. Dykstra said he could not. Doe said, please text it. Dykstra said he could not do that either. Then Dykstra said, "I can't have anything from my devices to your devices." Then Dykstra wrote the man's name on a piece of paper and insisted Doe contact him immediately to get a "special insurance policy payout."

81. Dykstra postured that he liked Doe and wanted to help her. Doe contacted the insurance man but got a bad feeling in her gut and decided not to do it. It just seemed too good to be true.

82. Confused about this special insurance policy, Doe contacted a friend, who was retired from the insurance business. Doe explained in detail what Dykstra was attempting to arrange with this insider insurance adjustor. The retired insurance friend said it sounded like insurance fraud and advised she have nothing to do with it. Doe told Dykstra she appreciated his concern, but she did not want to get involved.

83. Dykstra appeared to take it personally and got upset. He began berating Doe that he only wanted to "help her have great cash flow," but that she was "blocked" and "full of self-sabotage." Doe thanked Dykstra for his interest again in wanting to help her, but she continued to decline getting involved with his insurance scheme. Insistent and acting frustrated, Dykstra continued to insist she get the policy even though she continued to say that she was not

interested.  Then while Doe was at the Trust's rental property, working on her Sex Abuse Suit, Dykstra brought the insurance man to the Property courtyard and attempted to force a meeting between them.  Doe made an excuse and left the Property to get away from Dykstra's insistent demands to "help her."

84. The following day, Dykstra switched tactics and said this rental was "a dump" and needed renovating. He said he had a friend, who could loan about $300,000 dollars against the property.  Doe told Dykstra the property could not take a loan for various reasons including not qualifying.  Dykstra said it didn't matter he could still get a loan. He said, "Think of all the things you could buy."  First, since it was not Doe's personal property, she was the trustee and had a fiduciary duty to protect the Trust's asset thus she could not use any equity in the property to "buy herself things."  Second Doe herself was not a materialistic person, so she simply told Dykstra she was not materialistic, and had no interest in the "things money could buy," and that she could not put the property in debt.

85. Doe mentioned Dykstra's loan to a friend, who asked her to find out the lender because he wanted to get a "non-qualifying" loan.  When Doe inquired a few times, who could give this loan, without any qualification, Dykstra became evasive, changed the subject and would never tell her the lender's name or lending institution. Although Doe repeatedly told Dykstra she did not want to do the loan, he continued to harangue her to "get the loan." Then Dykstra would soften and say he cared about her, and he was just trying to help her but that she was destroying her life with "self-sabotage."

86. A day or so later, Dykstra said her problem was that she was too uptight, and she needed to "smoke pot." Jane Doe told Dykstra that she had never tried marijuana or any drugs whatsoever in her life and she had no interest in starting now.  Nevertheless, pot got added to the Dykstra's daily mantras: "drop the stupid lawsuit!" "Get the special insurance policy!" "Take the loan!" and now "smoke pot!"  Dykstra was becoming unbearable.

87. At some point, Jane Doe discovered that Airbnb "Kyle" was actually named "Lenny Dykstra," the former professional baseball player. Jane Doe mentioned to a friend named Loren Marken that through Airbnb she was renting a bedroom to Dykstra. Coincidently, Loren Marken knew Dykstra. Jane Doe told Dykstra that Loren Marken was her friend and she mentioned to him that Dykstra was renting. Dykstra became very upset and insisted that Jane Doe not mention to anyone that he was renting a room from her or even that she knew him.

88. Next, Dykstra's asked Jane Doe if she and her friends would attend a promotional business dinner event and help him organize model-looking actresses to also attend this event for which he would pay Doe $500. Jane Doe agreed and posted a notice on Craigslist.

89. Next, Jane Doe also overheard some extremely concerning conversation of Dykstra. Jane Doe can't remember if it was May 26 or the day after. Jane Doe had stepped outside the front door to get some fresh air, which is near the window of the bedroom Dykstra was renting. The window was open, and Doe could hear Dykstra talking on his cell phone telling someone that he had cut a deal and had been recruited by an agency and something big was going down. He continued saying, everything was set-up so he could go undercover and infiltrate and that he was working as an undercover secret agent and that he had a "G7" or something "7" clearance level.

90. On or about, May 26, 2017, the sixth day of Dykstra renting the bedroom, he invited Doe to dinner at a nearby restaurant, she agreed. After dinner, Jane Doe went back to the rental with Dykstra to get some paperwork, before heading back to her apartment but blacked out. Jane Doe does not remember what happened, but felt disoriented, confused and fearful the following day when she woke up on the couch in the living room of the Trust property. Jane Doe was and is deeply traumatized and has been in therapy regarding this evening, and to this day she does not know what happened.

91. The next day, May 27, 2017, Dykstra began making provocative sexual comments to Jane Doe and sent her similar texts messages. Jane Doe texted Dykstra back that he was

dreaming.  Also, Dykstra then began soliciting Jane Doe to be his paid "girlfriend experience," offering $10,000 a month to have sex with him.  Dykstra offered to continually pay Doe $10,000 a month indefinitely. Shocked, frightened and confused by the entire situation, and emotionally traumatized and drained. Jane Doe asked Dykstra to leave immediately. The Dykstra situation was a whirlwind.  Jane Doe was at a loss for words but feared that she had to very carefully back out of the situation and be nice.

92. Horrified, Jane Doe began to wonder, for the first time, seven days after meeting Dykstra was he a "plant" *i.e.* enemy agent spy sent in to infiltrate her life for Olson? Why was he soliciting prostitution, --was it to frame her as a prostitute?  Why did she black out?  What was happening?  Jane Doe had a sickening feeling Dykstra knew Olson.  A feeling came over Jane Doe where she felt faint and felt her life was in danger. Jane Doe told Dykstra, she did not feel comfortable and that she had to end his rental, requesting he leave immediately.

93. Dykstra moved out on or about May 27-28, 2017.  Jane Doe then began to research Dykstra on the Internet and became horrified of all the terrible things she read about him and even that he was a felon. She wondered how he got past the Airbnb prescreening.

94. After Dykstra has completely moved out, on or about May 29, 2017, Dykstra unexpectedly showed up and uninvited walked right into the Trust rental living room, where Doe was working. Dykstra took a heavy stance while Doe was on the opposite side of the front door. In a menacingly dark tone, Dykstra said, that he would not leave until Jane Doe wrote and signed a confidentiality agreement that he dictated, stating that she would not disclose any info about him from this day forward.  Jane Doe told him she did not want to write this and that she was not allowed to sign anything without having an attorney's review it. Dykstra took an extremely aggressive stance, demanding she do it.  Dykstra grabbed a small notebook and pen and forced it into Jane Doe hands. Jane Doe gaged to see if she could run around him to get out, she but could not.  Jane Doe was trapped and continued to say she could not sign anything.  Dykstra became

more forceful and accosted her forcing her down into a chair to write it as he stood over her. Afraid, Jane Doe feared for her life because Dykstra was overwhelming and overpowering in his size and stature, thus under duress, Jane Doe wrote down the few words, Dykstra dictated on a small piece of paper and signed it. Dykstra gabbed the notebook, ripped the paper out and left.

95. About this time, Jane Doe discovered Dykstra's purported "business promotional" dinner event was something altogether different. At this dinner, Dykstra wanted to audio record the actresses and Jane Doe in conversation pretending they had had sex with Dykstra in a mock orgy. He wanted them to make statements regarding his sexual prowess. Shocked, Jane Doe was totally dumbfounded. How is this supposed to be a promotional dinner party?  Doe told Dykstra she could not be involved with his recorded mock orgy.

96. Dykstra then tried to convince Doe that it was no big deal that she could use a fake name, and no one would know it was her.  He said the recording was only going to be audio--not video. Doe told Dykstra that she was not going to go to the "promotional business" dinner, nor would she be involved in any way. Doe forwarded to Dykstra all the information on the actresses and told Dykstra; he did not have to pay her for any work that she had done so far. Dykstra never paid Doe.  As before, Dykstra badgered Doe to attend the dinner. Dykstra also responded to the photos of the actresses in texts making racist comments about some of the women of color such as "Spear Chucked" and "the monkey."

97. Jane Doe feared, Olson and his minions had hatched a wicked plot to frame Jane Doe as a prostitute.  Where Dykstra would take the witness stand and lie, making a false accusation that he had purchased sex from Jane Doe and thereby using a purported "truth" as defense for defamation to undermine her defamation cause of action and thus her entire Sex Abuse Suit. Or if Kennedy had been successful in dismissing it with Olson's cross-complaint, Kennedy possibly would have filed a malicious prosecution case against Doe and used Dykstra.   Jane Doe discussed the "Dykstra situation" with various friends, her concerns that he might be a "plant"

i.e. an enemy agent spy attempting to frame her as a prostitute.  It was a big question mark in everyone's mind.

98. Also, up until the last moments Jane Doe spoke with Dykstra, he continued to insist she "drop the stupid lawsuit." After Dykstra left, he texted an ominous statement, "I'm not done with you yet." Jane Doe sent Dykstra a text that she was "…very insulted that [he] proposed a financial arrangement as [she is] NOT that kind of woman…"   Further, Jane Doe told Dykstra she did not want to communicate with him in any way going forward.

99. Unbeknownst to Jane Doe, Dykstra contacted Doe's girlfriend about a week after he left and tricked her to meet him. At this meeting, Dykstra's primary motive was to get Doe's girlfriend to help him convince Doe to drop her Sex Abuse Suit.  Jane Doe's girlfriend said she manipulated to meet him for other reasons but all he wanted to talk about was Doe's Sex Abuse Suit.  She tried to change the subject, but Dykstra, continually brought the subject back to Jane Doe's Sex Abuse Suit. So, Doe's girlfriend finally defending it saying she thought it had merit, but Dykstra disagreed and said Doe was "crazy." Jane Doe's girlfriend said Dykstra seemed financially motivated to get her to help convince Doe to drop her suit against Olson.

100. Why did Dykstra care so much about Doe's Sex Abuse Suit? It was filed by a woman Dykstra had just met and had barely know for a week against a man, Curtis Olson, he purportedly did not know.  The circumstantial evidence is overwhelming that the only explanation is that Dykstra, of course knows Olson and was working as an enemy agent spy harassing Doe and attempting to frame her as a prostitute.

101. Dykstra did however succeed in profoundly inflicting emotionally distress upon Jane Doe. This distress was compounded when Jane Doe discovered that some of the legal documents stored in the home office had gone missing. Since no one else had been there the only person who could have taken any legal documents was Dykstra unless he gave his key to Olson Kennedy or one of Olson's other agents?

102. Furthermore, Jane Doe didn't find out about her girlfriend's conversation/meeting with Dykstra for over a year and asked her girlfriend why she never mentioned it.  She said that because Doe was under so much stress and Dykstra just said mean things and called her crazy, she didn't want to hurt Jane Doe's feelings and didn't think it was important --- until Olson admitted on the witness stand, November 16, 2918, that yes, he was friends with Dykstra.

103. When the Dykstra Plan C to derail Doe's Sex Abuse Suit, by criminally framing her as a prostitute, insurance fraudster, and/or to pressure/manipulate/drug her to drop it, failed, the Olson conspirators upped the anti and moved to Plan D employing thugs to stalk Jane Doe.

### Plan D.  Stalkers

104. During the month of June 2017, Jane Doe and others witnessed strange men, often "dressed in black" as if in a work clothing like a driver, stalking around Doe's neighborhood and at local cafe that Jane Doe frequented for lunch, taking photographs of her.  At one point in late June 2017 a concerned eyewitness, waiter named Amado Moreno ("Moreno") at the café, warned Jane Doe to leave Los Angeles immediately and go into hiding because he had witnessed Olson with thugs, at this local café, discussing things that made him feel Jane Doe's life was in danger.

105. In fear of her life, Jane Doe left Los Angeles and went into hiding for months. Moreno continued to overheard Olson discussing something nefarious regarding Jane Doe. Moreno continued to see Olson show up at the café with the thugs only at lunch time. Moreno related that he reasonably believed that Olson was there to identify Jane Doe to the thugs. Later, Moreno witnessed Douglas Econn, an Olson crony, who knew Jane Doe's appearance, also begin showing up with the same sort of thugs in tow.  After a while the thugs would show up alone one at a time at lunchtime.  One thug admitted to Moreno that he was hired to look for/keep tabs on a young woman who lived across the street at the Property. Jane Doe was the only young-looking

woman who lived at the Property among the 6 residents total (4 men and one elderly woman and Doe). Moreno would overhear him say on the phone, "No she's not here."  Other men dressed in black also showed up at the quite café, that rarely had any business aside from hotel guests or locals. These men would case around the café, patio, lobby, store, swimming pool as if looking for someone. Then they would sit in the café for a short time and always make the same phone call saying, "No she is not here."  Moreno called Doe and spoke on a conference call with her attorney, giving twice weekly updates continually warning Doe and her attorney that it was not safe to return to Los Angeles.

106. Then Moreno remarkably reported that Dykstra began coming to the café in August and began asking staff if they knew when a particular woman, who fit Jane Doe's description might stop by the café.  Dykstra directly asked Moreno, "When do the locals show up?" Further, Moreno overheard Dykstra on his cell phone numerous times saying, "She's not here."  Moreno knew Dykstra because years earlier he had stayed at that hotel, and he had meet him and he was able to verify Dykstra and Olson by their names on their credit cards.

107. While Doe was in hiding, she sublet the Trust property to tenants.  During this same time, July of 2017, one tenant, who was usually at work unexpectedly came back to the Property during the day. He witnessed a group of suspicious people suspiciously at the back door of Jane Doe's rental, looking through the trash while she was still in hiding far from LA. When Jane Doe attempted to get the Property's surveillance video of the incident, the Property management and HOA attorneys fought tooth and nail to prevent Doe from having a copy.  Finally, after filing a motion to compel for evidence spoilage, Judge Karlan ordered Olson's co-conspirators to turn over an original copy of the video. However, what they turned over was obviously tampered with, as over 2 hours were missing in a 24-hour period and it had a 3-minute freeze and jump cut as the strangers walked towards the back door of Jane Doe's rental, then the video jump cut to the strangers leaving.  Moreno told Doe he recognized one of the men in the video as the same

man who frequented the café and who specifically said he was hired to find Doe.  As the tenant unexpectedly approached the back door the strangers suddenly left. Concerned the tenant went to look for these strangers, but they appeared to disappear. Then suddenly he witnessed them emerge from Olson's condominium back door and began taking several photos of them exiting.

108. Later, the Property manager and staff, again protected Olson, in court, making up a story and sending an after the fact notice that architects would be visiting the Property.  Notices were always sent prior and when asked on the witness stand who these people were, no one knew anything about them, not their first or last names, what company, even though they were in Olson's condominium. Further, even the Property surveillance camera installer said that the video was not supposed to freeze when people are in the fame moving.

109. Further, the tenant and another friend witnessed men parked for hours on the back alley or side street of the Property. One was able to take a photo and it was sent to the waiter Moreno, who identified him as one of the thugs he witnessed at the café during lunch, and telling someone on his cell phone, "She's not here."   Although this man wore a dark gray shirt.

110. Jane Doe was exhausted living in hiding.  She feared Olson had found her hiding place as she witnessed a car with two men parked outside at three in the morning, so she moved again. All the while Doe was in hiding, she researched and wrote her anti-SLAPP and fought Olson's *ex partes,* writing oppositions and attended hearings via phone appearances.

111. Jane Doe had been continually reporting these events to the LAPD, who recommended she obtain another restraining order that would expand her original Stay Away agreement and protect her from Olson using third parties to stalk and harass her. While looking for an attorney to represent her, Jane Doe filed a 2nd civil harassment restraining order ("2nd CHRO") on Sept 6, 2017 obtaining a Temporary Restraining Order (TRO) and returned to Los Angeles.  Every Attorney, who reviewed Doe's 2nd CHRO case, said it had merit and they would take it.  Jane Doe is not litigious, if an attorney had told she did not have a case, she would not have attempted

filing a 2nd CHRO.

112. Jane Doe had Olson served her 2nd CHRO. Olson filed a retaliatory restraining order against Jane Doe for service of process, which is a protected activity, and a SLAPP. The family court never should have allowed it. But when you are a rich club member the rules and laws do not apply.

113. The Martinez Law Group, who had been advising Jane Doe throughout decided to represent her on her anti-SLAPP, writing the reply that contained important case law. Jane Doe won her anti-SLAPP on September 14, 2017 before Jude Karlan, as litigation privilege is a sacred right. Olson appealed soon after.

### Plan E.   Witness Tampering

114. After Jane Doe filed declarations in the restraining order case from the waiter, Moreno regarding what he had witnessed. Moreno then became the target of Olson's army of thugs. Moreno was harassed at work and in his neighborhood by strange people, who made threatening comments. Moreno was followed while driving numerous times and finally a thug put a berretta gun in his face and threatened to kill him. Moreno was able to escape and filed a police report. Moreno believed that Olson was responsible for all the retaliation he was receiving. Finally in June of 2018, Moreno suddenly quit his job and disappeared. Intimidated and in fear for his life, Moreno told Doe he had to get out of California. Moreno failed to appear to testify at the November 14-19, 2018 restraining order hearing, even though he had been subpoenaed and warned that a bench warrant would be issued for his arrest, for failure to appear. Doe reasonably believes Olson and his agents are guilty of witness tampering when they harassed and threatened Moreno's life if he testified at Jane Doe's 2nd CHRO.

## PART II.  UNLAWFUL JUDICIAL COVER-UP SCHEMES AND SYSTEMIC BIAS

### Judge Michael Convey
### <u>Lenny Dykstra - Judicial Cover-up Scheme</u>

115. From November 14 to 19, 2018 in the Van Nuys Courthouse, Judge Convey presided over Jane Doe 2ⁿᵈ civil harassment restraining order hearings, and Olson cross restraining order for the single incident of process service. The two cases were combined into one case.

116. To receive the protection of a restraining order against Olson, Jane Doe had to prove that Olson had used any third party to threaten, stalk or harass her with a clear and convincing burden of proof. Jane Doe had three separate events that proved her case and the fourth suspicious unknown Lenny Dykstra wild card.

117. However, no amount of evidence can surmount an old boys' club, Systemic Bias, oath violating judge. The evidence in Jane Doe's case will prove that Judge Convey, a college fraternity brother of Olson's and a baseball fan of Dykstra's conspired with Olson, court reporter Marlene Burris and attorneys, Eric Kennedy, Lamdien Le, Ryan Vogt-Lowell and third party individuals, who participated and/or aided and abetted, whose identities are currently unknown but discoverable through the discovery process to unconscionably and criminally alter and counterfeit official transcripts deleting about 24 original words and replacing them with 44 counterfeit made up words consisting of questions and answers that never took place to hide the truth, that answers the Lenny Dykstra question –yes Dykstra was a close friend of Olson's and Dykstra was an enemy agent spy infiltrating and harassing Doe's life for Olson.

118. Olson testifying under oath at the restraining order hearing on November 16, 2018 was asked:  Do you know Lenny Dykstra? Judge Convey suddenly became very interested in the testimony as he knew all too well, who Lenny Dykstra was.  Strangely the courtroom turned into a sports bar where the men excitedly started commenting and talking over each other about baseball. Someone even made a comment about some famous play that Dykstra did. Much of

1  this conversation was deleted on the transcript or possibly since people including the Bailiff were

2  talking over each other, the court reporter, Burris was unable to get it all.

3      119. The courtroom took on an excited energy. Judge Convey was engaged and very curious.

4  Kennedy asked if Judge Convey was a Mets fan, No Judge Convey replied. Then Kennedy asked

5  Judge Convey if he was a Philly's fan. No, Judge Convey replied adding he was a Cubs fan (the

6  baseball team from Chicago, his hometown) as evidenced on the provided court transcript.

7      120. Jane Doe began to have an awful gut feeling, Kennedy and Judge Convey's conversation

8  felt too familiar.  Here parties are at a serious civil harassment restraining order hearing, where

9  Doe is afraid for her life and as a last resort is seeking protection but Judge Convey and Kennedy

10  and others in the courtroom are gabbing about baseball? This does not feel right.

11      121. After the initial excitement calmed down, the courtroom became very quiet, all eyes

12  were on Olson. Especially, Judge Convey because he was an admitted baseball fan, and he knew

13  who Dykstra was and it appeared to be reminiscent of his youth. Olson admitted being friends

14  with Lenny Dykstra stating that they were "golf buddies" and had played golf together in Mexico

15      122. Jane Doe remembers being completely floored when she heard Olson's testimony. She

16  immediately wrote it down on her notebook. As did Doe's attorney, Benjamin Kanani, as it was

17  the first affirmative answer Olson had given in a series of questions.

18      123. Olson's attorney, Kennedy also had a huge reaction when he heard Olson's admission.

19  Kennedy immediately became extremely agitated, began making big arm gestures, a certain well

20  known secret society old boys' club gesture of distress, and strongly objected to any more

21  questions regarding Dykstra. Jane Doe's attorney attempted a show of proof but Judge Convey

22  ruled, "Sustained!"  No further questions were allowed of Olson's friendship with Dykstra. After

23  Judge Convey picked up the club distress signal from Kennedy during Olson's testimony where

24  Olson actually told the truth about being "golf buddies" with Dykstra; Judge Convey effectively

25  shut down any further questions.  Jane Doe was at trial to discover if Olson was violating the

spirit of the original "Stay Away" restraining order agreement by using third parties to harass her. Courts are supposed to be a trier of fact.  There was no logical or legal reason why Judge Convey would shut down an examination of facts, except Systemic Bias.

124. Similarly, when Jane Doe was on the witness stand her attorney attempted to fill in the gaps by questioning her about Dykstra, which he only did because Olson had previously opened the door by admitting to having a friendship with Dykstra.  Again, Kennedy objected and again Judge Convey sustained squelching any further examination regarding the nature of the Olson-Dykstra friendship, essentially destroying the fact-finding purpose for the restraining order hearing.

125. Jane Doe had undergone such a momentous and stressful situation with Dykstra and the burning question was finally answered 100%, not only did Olson know Dykstra; they were friends! It was a startling event that Jane Doe excitedly told everyone she knew at the first courtroom break. Jane Doe emailed, texted and called her friends and family with the astounding news –in real time within about an hour of Olson's testimony admission of a friendship with Dykstra.  Jane Doe's friends also responded startled, as this had been a question that irked everyone's mind. Doe's girlfriend who had met with Dykstra texted back "Bingo!"

126. However, now the corrupt Defendants had to do "clean up" work.  Judge Convey announced that there would be an extra-long break before the court would reconvene (immediately following Olson's dramatic Dykstra admission testimony). During this extended break, Jane Doe reasonably believes, that Judge Convey, court reporter Marlene Burris, Kennedy, Vogt-Lowell, Le and possibly others conspired to counterfeit the official court transcript. Defendants removed 24 words and replaced them with 44 words destroying the official court transcript evidence of the Olson-Dykstra "golf-buddy" friendship testimony and replaced it with different testimony that the golf friendship never took place and essential that Olson really did not know Dykstra. Further, Judge Convey removed Kennedy's objections and

1    his "Sustained" ruling to prevent Jane Doe from reversing the ruling on appeal.

2         127. After the fix was in, Judge Convey denied Jane Doe's restraining order and he denied

3    Olson process-service restraining order although he sympathized with Olson that he believed he

4    was frightened of the process server.  Jane Doe immediately ordered the transcript, expedited.

5    However, calculatingly, the court reporter Burris had a convenient delay that she could not give

6    Jane Doe the transcript for months because she was busy with a purported appeal that took

7    precedence.

8         128. After an extended period, Jane Doe, finally received Burris's court certified transcript

9    and was devastated witnessing Burris' altered and counterfeited transcript effectively destroying

10   

11   the evidence and facts of Olson's testimony

12        129. Jane Doe has been informed that certifying altering, tampering, changing or

13   counterfeiting court transcripts is a criminal act and can be construed as a felony. Olson's

14   testimony that Lenny Dykstra was his "golf buddy" and that they played golf together in Mexico

15   was removed.  The alter transcript also removed Kennedy's objections and Judge Convey's

16   sustained.  Once the transcript was altered, effectively hiding the truth, it protected both Olson

17   and his attorneys and insolated Judge Convey from an appeal reversal for his abuse of discretion

18   

19   for not allowing Olson to be questioned about his friendship with Dykstra.

20        130. Furthermore, Jane Doe's attorney Benjamin Kanani provided a declaration signed under

21   penalty of perjury in the State of California before the altered transcript was provided. Kanani's

22   declaration in detail verified that Olson had answered the Dykstra question affirmatively that he

23   knew Dykstra because they played golf in Mexico, [where Olson owns a luxury home.] Further,

24   Kanani's declaration states that Kennedy objected and Judge Convey sustained shutting down an

25   inquiry into the matter.  However, when Jane Doe went to cite this declaration in the bate

26   stamped record of her appeal, the superior court suspiciously omitted the second page of

27   

28   Kanani's declaration with these pertinent facts.  Clerk Cindy Kim and other unknown Doe court

staff are working, like a RICO Operation behind the scenes to rob justice from Olson's victim, Jane Doe.

### Three More Findings of Systemic Bias

131. When a judge is racist, it can easily go under the radar as plausible deniability, but when a judge acts criminally, his bias hatred is laid wide open. It is a rare situation that a victim can mount the evidence necessary to prove altered and counterfeit transcripts. Especially when courts do not allow litigants to independently record hearings. During the hearing, Judge Convey more than once, tellingly, threatened that no one was allowed to record the proceedings. A curious law that only benefits, those that do not want transparency and enables the corrupt courtroom staff or judicial officers to manipulate and alter testimony with impunity.

132. Since Judge Convey is willing to aid and abet the felony counterfeiting of official court transcripts, he cannot be trusted to rule impartially on any other critical matter in Doe 2nd CHRO case, and therefore each of these three findings should be reviewed as discrimination violating Jane Doe's civil rights and a Fraud Upon the Court.

133. Ignoring that restraining order courts allow the admittance of declarations into evidence. Moreno's declarations and audio recordings taken under oath meet the clear and convincing burden of proof that tie Olson to the third-party thugs for civil harassment restraining orders. Therefore, Jane Doe should have been granted a restraining order based on Moreno's declarations alone. Judge Convey ignored Moreno's declarations.

134. Ignoring obvious spoliation of video evidence, where the video freezes for 3 minutes just as unknown people approach Jane Doe's back door. Then the video jump cuts, and 2 hours are missing in a 24-hour period, and the video installer testifies that this is not supposed to happen. Judge Convey dismissing this reality and wholesale gaslights this issue.

135. Attorney Le sat in the galley the entire trial, thus he should not have been allowed to take the witness stand. Inappropriately, Judge Convey allowed Le to take the witness stand to

refute Jane Doe's allegations. Le committed perjury under oath on the witness stand, denying the threatening statement to Jane Doe, made on behalf of Olson, stating: "[Olson] *will* do something to you –*ah hurt you* –if You Do Not Dismiss the Case!"  Jane Doe has since acquired irrefutable proof from Le himself lied i.e., committed perjured on the witness stand BAR attorneys have a higher duty to be honest on the witness stand as they are officers of the court. Le had a conflict of interest in that he had an ethical duty to be honest on the witness stand regarding Olson's violence towards Jane Doe and he had a fiduciary duty towards Olson to protect his interests as his attorney representing him as the Property HOA president.

136. Jane Doe understood Le's conflict of interest, which is why she requested to his law firm Slaughter Regan and Cole that he be removed.  Also, Jane Doe directly requested to Le, that he voluntarily recuse himself.  Slaughter Regan and Cole chose to ignore a victim of sexual abuse and harassment, and a woman of color's rights to equal justice and an ethical standard.  Le chose to commit perjury and heinously throw Jane Doe under the bus.

137. Further, even Judge Convey stated that if Le had made that one single threat on behalf of Olson to Jane Doe, it rose to the bar of clear and convincing evidence to grant her a restraining order, because there was an irrefutable third party connection between Olson and his attorney Le.

138. Before Jane Doe received the counterfeit court transcript and realized Judge Convey was gaslighting her she was inspired to present new evidence in a motion to reconsider, that proved Le made the threatening statements. However, Judge Convey's words were empty, as he was taking care of the "important club member" Olson. Therefore, in this situation, Convey, violated his oath of office, judicial canons and committed gross violations of Jane Doe's civil rights.

139. After Judge Convey stripped Jane Doe's constitutional rights to a fair and impartial trial by conspiring with Olson, court reporter Marlene Burris and Olson's attorneys to criminally destroy and alter the official court transcripts, Jane Doe filed a notice to disqualify Judge Convey.  Of course, he refused to get off the bench as he had plotted to sadistically punish Jane

Doe an "unimportant woman of color" and an indigent litigant with the burden of an unlawful $80,000 attorney's fees judgment.

## Combined Systemic Bias and Fraud Upon the Court

140. First, considering that Judge Convey combined Jane Doe's and Olson's respective restraining order cases into one, noting they were intertwined, and since both parties lost their cases; neither one was the prevailing party.  Yet, Judge Convey in a radical departure from the law, where there can only be one prevailing party, made them both prevailing parties. (See *de la Cuesta*, *supra*, 193 Cal.App.4th at pp. 1287, 1295, 1296; and *McKenzie v. Ford Motor Co.* (2015) 238 Cal. App. 4th 69 704.)

141. Having two prevailing parties allowed Judge Convey to utilize a white privilege accounting scheme.  Since, Olson could afford Kennedy's outrageous Big Law fees (total about $300,000), after adjustment, Olson was awarded about $120,000 of which Jane Doe's relatively small contingency attorney's fees award of about $40,000 was subtracted as an off set.  Olson was awarded the difference about $80,000.

142. However, by this reasoning, if Jane Doe was a billionaire, she could have billed $1 million dollars ($1,000,000) in attorney's fees.  Then Olson would have had to pay Jane Doe the difference.  Is that justice?  Whoever has the biggest wad of money to dish out gets the attorney's fees award. Is that our justice system?  When Jane Doe called out Judge Convey for this bias, siding with white privileged, he doubled down noting that Olson had the right to choose the attorney *he wants*— but a pauper does not get that same luxury and therein lays the white privileged inequity.   A white supremacist attitude destroys society's faith in the justice system, as it does not ensure a level playing field.

143. Thus, Olson is from a white privileged family of wealth, and an alleged billionaire, who owns multiple luxury homes, and numerous expensive cars, is essentially being awarded attorney's fees for being Uber rich against an indigent woman of color, who has never owned

any real estate, doesn't own a car because she can't afford one, has never had a credit card because she can't qualify for one, cannot afford to buy new clothes, wears hand me downs, and thrift store used clothing.

144. This is clearly unjust not to mention the law is very clear that there cannot be two prevailing parties. But because Olson is rich, even though he technically was not the prevailing party, Judge Convey essentially made him a "de facto" prevailing party by giving him the offset difference of Kennedy's attorney's fees on April 17, 2019.

145. Jane Doe also argued in a "court of equity" no debt can lawfully be awarded against a verified fee waiver indigent litigant. Judge Convey agreed. Heaping a huge attorney's fees judgement against Jane Doe was even a mountain Judge Convey wouldn't climb -but he helped set up the situation such that his two prevailing parties scheme would accept any flimsy hearsay purported "evidence" to pass his trier of fact to punish Jane Doe with a life -sentence of debt.

146. Further, Jane Doe later discovered, what Judge Convey must have known, is that the court of equity must also consider both parties' relative wealth and income stream. If not a billionaire as one of Olson's employees told Doe. Olson is at minimum a multi-millionaire, and he has a huge income stream and lavish lifestyle with many million-dollar homes. Whereas Doe is unemployed and disabled with no income stream but food stamps and general assistance and more recently some covid assistance. Established case law supports no attorney's fees to Jane Doe. *Garcia v Santana* (2009) 174 Cal. App 4th 464: "Thus, when two competing parties possess vastly disparate economic resources, [billionaire Olson vs. indigent Aaronoff] this may require the trial courts to `scale' the financial incentives-- to the parties' respective resources." (*Seever v. Copley Press, Inc.* (2006) 141 Cal.App.4th 1550, 1561-1562.)") "We wholeheartedly agree with the Ninth Circuit's holding an award of attorney fees "should not subject the plaintiff to financial ruin."' (*Ibid.)" (Rosenman, supra*, at p. 868, fn. 42.) "But, in the proper case, the trial court does have the discretion to determine that the award that is reasonable is zero."

147. Therefore, Olson's Nexus company attorney Ryan Vogt-Lowell filed flimsy contradictory heresy purported "evidence" that Jane Doe owned the one-bedroom condominium at the Property that was owned by the Trust and prior to that by the LLC of which Max Wilcox was the majority owner prior to transferring the property to the Trust in 2012 as evidence on the California Secretary of State documents Olson provided the court as exhibits.

148. Vogt-Lowell submitted fraudulent Fidelity National Title report that purported to show evidence that the Max Wilcox condominium "appeared" to belong to Jane Doe. Then Kennedy purported to find Internet real estate company websites that estimated the condo's values as high as $1,459,600.00 to declare that Jane Doe had one asset worth a million dollars and therefore should pay a multi-millionaire's attorney's fees. Judge Convey quickly accepted these unsupported exhibits and found that Jane Doe did have some wealth and therefore she could afford to pay Olson's attorney's fees.

149. This purported "evidence" without a deed was "good enough" for Judge Convey to find two prevailing parties and awarded both parties their attorney's fees for both defense and chief – even though neither won party won in chief. The theory that they both won in defense, falls apart in the face of the fact that Judge Convey said he combined both cases into one case, as the cases were intertwined and overlapped. But to help Olson steal the Trust property, Judge Convey then magically split the cases apart to make two judgments. Where Jane Doe, who was self-represented because she could not afford an attorney is somehow wealthy enough to own a million-dollar condominium and pay the $80,000 off set attorney fees to Olson which the next family court judges quickly escalated to $356,000 and counting.

150. However, Jane Doe was alerted by attorney Mitchel Keiter in or about March 2021 that something appeared wrong about the evidence Olson submitted that found Jane Doe owned the condominium. Keiter recommended Doe find a real estate expert to help her discover the truth of the 63 pages of real estate documents Olson submitted on reply to his attorney's fees motion. On

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF AND DAMAGES

April 16, 2021, Jane Doe received the verified evidence in the report with exhibits from independent real estate expert Eric Forster, who states: "that Olson misled the court when he presented the court with a title report [Fidelity National Title report] containing false information. By omitting a most important material fact, i.e., that Olson severed his interest in "[condominium property in question] when he sold it in 2005 to Max Wilcox, he led the court down a rabbit hold of wild accusations that bore little semblance to reality. Further, it is my opinion the documents and deeds I have reviewed have not shown Doe to have any ownership interests in any of the entities that held title to the property…"

151. Olson and his attorneys submitted fraudulent evidence in violation of Penal Code 134 to "prepare" false evidence with the intent for it to be introduced in court as evidence.  In Doe's 2nd CHRO case this fraudulent evidence was 'good enough" for Judges: Convey, Judge Emily Spear, Judge Georgy Weingart and Judge Wendy Wilcox to grant billionaire Olson $356,000 in attorney's fees against Jane Doe with no limit in sight except to drag Jane Doe's mother –who Olson also sued into the poor house and steal Max Wilcox property granted to a church.

152. For Olson to get over this glaring fact that Jane Doe is indigent.  He submitted a fraudulent preliminary National Fidelity Title Report, that omitted Olson's transfer of the condominium to Max Wilcox and instead inserted a false "ingress egress" recording instrument that does not exist but purports to have the same official recording number and recording date as the missing Max Wilcox grant deed. Then the attorneys' declarations misstate and obfuscate the facts of the fraudulent Fidelity National Title report and playing word games referring to Max Wilcox property from 2005-2009 as the [Jane Doe] Unit. Since Olson transferred the property to Max Wilcox, he had to have known the Fidelity National Title report was fraudulent and doctored it to make it appear (counterfactually) that Jane Doe owned a one-bedroom condominium. When in fact she did not own.  This is in violation of Penal Code 134 and constitutes a Fraud on the Court.

153. Further, Kennedy submitted two doctored website property valuations/estimates, that are graphically designed, cut and paste modified website pages that prove Kennedy committed perjury in his declaration by knowingly inflating the Wilcox Unit condo's price from Realtor.com original estimate of $682,500 to $1,459,600. The motivation to do this was to make it appear that Jane Doe owned an expensive luxury condo, so it would appear that Doe had some wealth such that she could be subject to an attorney's fees judgment. However, this ballooned $350,000 attorney's fees judgement against Doe has been financially ruinous and has subjected her to a debtor's prison life for simply seeking restraining order protection.   This is the punishment for uppity minority women when they seek justice against the established powers that be.

154. Jane Doe is now forced to appeal this erroneous attorneys' fees award. Noticeably a pattern has been emerging where many of the trial judges in the Jane Doe/Olson related cases do not appear to care about the established case law, black letter law and procedural due process. Also, a change of judges may be expected, but in Doe's 2nd CHRO the numerous changing of judges over seven operates more like a RICO Enterprise, where they calculatingly hand off to new judges to obfuscate the previous abuses.

155. Jane Doe's 2nd CHRO case was suspiciously sent to Stanley Mosk Courthouse for post-trial motions before Judge Emily Spear when both parties live in Westwood, and it was originally filed in the Santa Monica courthouse.  It continues to be a hardship for indigent Jane Doe to travel to downtown Los Angeles, but it was very convenient for Kennedy as the Buchalter office is near the downtown courthouse.

### Judge Emily T. Spear

**Conspires with Deputy Sheriff Koo to use**
**Excessive Force and Intimidation Against Jane Doe**

156. On December 11, 2019, Judge Spear signaled the **Deputy Sheriff, Doe Koo,** (first name

unknown) on duty in her courtroom to intimidate Jane Doe as she sat at the plaintiff's court table making her oral arguments. Sheriff, Koo walked over and stood about 12 inches directly behind Jane Doe.  He put one foot forward, lunged into a ready to shoot stance, in the weaver position. He removed the strap from his weapon, put his hand on the grip of his gun, cocked his arm/elbow back and up high and held this "ready to shoot" stance directly behind Jane Doe as she tried to speak. The Sheriff stayed in this position during Jane Doe's entire hearing. Jane Doe was shocked, threatened, confused and in fear of her life.  The situation impaired Jane Doe's ability to speak freely.  In a rogue move, Judge Spear used the Sheriff to aggressively intimidate Jane Doe.

157. Witnesses in the courtroom were also shocked and confused.  One witness, a former US Marine said to Sheriff Koo, "She's not armed, she's not a threat."  Judge Spear conspired with the Sheriff Koo to use excessive force and intimidation against Jane Doe.

158. After this traumatizing incident Jane Doe, sought help and found ADA advocate and American Civil Liberties Advocate Cynthia Brown. Jane Doe found she was afraid to go back into Judge Spear's courtroom without the support of Ms. Brown. Further, the services of Ms. Brown were not free, and it was a great financial hardship for Jane Doe. Doe ended up making payments to Ms. Brown for her needed services.

159. Later, Jane Doe saw Sheriff Koo in the courtroom hallway and asked him why he did that to her.  Sheriff Koo told Jane Doe that he had had the courtroom surveillance videos erased, so there would be no evidence of his illegal and abusive actions.  Jane Doe made a report with the head Sheriff of the department, who said he would follow up and get back to Doe. He has not followed up as of yet.


## Violations American Disabilities Act - California's Medical Confidentiality Act

160. On January 22, 2020, Jane Doe requested American Disabilities Accommodations

(ADA) in Judge Spear's courtroom and filed a confidential ADA medical document. Judge Spear allowed the ADA hearing and cleared the courtroom to discuss the matter. Every person sitting in the courtroom galley left including Olson's attorney Kennedy. Everyone exited the courtroom and did not come back into the courtroom until the hearing had completely ended and Deputy Koo reopened the courtroom door. Only court staff, the Judge, Deputy, Jane Doe and her ADA advocate Cynthia Brown were present.

161. Judge Spear refused Jane Doe's necessary medical accommodations requests putting Doe at a serious disadvantage for a level playing field as a non-attorney against Big Law Buchalter attorney Kennedy. Judge Spear continuously gaslight Doe during her Confidential and Private ADA hearing that she did not understand her ADA request. However, in the past, two other California Superior Court Judges have granted in full, the exact same requests Jane Doe requested of Judge Spear. Jane Doe's medical American Disabilities Accommodations were necessary. Doe noted that Judge Spear often double spoke and gaslight her on numerous matters.

162. However, upon learning what Jane Doe's medical condition was Judge Spear purposely and maliciously acted against her medical condition to undermine Doe's ability to litigate and acted in way to aggravate Doe's existing medical condition.

163. In a subsequent hearing, another Buchalter attorney, named **Ashley Milnes** ("Milnes") appeared for Olson. Milnes brought up matters concerning Jane Doe's confidential medical American Disabilities Accommodations requests, indicating that she knew what they were and wanted to make sure Judge Spear would not to grant Jane Doe her American Disabilities Accommodations.

164. Wait! How did Milnes discover Jane Doe's private medical matters? Kennedy was not in the courtroom. Judge Spear, Kennedy and Milnes had unauthorized *ex parte* communications whereupon Judge Spear unethically and illegally disclosed Jane Doe's private and personal

medical ADA information.  To hide Judge Spear's disclosure, court reporter **Debra Rivera** ("Rivera") altered the official court transcripts to state that Kennedy was allowed to come back into the courtroom and attended Jane Doe's private ADA hearing.  Of course, Kennedy was not present during Jane Doe's ADA hearing and multiple witnesses can testify to that fact.   Judge Spear's hatred and Systemic Bias of Jane Doe has led her to violate the sanctity of Jane Doe's medical privacy rights per the ADA, California's Medical Confidentiality Act and violated the Federal HIPAA Act. Humiliated and traumatizes that Olson and his attorneys know Jane Doe's private medical problems has compounded Doe's medical condition and caused her anxiety and duress.

165. Further, Judge Spear's court clerk, Cindy Kim against ADA laws, sent Kennedy, Doe's private medical records, which he promptly posted on the internet to Doe's great humiliation. When Jane Doe tried to discuss the matter with Cindy Kim or the new department Judge Wendy Wilcox or the Stanley Mosk Courthouse ADA coordinator, Jane Doe was initially told it was not the court's mistake.  However, when it was discovered that court clerk Cindy Kim did violate the ADA protocol when she secretly took Jane Doe's Confidential ADA medical documents and US mailed them personally to Kennedy, they said they would do an investigation, but every time Jane Doe contacted the ADA coordinator to follow up, she was brushed off.  The only thing the ADA department told Doe was that Clerk Cindy Kim was trained not to make *that mistake*, and that to do so was intentional.

166. **Violating Automatic Stay** Upon Jane Doe perfecting an appealed on her restraining order case, on January 28, 2019, her 2nd CHRO case is automatically stayed with no undertaking for attorney's fees only judgments, per 917.1(d) *Quiles v. Parent*, 10 Cal. App. 5th 130. However, Judge Spear ignored the law and allowed Olson to proceed with enforcement of collections, without doing a proper motion for an undertaking.  Therefore, Jane Doe was forced to file a motion for a protective order to enforce the automatic stay. This may be an innocent

mistake.

167. However, with Machiavellian gamesmanship, Judge Spear arbitrarily **rescheduled** Jane Doe's motion for her protective order from September 26, 2019 to February 28, 2020. Judge Spear gamed the judicial system by kicking Jane Doe's motion for a protective order to enforce the automatic stay, months into the future, so Olson would have plenty of time to file motions to undermine Doe's rights. When Doe said she would file a Writ of Supersedes to enforce her right to an automatic stay, Judge Spear scoffed and said it would never be granted. Doe did not understand at the time but learned later that the Court of Appeal cannot grant a Writ of Supersedes on a trial court motion without the litigant first exhausting her remedies in the trial court i.e. having the motion in the trial court denied first.

168. This gave Judge Spear time to conspire with Olson's legal minions, Kennedy and Milnes to build upon Judge Convey's Fraud Upon the Court, that procured their unlawful attorney's fees award, with other Frauds Upon the Court to further harass Jane Doe with new Frauds Upon the Court to procure more fraudulent rulings and orders.

169. Therefore, Jane Doe was forced to file a writ to the Court of Appeal to enforce the automatic stay. However, because Jane Doe had not received a ruling on her motion for a protective order to enforce the automatic stay, the Court of Appeal dismissed Jane Doe's writ because she had not exhausted all her remedies in the lower court. Judge Spear knew this would happen, as she confidently said the writ would never succeed. Of course, Judge Spear knew the writ would fail, that's why she moved Doe's protective motion months into the future so the Court of Appeal could not rule on the case -- they had planned it and knew how to game the judicial system. Writing the writ was extremely time consuming, and Doe also had to do fund raising to hire an attorney to help her. Jane Doe has been unconscionable railroaded.

170. **Improper Orders and Sanctions** Judge Spear made improper orders that Jane Doe and/or the specially appearing nonparty Trust, submit all their Trust documents, including email

communications, taxes etc., to her chambers under seal, to help Olson obtain discovery by getting around a lawful subpoena and discovery process. The Trust filed an objection that Judge Spear's order violated the rules of court and further since the Trust was a nonparty, and they were never served process, thus there was no personal jurisdiction or subject matter jurisdiction for that matter over the nonparty Trust.

171. Ignoring procedural due process, Judge Spear again continued to make orders demanding Trust documents be turned over and that Jane Doe, a party to the case, act as Olson's free process server to serve papers on the Trust.   Jane Doe noted to Judge Spear that since she is a party to the action, she could not also be the free process server for Olson. Judge Spear did not care –she just wanted those Trust documents.

172. As reported on a declaration of a person who worked for the Trust, the Trust documents were lost, which happens often.  Former trustee, William Welty, who had the Trust documents suddenly died of a blood clot in July 2019, and his family and estate manager could not find the Trust documents. Nevertheless, Judge Spear sanctioned Doe $10,000 for not delivering Trust documents on February 28, 2020, even though Doe had stopped working for the Trust in April of 2019 and had no access or control of any Trust documents, and Judge Spear had no jurisdiction over the nonparty Trust.

173. **No Procedural Due Process.**  On November 6, 2019, Judge Spear unlawfully granted Olson's *ex parte* making the Trust a judgment debtor per CCP 183 even though a notice motion is required. See: *Danko v O'Reilly* A138784 (Dec. 22 2014) Cal. App 4th and the Specially Appearing Non-Party Trust was never served.

174. After Judge Spear granted the unlawful *ex parte* she continued to improperly demand the Trust's documents filed under seal later.  Jane Doe asked Judge Spear, Why she needed the Trust's documents since she already made the Trust a judgment debtor. On December 11, 2019, Judge Spear admitted she needed the Trust documents to support her earlier *ex parte* finding that

made the Trust a Judgment Debtor, stating, page14: " it's a catch-22, because if you are, in fact,

a beneficiary or a trustee of the trust, in that case it is ---we do have subject matter jurisdiction.

However, without the documents, **I cannot make a ruling one way or the other."**  However

even though, Judge Spear conceded that she did not have enough information and facts to make

the Trust a Judgment Debtor on November 6, 2019, so she was after the fact attempting to get

evidence to support her finding months later.

175. Further, ATW Trust required due process *i.e.* to be properly served, which the Trust was

not. (See: *Wells Fargo, NA* 227 Cal. App at 6: *Mad Dog Athletics v NYC Holdings* 565 F. Supp.

2d 1127, 1130 (CD cal. 2008,) A court may add a judgment debtor but it must still effectuate

proper service and establish that the court has the requisite jurisdiction over the judgment debtor

to be.)  On October 7, 2020, Kennedy in front of Judge Gregory Weingart, admitted that he never

personally served any trustee but only mailed Mr. Arroliga after-the-fact the November 6, 2019

ex *parte* determination. Attorney Sobel for the Trust questioned the legitimacy of this mail

service **after** the *ex parte* hearing: "Mail Service is adequate on a nonparty?"

176. Judge Weingart softball threw the question to Kennedy.  Kennedy made a completely

nonsense excuse and lied that he should not have to bother with service of process on any trustee,

stating, "Where we are forced to chase after trustees…."  However, Kennedy had Mr. Arroliga's

name, number, address and email. Kennedy continued to stumble over his lies stating: page 16

"There is no distinction here.  The idea that [Jane Doe] and the Trust are separate is --is –is

inaccurate,...its all one and the same. It's service on [Jane Doe], a service on the Trust."

177. Thus, Kennedy did not want to go through the process to prove Jane Doe was a

purported alter ego of the Trust or the Trust was a sham by noticed motion and proper service of

process of the Trust, he just wanted the court to accept his circular argument. And they did

accept it and thereby forfeited justice.

178. Thus, everyone else in California is forced to follow due process laws to serve people.

Jane Doe spent almost a year trying to serve Olson and his cronies, constantly asking for extensions of time and hiring PIs to track down people, but when it comes to rich white privilege, all bets are off and procedural due process is out the window

### Judge Emily Spear (2019) is the same Deputy DA Emily Spear (2016) of the Sex Crimes Division that Refused to Prosecute Olson

179. **Judge Spear's Conflict of Interest and Appearance of Impropriety**  On December 11, 2019, Jane Doe filed a verified notice to disqualify Judge Spear under CCP 170.1 because Jane Doe discovered a reasonable conflict of interest, that Judge Spear had been the Deputy District Attorney for the Sex Crimes Division for the County of Los Angeles that reviewed Jane Doe's sex crimes case against Curtis Olson in which Olson violently sexually assaulted Jane Doe and put video cameras in her bathroom filming her and a 15 year old minor in 2015.  Further, even though the LAPD detective said there was enough evidence to get a conviction, it was Emily Spear's division, that refused to prosecute Olson.

180. Refusing to recuse herself from the bench, Judge Spear quibbled that even if she had been involved with Jane Doe's sex crimes case against Olson, she simply did not remember it. However, the standard is not **if** Judge Spear remembers –but the appearance of impropriety:

> An **appearance of impropriety** occurs when reasonable minds, with knowledge of all the relevant circumstances disclosed by a reasonable inquiry, would conclude that the **judge's** honesty, integrity, impartiality, temperament, or fitness to serve as a **judge** is impaired.

181. **Judge Spear, unauthorized *ex parte* communications** On January 15, 2020, Judge Spear did not receive any Trust documents under seal because ATW Trust, specially appearing contended that they never voluntarily entered the case by any motion or response and that the Court did not have personal or subject matter jurisdiction over them because they were never

served.  Therefore, they were not required to turn over any documents under seal and furthermore because people involved with the Trust had passed away, they were unable to locate any documents at that time.  Shortly thereafter, Judge Spear again had unauthorized and unlawful *ex parte* communications with Kennedy notifying him, that she did not receive the desired Trust documents under seal.  Judge Spear was improperly using her judicial powers to procure Trust documents under seal to unlawfully hand over to Kennedy instead of him going through the normal process of a subpoena. Kennedy personally admitted to Jane Doe on the phone that he knew no Trust documents were found so he was canceling her deposition. However, there was no court hearing for Kennedy to discover this information as the Trust information was given to the court under seal.  Kennedy is brazen and doesn't even try to hide his corruption, often saying to Jane Doe when she confronts him about the alter transcripts and other illegal activities, he states, "You can't prove it!

182. **Judge Spear Conspired with Court Reporter Debra Rivera and Olson's attorneys Kennedy and Milnes to alter official court transcripts.** There are numerous alterations in Debra Rivera's court transcripts, which hide the truth for the benefit and enrichment of Olson and the unjust unethical demise of Jane Doe.  Unfortunately, altering court transcripts in Courts across the United States appears to be a common practice.

183. **Judge Spear Framing Jane Doe to Illegally Arrest Her** Judge Spear and her court clerk Cindy Kim concocted a defamatory falsehood that Jane Doe had come to her courtroom after hours and had "banged" on the heavy wood locked courtroom door to such an extent it frighten her courtroom staff. This event never took place.  On February 28, 2020, Judge Spear with a raised voice went on to scold and humiliate Jane Doe that she must not disrespect her courtroom, or she will be in contempt and will be arrested and put in jail.  Doe was shocked at the unfounded no proof allegation. Judge Spear had set herself up as Judge Jury and Prosecutor. Clerk Kim duly noted Judge Spear's defamatory comments on the Minute Order, February 28,

2020 making it appear that Jane Doe was violent and out of control and to poison the well for any future judge or person who read the record.

184. Further Judge Spear often would double speak, gaslight and pretending she didn't understand. Words fail to describe the suffering Jane Doe experienced at the hands and orders of Judge Spear.

### Jane Doe's Injuries Are Severe

185. Jane Doe has been the victim of devastating financial, physical, mental, emotional and constitutional injuries at the hands of Defendants, and comes now to this Honorable Court demanding justice. Jane Doe rightly deserves to be monetarily compensated for the pain and hurt, medical expenses, and lost income she has endured because of the underlying Lenny Dykstra sexual harassment, retaliation, stalking and abuse, and compensated for the all attorney's fees and costs Jane Doe incurred in the courts of the related cases and the Defendant judges for her meritorious civil harassment restraining order lawsuit Defendants destroyed.

186. Dismissal of Olson's lawsuit filed on December 23, 2019 against Jane Doe and her mother. In addition, Jane Doe is rightly seeking an award of punitive damages against these Defendants for their intentionally tortious and malicious conduct.

### Jane Doe Pledges Punitive Damages to Charity

187. Justice for Jane Doe also means relief for other survivors of this type of abuse. Jane Doe has pledged under oath to donate any and all punitive damages awarded to her towards nonprofit organization dedicated to serving the needs of other abuse survivors and judicial corruption survivors. (See attached Affidavit of Jane Doe)

188. The national conversation has now shifted from, "Does Systemic Bias exists?" to "What are we going to do about Systemic Bias?"

189. As to Systemic Bias, this case, right here, right now, presents this Court and this Jury with an historic opportunity to *do something about it*. Finding these Defendants liable for

damages, including punitive damages, are not only the Justice that Jane Doe deserves personally, but also it is also the Justice that America is crying out for. Finding these Defendants liable will send a message loud and clear that the United States of America will no longer tolerate racism, sex harassment or judicial corruption.

## FIRST CAUSE OF ACTION

## FRAUD UPON THE COURT

**Created Evidence: Altered Court Transcripts and Falsified Real Estate Documents**

(Against All Other Defendants, and Does 1 through 20, inclusive)

190.   Plaintiff repeats and re-alleges all the preceding allegations as if fully set forth herein.

191.   Altering and Counterfeiting Court Transcripts and Falsifying and Doctoring Real Estate Documents submitted to court as evidence is a Fraud and/or Rule 60(d)(3) makes available to Set aside judgment(s) for Fraud Upon the Court. It applies to the most egregious misconduct directed at the court itself and requires: Intentional fraud, an officer of the court, which is directed at the court and in fact deceives the court.  see *Hazel-Atlas Glass Co. v. Hartford Empire Co.* [322 U.S. 238 (1944)]

192.   Plaintiff is informed and believes and thereon alleges that Defendants Burris and Rivera intentionally Altered/Counterfeited CHRO trial and post-trial Court Transcripts, and conspired with officers of the court Judge Convey, Judge Spear and together with the aid and abetting of direct participants and/or witnesses Olson, Dykstra, attorneys Kennedy, Milnes, with Buchalter P.C ; Vogt-Lowell and Le with Slaughter Reagan & Cole LLP, Kim and Koo; and it was directed at the court itself and in fact the deceptive court transcripts were manufactured by the court officers with the sanction of the Judges and aiding and abetting and protection and of the other Defendant witnesses and declaration of Kennedy, and  the altered transcripts were subsequently used to procure judgments for the benefit of defendants Olson and payment to his defendant attorneys and their law firms, and those judgments were used in post-trial and other

courts to perpetuate new motions findings/orders/judgments and new lawsuits unlawfully against Plaintiff.

193.   Plaintiff is informed and believes and thereon alleges that Defendants Olson conspired with court officers Kennedy and Vogt-Lowell to intentionally commit a Fraud Upon the Court by submitting a fraudulent Fidelity National Title Report, Doctored Website Real Estate Property Value Estimates and Market Values containing falsified information to mislead the court to rule in their favor based upon fraud.

194.   Fraud on the court is one of the most serious violations that can occur in a court of law. An "Unconscionable" scheme to deceive or make misrepresentations through the court system, corruption or influence of a court member official. If fraud on the court occurs, the effect is that the entire case is voided or cancelled. Any ruling or judgment that the court has issued will be void, such as Jane Doe's 2nd CHRO filed September 6, 2017 and all subsequent judgments, orders, levies, lawsuits including Olson's action filed 12/23/2019 against Doe et al.

195.   Further, Defendants are responsible for undermining the integrity of the judicial process because they chose to recklessly present misleading or false evidence to the court and the court's judgment of Doe's 2017 2nd CHRO was influenced by the conduct at issue, the judgment should be set aside as a fraud on the court and vacated akin to a mistrial and all subsequent judgments, lawsuits, orders, levies derived therefrom should be set aside.

196.   Attorneys that use information obtained through discovery that has no basis in law or fact to support orders judgment and motions filed with the court are clearly misleading the court, even if they have no intent to defraud the court. Indeed, "an attorney might commit fraud upon the court by instituting an action 'to which he knew [or should have known] there was a complete defense. Olson, Kennedy and Milnes used information derived from fraud to create subsequent motions and a lawsuit to further misleading the courts of Judges Theresa Beaudet, Wendy Wilcox and Gregory Weingart, who may not have known about the earlier Frauds Upon

the Court.

197.  As a direct and proximate result of Defendants' actions Plaintiff is entitled to injunctive relief to void, vacate and set aside Jane Doe's September 6, 2017 2nd CHRO application judgments all subsequent derivative orders, findings, judgments, lawsuits and levies.

198.  As a direct and proximate result of Defendants' actions Plaintiff has been damaged and is entitled to general and special damages as a direct result of defendants' Frauds Upon the Court  in an amount to be proven at trial.

199.  Defendants' acts were willful, malicious, fraudulent and oppressive. Plaintiff is therefore entitled to an award of exemplary and punitive damages subject to proof at trial, as well as an award of attorneys' fees.

## SECOND CAUSE OF ACTION

### DEPRIVATION OF CIVIL RIGHTS 42 USC 1983

### Destruction of Jane Doe's First, Seventh Amendment Rights to Petition

### Without Substantive or Procedural Due Process

(Against Judge Convey, Spear in his/her individual capacity but for liability only, and

against all other Defendants as defacto State Actors for damages)

200.  Plaintiff repeats and re-allege all the preceding allegations as if fully set forth herein.

201.  The Fourteenth Amendment due process clause of the United States Constitution empowers this Court to nullify conduct by a State Actor that "shocks the conscience," offends "a sense of justice" or runs counter to the "decencies of civilized conduct." [*Rochin v. California*, 342 U.S. 165, 175, 72 S. Ct. 205, 211 (1952)]

202.  To state a substantive due process claim, the plaintiff must show as a threshold matter that a state actor deprived it of a constitutionally protected life, liberty or property interest. [*Shanks v. Dressel*, 540 F.3d 1082, 1087 (9th Cir. 2008)] Procedural due process claims require (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of

adequate procedural protections. [*Kildare v. Saenz*, 325 F.3d 1078, 1085 (9th Cir. 2003)]

203. The right to petition is a constitutionally protected fundamental right. U.S. Constitution, Amend. I. Moreover, Plaintiff asserts a property right and property interest in any litigation to which he is party.

204. Plaintiff is informed and believes and thereon alleges that here, at the behest of all Defendants, willfully and intentionally destroyed Jane Doe's ability to fair hearings and motions.

205. Victim Jane Doe has developed Legal Abuse Syndrome, a form of PTSD recognized by mental health professionals. Among other things, Defendants' actions are the actual and proximate cause of Jane Doe's severe humiliation, fear, shock, anger, mortification, anxiety, worry, dread, despondency, and depression.

206. The plain facts here **_do_** shock the conscience, they **_do_** offend any sense of justice, and they **_do_** run contrary to the decencies of civilized conduct.

207. Therefore, Judge Convey, and Spear and Court Reporters, Burris and Rivera, and each of the other named Defendants is jointly and severally liable for the deprivation of Plaintiff's substantive and procedural due process rights.

208. Therefore, under 42 U.S.C. § 1983, Defendants and each of them are jointly and severally liable to Jane Doe for intentionally and willfully violating his Substantive and Procedural Due Process rights guaranteed by Fourteenth Amendment.

209. As a direct and proximate result of Defendants' actions Plaintiff has been damaged and is entitled to compensatory, general and special damages as a direct result of defendants in an amount to be proven at trial, as well as an award of attorneys' fees.

210. Defendants' acts were motivated by evil motive or intent, or reckless or callous indifference. "Punitive damages may be awarded under 42 U.S.C. § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others," in an amount to be proven at trial.

### THIRD CAUSE OF ACTION

### CONSPIRACY TO VIOLATE CIVIL RIGHTS – 42 U.S.C. § 1983

(Against ALL Defendants, and Does 1 through 20, inclusive)

211.   Plaintiff repeats and incorporates by reference all facts alleged above.

212.   Under the Joint Action Test Defendants, and each of them, must be held as State Actors for civil rights purposes. *Supra.*

213.   In order to prevail on a conspiracy claim under § 1983, a plaintiff must prove that persons acting under color of state law conspired to deprive him of a federally protected right:

214.   To state a section 1983 conspiracy claim, a plaintiff must allege: (1) the existence of a conspiracy involving state action; and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy. [*Marchese v. Umstead*, 110 F.Supp.2d 361, 371 (E.D. Pa. 2000)]

215.   A conspiracy, generally, consists of an agreement between two or more persons to engage in an unlawful act. In some contexts, an overt act in furtherance is also required.

216.   Plaintiff is informed and believes and thereon alleges that here, functioning as a well-coordinated single force, Defendants collectively planned, agreed and acted to deprive Jane Doe of her constitutional rights to petition and jury trial under the First and Seventh Amendments, respectively, without the Substantive or Procedural Due Process guaranteed by the Fourteenth Amendment, as well as being the actual and proximate cause of Jane Doe's physical, mental and emotional injuries.

217.   Therefore, under 42 U.S.C. § 1983, Defendants and each of them are jointly and severally liable to Jane Doe for a Conspiracy to Violate his Substantive and Procedural Due Process rights guaranteed by the Fourteenth Amendment.

218.   As a direct and proximate result of Defendants' actions Plaintiff has been damaged and is entitled to compensatory, general and special damages as a direct result of defendants in

1    an amount to be proven at trial, as well as an award of attorneys' fees.

2        219.  Defendants' acts were motivated by evil motive or intent, or reckless or callous

3    indifference. "Punitive damages may be awarded under 42 U.S.C. § 1983 when the defendant's

4    conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous

5    indifference to the federally protected rights of others," in an amount to be proven at trial.

6

7

8                          **FOURTH CAUSE OF ACTION**

9        **DENIAL OF EQUAL PROTECTION 42 U.S.C. § 1983 under 14th Amendment**

10       (Against Defendants: Convey, Spear, Burris, Rivera, Kim, Koo and Does 1-20, inclusive)

11       220.  Plaintiff repeats and re-allege all the preceding allegations as if fully set forth herein.

12       221.  Plaintiff is informed and believes and thereon alleges that Defendants discriminated

13   against Plaintiff's race and violated Plaintiff's rights under color of law, her equal protection

14   under 42 U.S.C. § 1983 under 14th Amendment

15       222.   As a direct and proximate result of Defendants' actions Plaintiff has been damaged

16   in an amount to be proven at trial.

17

18       223.  As a direct and proximate result of Defendants' actions Plaintiff has been damaged

19   and is entitled to compensatory, general and special damages as a direct result of defendants in

20   an amount to be proven at trial, as well as an award of attorneys' fees.

21       224.  Defendants' acts were motivated by evil motive or intent, or reckless or callous

22   indifference. "Punitive damages may be awarded under 42 U.S.C. § 1983 when the defendant's

23   conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous

24   indifference to the federally protected rights of others," in an amount to be proven at trial.

25

26

27

28

## FIFTH CAUSE OF ACTION

### UNRUH CIVIL RIGHTS ACT

(Against Defendants: Convey, Spear, Burris, Rivera, Kim , Koo and Does 1 - 20, inclusive)

225.  Plaintiff repeats and re-allege all the preceding allegations as if fully set forth herein.

226.  Plaintiff is informed and believes and thereon alleges that Defendants discriminated against Plaintiff's race and violated Plaintiff's rights under color of law, under the Unruh Civil Right Act.

227.  As a direct and proximate result of Defendants' actions Plaintiff has been damaged in an amount to be proven at trial

## SIXTTH CAUSE OF ACTION

### VIOLATION BANE ACT

(Against Defendants: Convey, Spear, Burris, Rivera, Kim, Koo and Does 1 - 20, inclusive)

228.  Plaintiff repeats and re-allege all the preceding allegations as if fully set forth herein.

229.  Plaintiff is informed and believes and thereon alleges that Defendants discriminated against Plaintiff's race and violated Plaintiff's rights under color of law, violating the Bane Act.

230.  As a direct and proximate result of Defendants' actions Plaintiff has been damaged in an amount to be proven at trial

## SEVENTH CAUSE OF ACTION

### VIOLATION RALPH ACT

(Against Defendants: Convey, Spear, Burris, Rivera, Kim, Koo and Does 1 - 20, inclusive)

231.  Plaintiff repeats and re-allege all the preceding allegations as if fully set forth herein.

232.  Plaintiff is informed and believes and thereon alleges that Defendants discriminated against Plaintiff's race and violated Plaintiff's rights under color of law, violating the Ralph Act.

233.  As a direct and proximate result of Defendants' actions Plaintiff has been damaged in

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF AND DAMAGES

an amount to be proven at trial.

## EIGTH CAUSE OF ACTION

### MISPRISION FELONY 18 U.S.C. § 4

(Against Defendants: Convey, Spear, Le, Kennedy, Milnes, Vogt-Lowell, Buchalter, SR&C, Burris, Rivera, and Does 1 through 20, inclusive)

234.   "Misprision of felony" is still an offense under United States federal law after being codified in 1909 under 18 U.S.C § 4: Whoever, having knowledge of the actual commission and active concealment of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both. The federal misprision of felony statute is used against defendants who have a special duty to report a crime, such as a government official.

235.   Plaintiff repeats and re-allege all the preceding allegations as if fully set forth here

236.   Plaintiff is informed and believes and thereon alleges that each and every in defendant judicial officer and licensed BAR attorney and law firm herein was notified in court hearings and/or filed court documents that Court Reporter Burris (and Rivera excluding Le, Vogt-Lowell, SR&C) had committed the felony crime of counterfeit transcripts and active concealment had occurred and this crime had been reported to authorities and there was an ongoing investigation and thus each and every defendant had a duty to report theses felony crimes to some governmental authority. However, each and every defendant judicial officer and licensed BAR attorney herein knew the crimes had occurred and there was spoliation of evidence yet knowingly and willfully each and everyone failed to report these crimes.

237.   Plaintiff is informed and believes and thereon alleges that Defendant Court Reporter Burris and Rivera continued to criminally counterfeit court transcripts and actively conceal them

and Defendants: Convey, Spear, Kennedy, Milnes and Buchalter knowingly and willfully committed Misprision of Felony when they failed to report the criminal actions to any authority.

238.   Defendants having knowledge of the actual commission of a felony cognizable by a court of the United States, and actively concealed it and they did not as soon as possible make known the same to some judge or other person in civil authority under the United States, shall be fined under this title or imprisoned not more then three years or both.

239.   Plaintiff is entitled to general and special damages as a direct result of defendants' Misprision of felony.

### NINTH CAUSE OF ACTION

### OBSTRUCTION OF JUSTICE

18 U.S.C. § 1503 Cal. Penal Code 132, 134, 135 PC

(Against ALL Defendants)

240. Plaintiff repeats and re-alleges all the preceding allegations as if fully set forth herein.

Obstruction of Justice 18 U.S.C. § 1503 provides that (a)Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States magistrate judge or other committing magistrate, in the discharge of his duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, magistrate judge, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished as

provided in subsection (b). If the offense under this section occurs in connection with a trial of a criminal case, and the act in violation of this section involves the threat of physical force or physical force, the maximum term of imprisonment which may be imposed for the offense shall be the higher of that otherwise provided by law or the maximum term that could have been imposed for any offense charged in such case.  (3) in any other case, imprisonment for not more than 10 years, a fine under this title, or both.

241.  California Penal Code 132 provides that, "offering false evidence, is legally described as follows: *Anyone who upon any trial, proceeding, inquiry, or investigation authorized law, offers in evidence, as genuine, any book, paper, document, record, or other instrument in writing, knowing it's forged or fraudulently altered, is guilty of felony offense."*

242.  California Penal Code 134 provides that preparing false evidence, is legally described as follows: *Anyone guilty of preparing a false paper, record, instrument in writing, or other matter with intent to produce or allow it to be produced for a fraudulent or deceitful purpose as genuine upon a trial, proceeding, or inquiry authorized by law, is guilty of felony offense*

243.  California Penal Code 134 makes it a crime for a person to prepare false evidence with the intent to use it fraudulently in a legal proceeding. A conviction is a felony that carries a penalty of up to 3 years in jail or state prison.

244.  Plaintiff is informed and believes and thereon alleges that Each and Every Defendant obstructed justice under 18 U.S.C. § 1503 and violated Cal. Penal Code 132, 134, 135, and/or 118 PC.

245.  As a direct and proximate result of Defendants' actions Plaintiff has been damaged in an amount to be proven at trial

## TENITH CAUSE OF ACTION

(Discrimination Based on Sex, Race and Ethnicity Government Code §12955 et seq. Against Defendants Olson, Le, SR& C and Does 1 -20, inclusive)

246. Plaintiff repeats and re-alleges all the preceding allegations as if fully set forth herein.

247. This cause of action is alleged against defendants Olson, Le SR& C and each of them, including Does 1 through 20, inclusive to Discrimination based on sex.

248. Plaintiff's gender is a protected attribute under the Fair Employment and Housing Act ("FEHA"), and likewise Plaintiff Jane Doe's perceived religion, race and ethnicity are protected attributes under FEHA.

249. Plaintiff is informed and believes and thereon alleges that she was subject to harassing conduct by Dykstra as part of a larger conspiracy orchestrated by Olson and his attorneys to cause harm to Jane Doe in her individual capacity, where she resides or resided on the Property and was or is a housing consumer.

250. Defendants, and each of them, are housing providers and/or agents working on behalf of housing providers within the definition of FEHA and as such may not lawfully Harass or Sexual harass any person(s) in connection with the Property.

251. The harassing conduct by orchestrated by Defendants of Dykstra was so severe and pervasive that it has caused severe and likely permanent emotional distress.

252. Any reasonable person in Jane Doe's circumstances would have considered the environment to be hostile, intimidating, offensive, oppressive, or abusive.

253. Jane Doe considered the infiltration of Dykstra into her housing environment to be hostile, intimidating, offensive, oppressive, or abusive.

254. Defendants engaged in the sex abuse and sex harassment. Moreover, Defendants also knew about sex abuse and sex harassment of Dykstra but failed to take immediate and appropriate corrective action. Indeed, sex abuse and harassment was and is "Standard Operating Procedure" in Defendants' culture.

255. Jane Doe was harmed by the sex abuse and sexual harassment, and developed PTSD and emotional distress, requiring possibly lifelong treatment. It is Plaintiff's understanding that

complications from sex abuse/harassment can manifest long after the acts are over.

256.  The sexual abuse/harassment was a substantial factor in causing Jane Doe's harm.

257.  Therefore, the Defendants named above are jointly and severably liable to Jane Doe's for Sexual Harassment.

258.  As a direct and proximate result of Defendants' actions Plaintiff has been damaged in an amount to be proven at trial

259.  Defendants' acts were willful, malicious, fraudulent and oppressive. Plaintiff is therefore entitled to an award of exemplary and punitive damages subject to proof at trial, as well as an award of attorneys' fees.

## ELEVENTH CAUSE OF ACTION

## RETALIATION

(Against All Defendants; Olson, Le, SR& C and Does 1-20 inclusive)

260.  Plaintiff repeats and re-allege all the preceding allegations as if fully set forth herein.

261.  Defendants and each of them, including Does 1 through 10, inclusive, retaliated against Plaintiff because they engaged in protected conduct, to wit: Plaintiff opposed and refused to acquiesce to discrimination and harassment in connection with the Property.

262.  Plaintiff is informed and believes and thereon alleges that Defendants engaged in a course of conduct in violation of Govt. Code § 12955(f).  Such illegal conduct has included subjecting Plaintiff to retaliation and ongoing harassment because of Plaintiff's complaints about discrimination and harassment, against Plaintiff Jane Doe

263.  At all relevant times, defendants, and each of them, were prohibited from retaliating in any manner against residents of the Property who opposed or refused to acquiesce to practices forbidden by FEHA.

264.  At all relevant times, Plaintiff Jane Doe's complaints regarding defendants' acts of harassment and discrimination were based on Plaintiffs' protected status as persons lawfully

engaged in constitutionally protected expressive activity concerning religion, politics and other public matters.

265. Defendants, and each of them, continuously engaged in a course of conduct to harass Plaintiff and to retaliate against them for asserting their rights to engage in protected speech activity and to complain about defendants' conduct to the Department of Fair Employment and Housing.

266. Such conduct as described herein violates Govt. Code § 12955(f), which makes it unlawful to retaliate or discriminate against residents because they have opposed discriminatory and harassing practices.

267. As a proximate result of defendants' conduct, Plaintiff is entitled to general and special damages, including but not limited to lost past and future earnings, benefits, out of pocket expenses, embarrassment, humiliation, and mental and emotional distress, in an amount subject to proof at trial.

268. As a direct result of defendants' unlawful conduct, Plaintiff has been forced to retain attorneys to prosecute this claim under FEHA, and  are therefore entitled to recover reasonable attorneys' fees and costs pursuant to Govt. Code § 12965(b), in addition to other damages as provided by law and as alleged herein.

269. Therefore, the Defendants named above are jointly and severably liable to Jane Doe for Retaliation.

270. Defendants, and each of them, committed the acts alleged herein oppressively and maliciously, with the wrongful intention of injuring Plaintiff, from an evil and improper motive amounting to malice, and in conscious disregard of Plaintiffs' rights.  Thus, Plaintiffs are entitled to recover an award of exemplary and punitive damages from defendants in an amount subject to proof at trial.

## TWELFTH CAUSE OF ACTION

### STALKING

(Against Defendants Olson, Dykstra, Le, Kennedy and Does 1 - 20, inclusive)

271.   Plaintiff repeats and re-alleges all the preceding allegations as if fully set forth herein.

272.   Plaintiff is informed and believes and thereon alleges that the Defendants named and specified above engaged in a pattern of misconduct described in more detail above, the intent of which was to follow and stalk Plaintiff at their residence on the Property.

273.   As a result of that pattern of conduct, Plaintiff reasonably feared for her safety, and sustained substantial mental and emotional distress

274.   The pattern of conduct by defendants would cause any reasonable person to develop substantial mental and emotional distress.

275.   Defendants as a part of the pattern of conduct made a credible threat with reckless disregard for the safety of Plaintiff.

276.   Therefore, the Defendants named above are jointly and severably liable to Jane Doe.

277.   Plaintiffs have clearly and definitively demanded that defendants cease and abate this pattern of conduct, but defendants have persisted in their pattern of conduct. Defendants' actions were willful, malicious, fraudulent and oppressive, entitling Plaintiff are therefore entitled to an award of exemplary damages and punitive damages subject to proof at trial, as well as an award of attorneys' fees.

### THIRTEETH CAUSE OF ACTION

### INTRUSION INTO PRIVATE AFFAIRS/STALKING

(Against Defendants Olson, Dykstra, Le, Kennedy, Spear, Rivera, Kim and Does 1 - 20, inclusive)

278.   Plaintiff repeats and re-allege all the preceding allegations as if fully set forth herein.

279.   Plaintiff had a reasonable expectation of privacy in their residence at the Property

280.   Plaintiff is informed and believes and thereon alleges that Defendants engaged in an extensive and invasive pattern of behavior described in more detail above, including but not limited to the outrageous actions of Dykstra, Olson from on or about May 20 until on or about August 2017, intentionally intruding into Plaintiffs' private space by Dykstra pretending to be a religious bible study nice guy when at the Property with the primary goal of placing Plaintiff Jane Doe under constant surveillance at her residence on the Property.

281.   Defendants Spear, Kim and Rivera violating confidentiality of Plaintiff's private ADA and medical needs/accommodations in violation of the America Disabilities Act, California's Medical Confidentiality Act and violated the Federal HIPAA Act and sharing the private information with Milnes, Kennedy and Olson and other unknown people.

282.   Defendants' intrusions and pattern of misconduct would be highly offensive to any reasonable person;

283.   Plaintiff is entitled to general and special damages as a direct result of defendants' extensive and invasive pattern of intrusive stalking and surveillance in an amount subject to proof at trial.

284.   Plaintiff clearly and definitively demanded that the Defendants cease and abate this pattern of conduct, but defendants have persisted in their pattern of conduct. Defendants' acts were willful, malicious, fraudulent and oppressive. Plaintiffs are therefore entitled to an award of exemplary and punitive damages subject to proof at trial, as well as an award of attorneys' fees.

## FOURTEETH CAUSE OF ACTION

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

(Against All Defendants and Does 1 through 20, inclusive).

285.   Plaintiff repeats and re-alleges all the preceding allegations as if fully set forth herein

286.   The vast and pervasive pattern of misconduct by defendants has caused Plaintiff Jane

Doe to be the victim of severe emotional distress.

287.   Defendants' conduct was outrageous.

288.   Defendants negligently caused Plaintiff's emotional distress and/or acted with reckless disregard for Plaintiff's legal rights, resulting in general and special damages subject to proof at trial.

## FIFTEETH CAUSE OF ACTION

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

(Against All Defendants and Does 1 through 20, inclusive)

289.   Plaintiff repeats and re-alleges all the preceding allegations as if fully set forth herein

290.   Plaintiff alleges that the misconduct of all defendants and Does 1-20 inclusive, caused her to be the victim of severe emotional distress.

291.   Defendants' conduct was extreme and outrageous.

292.   Defendants intended to cause Plaintiff emotional distress.

293.   Plaintiff Jane Doe as the victim has been developed severe emotional distress.

294.   Defendants' conduct was a substantial factor in causing Plaintiff's severe emotional distress.

295.   Defendant's' acts were willful, malicious, oppressive and fraudulent, including use of deliberate acts of deception and concealment.  Plaintiff is therefore entitled to an award of exemplary damages and punitive damages according to proof at trial, and also to an award of attorneys' fees.

## SIXTEENTH CAUSE OF ACTION

### CIVIL CONSPIRACY

(Against All Defendants and Does 1 - 20, inclusive)

296.   Plaintiff repeats and re-alleges all the preceding allegations as if fully set forth herein.

297.   Plaintiff is informed and believes and thereon alleges that Defendants, and each of them, knowingly and willfully conspired and agreed among themselves to employ any and all available harassing, discriminatory and defamatory methods of misconduct to remove Plaintiff from the Unit, including but not limited to entering Plaintiff's Unit; following Plaintiff to keep her under surveillance.

298.   Defendants, and each of them, did the acts  alleged pursuant to, and in furtherance of, the conspiracy and their private agreement with one another to do so, in order to inflict damage on Plaintiff.

299.   Defendants and each of them furthered the conspiracy by cooperating with,  lending aid and encouragement to, or by ratifying and adopting the acts of the remaining defendants

300.   As a proximate result of the wrongful acts alleged above, Plaintiff Jane Doe has incurred general and special damages in amounts subject to proof at trial.

301.   Defendants' acts against Plaintiff were willful, malicious, fraudulent and oppressive. Plaintiff is therefore entitled to an award of exemplary and punitive damages according to proof at trial.

### SEVENTEENTH CAUSE OF ACTION

### WITNESS TAMPERING IN VIOLATION OF PENAL CODE § 136.1

(Against Olson, Kennedy, Le, Vogt-Lowell, Milnes, Convey, Buchalter, SR& C

and Does 1 - 20, inclusive)

302.   Plaintiffs repeat and re-allege all the preceding allegations as if fully set forth herein.

303.   Penal Code §§ 136.1(a) and 136.1(c)

304.   Plaintiff is informed and believes and thereon alleges that Defendants and Does 1 through 20, inclusive, in violation of Penal Code Section 136.1(a), have knowingly acted maliciously when he/she unlawfully annoyed, intimidated, harmed, discourage and/or interfered with the foregoing witness (Amado Moreno ("Moreno"), a male waiter; thereby interfering in the

1   orderly administration of justice. Additionally in violation of Penal Code Sec. 136.1(c) with

2   respect to Moreno.

3       305.   Defendant's attempts to prevent or dissuade or prevent Moreno form testifying were

4   Defendants acted with reckless, willful or callous disregard for Plaintiff's rights and with malice

5   fraud or oppression towards Plaintiff, accompanied by force of by an express or implied threat of

6   force or violence. thereby entitling Plaintiff to an award of exemplary or punitive damages in

7   accordance with proof at trial

8

9                          **EIGHTEENTH CAUSE OF ACTION**

10                              **UNJUST ENRICHMENT**

11                  (Against ALL Defendants, and Does 1 through 20, inclusive)

12      306. Plaintiff repeats and re-allege all the preceding allegations as if fully set forth herein

13      307. Plaintiff is informed and believes and thereon alleges that Defendants Olson and

14  Kennedy, Milnes and Buchalter have been unjustly enriched when attorney's fees, costs and

15  sanctions were awarded to them against Jane Doe and justice would not be served if Olson and

16  Kennedy, Milnes and Buchalter were permitted to retain any monetary right or interest in any

17  amount of attorney's fees, costs and sanctions awarded to them.

18

19      308. Plaintiff seeks all attorney's fees, costs and sanctions awarded to Olson and his

20  attorneys Kennedy, Milnes and Buchalter be stricken, void vacated.

21                          **NINETEENTH CAUSE OF ACTION**

22                              **SEXUAL HARRASSMENT**

23                  (Against Dykstra, Olson, Kennedy, Le and Does 1 through 20, inclusive)

24  Plaintiff repeat and re-allege all the preceding allegations as if fully set forth herein.

25

26      309. This cause of action is alleged against defendants Dykstra, Olson, Kennedy, Vogt-

27  Lowell and Le and each of them, including Does 1 through 20, inclusive to sexual harassment.

28      310. Plaintiff is informed and believes and thereon alleges that she was subject to harassing

conduct by Dykstra as part of a larger conspiracy orchestrated by Olson and his attorneys to cause harm to Jane Doe

311. The harassing conduct by orchestrated by Defendants of Dykstra was so severe and pervasive that it has caused severe and likely permanent emotional distress.

312. Defendants engaged in the sex abuse and sex harassment. Moreover, Defendants also knew about sex abuse and sex harassment of Dykstra but failed to take immediate and appropriate corrective action. Indeed, sex abuse and harassment was and is "Standard Operating Procedure" in Defendants' culture

313. Jane Doe was harmed by the sex abuse and sexual harassment, and developed PTSD and emotional distress, requiring possibly lifelong treatment. It is Plaintiff's understanding that complications from sex abuse/harassment can manifest long after the acts are over

314.  The sexual abuse/harassment was a substantial factor in causing Jane Doe's harm

315.  Therefore, the Defendants named above are jointly and severably liable to Jane Doe's for Sexual Harassment.

316.  As a direct and proximate result of Defendants' actions Plaintiff has been damaged in an amount to be proven at trial

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and equitable relief against Defendants jointly and severally and Does 1 through 10, and each of them, as follows:

1.   **For Declaratory Judgment** – that all Judges: Convey's, Spear's, Wendy Wilcox, and Gregory Weingart's and Orders, Findings, Judgments and/or Rulings issued by/under them in the case 17SMRO00308 are SET ASIDE, VOID VACATED *ab inito*

2.    **For Declaratory Judgment** – that Olson's lawsuit bearing case number 19STCV46███ in Judge Beaudet's courtroom department 50, which is based on the Fraud Upon the Court in 17SMRO00███ (numbers redated for privacy) be dismissed in its entirety.

3. **For Injunctive Relief –** that Jane Doe be granted a 3 year Restraining Order to protect her against Curtis Olson, Lenny Dykstra, Eric Kennedy and Judge Emily Spear.

4. For compensatory and special damages, including liquidated damages in appropriate amounts to be proven at trial,

5. For general damages according to proof, plus interest thereon at the legal rate paid in full

6. For punitive and exemplary damages against Defendants in an amount necessary to punish and/or set an example of Defendants;

7. For prejudgment interest at the maximum allowable legal rate; and

8.  For such other and further relief as this Honorable Court deems just and proper.

9. For reasonable attorney fees - as allowed by statute, in amounts to be documented at trial.

10. DEMAND FOR TRIAL BY JURY Plaintiff hereby demands a trial by jury on all issues so triable, including all issues of fact.

DATED: November 10, 202        By: ~~Jane Doe~~ _Jane Doe_
                                 Jane Doe, in *sui juris*

*Veritas, fiat justitia ruat caelum*

In truth, let justice be done though the heavens fall

---

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF AND DAMAGES

# SWORN AFFIDAVIT AND VERIFICATION

## by Jane Doe

1)  I am Plaintiff, Jane Doe. I have made a careful review of the complaint now before this Honorable Court. I have personal knowledge of each and every fact I allege within the complaint, and I solemnly swear that each one is true.

2)  As to those matters alleged outside my personal knowledge, I believe them to be true, based on reasonable inference.

3)  If called before any court, I could and would testify competently about the sexual abuse, harassment and judicial corruption that have injured me so badly.

4)  I hereby promise and pledge that I will charitably donate 100% of any money I receive as a punitive damage award to a 501(c)(3) nonprofit organization dedicated to benefitting victims of abuse similar to what happened to me.

5)  I am not suicidal, and I would never make the last act of my life on earth something that would foreclose the gates of God's Heavenly Kingdom to me.

6)  I have never tried marijuana, or any other illegal drugs or substances and I rarely drink alcohol and if I do drink alcohol it is only in very small amounts because I am allergic to alcohol.

7)  I fear for my life from the diabolical Defendants to kill me or attempt to frame me is some criminal fashion as that is their modus operando.

8)  I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct. Executed in Los Angeles, California on November 15, 2021.


Jane Doe
Jane Doe

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF AND DAMAGES