G. SCOTT SOBEL, Esq., SBN 124818
LAW OFFICES OF G. SCOTT SOBEL
1180 S. Beverly Drive, Suite 610
Los Angeles, CA 90035-1158
Tel: 323-377-4000/ Fax: 888-863-5630
Gscottsobel@gmail.com
Attorney for Jane Doe

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE DOE, an individual,<br><br>        Plaintiff,<br><br>        vs.<br><br>CURTIS R. OLSON, an individual; LEONARD KYLE DYKSTRA, an individual; RYAN VOGT-LOWELL, an individual and in his capacity as an officer of the court; ERIC KENNEDY, an individual and in his capacity as an officer of the court; ASHLEY MILNES, an individual and in his capacity as an officer of the court; BUCHALTER, P.C., a California professional corporation; LAMDIEN LE, an individual and in his capacity as an officer of the court; SLAUGHTER, REAGAN & COLE, LLP, a Limited Liability Partnership: MARLENE BURRIS, an individual and in her judicial officer capacity as a court reporter; MARLENE BURRIS, an individual and in her judicial officer capacity as a court reporter; DEBRA RIVERA, an individual and in her judicial officer capacity as a court reporter; | **Case No. 2:21-cv-09747-SB-PD**<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES**<br><br>1. **DEPRIVATION OF CIVIL RIGHTS**<br>42 U.S.C. § 1983 and 14th Amendment: Substantive and Procedural Due Process, and Equal Protection<br>2. **CONSPIRACY TO VIOLATE CIVIL RIGHTS**<br>3. **VIOLATION OF AMERICANS WITH DISABILITIES ACT**<br><br><br>**DEMAND FOR TRIAL BY JURY** |

MICHAEL CONVEY, as an individual and in his official capacity as Justice of the Superior Court of Los Angeles County; EMILY SPEAR, as an individual and in her official capacity as Justice of the Superior Court of Los Angeles County and as Deputy District Attorney of Los Angeles County; CINDY KIM an individual and in her judicial officer capacity as Court Clerk; and Judicial Assistant; DEPUTY SHERIFF OFFICER WILLIAM KOO an individual and his official Deputy Sheriff capacity; and Does 1 through 20.

          Defendants.

_____

          Plaintiff **Jane Doe** hereby submits this Complaint against Defendants, and alleges as follows:

### JURISDICTION AND VENUE

1.      This action is brought pursuant to 42 U.S.C. § 1983 and 14th Amendment: Substantive and Procedural Due Process, and Equal Protection;

2.      This Court has jurisdiction under the aforementioned statutes for violations of the Civil Rights Act, for misprision of felony, and for obstruction of justice.

3.      The acts and omissions complained of herein commenced on or about November 16, 2018 and continued through and until about March 15, 2020.  A substantial part of such acts and omissions occurred in the Central District of California. As such, venue lies properly in the Central District of California pursuant to 28 U.S.C. § 1391(b)(2).

## **GENERAL ALLEGATIONS**

4.      Plaintiff **Jane Doe** is a citizen of the United States and resides in Los Angeles County, California.[1]  Plaintiff is a female of mixed race.  She also has a disability as defined under the Americans With Disabilities Act (ADA) (42 U.S.C. § 12102[1]).

5.      Defendant **Marlene Burris** is, and at all times herein mentioned was, a citizen of the United States and at all times relevant hereto was an individual in her judicial officer capacity as a court reporter in Los Angeles County, and in doing the things herein alleged, was acting within the scope of such employment and agency.

14.      Defendant **Debra Rivera** is, and at all times herein mentioned was, a citizen of the United States and at all times relevant hereto was an individual in her judicial officer capacity as a court reporter in Los Angeles County, and in doing the things herein alleged, was acting within the scope of such employment and agency.

15.      Defendant **Michael Convey** is, and at all times herein mentioned was, a citizen of the United States.  Furthermore, Convey was, at all times relevant hereto, acting individually and in his official capacity as Justice of the Superior Court of Los Angeles County, and in doing the things herein alleged, was acting within the scope of such employment and agency.

16.      Defendant **Emily T. Spear** is, and at all times herein mentioned was, a citizen of the United States.  Furthermore, Spear was, at all times relevant hereto, acting individually and in his official capacity as Justice of the Superior Court of Los Angeles

---

[1] Plaintiff is proceeding using the pseudonym Jane Doe, pursuant to California Civil Code § 1708.85(f)(1), in relation to the related California state action of *Doe v. Olson et al.*, currently pending in the Superior Court of California, Los Angeles County (Case No. SC126806).

County or Deputy District Attorney of Los Angeles County, and in doing the things herein alleged was acting within the scope of such employment and agency.

17.    Defendant **Cindy Kim** is a citizen of the United States, and at all times relevant hereto was acting individually and in her official capacity as Court Clerk and/or Judicial Assistant/Officer of the Superior Court of Los Angeles County, and in doing the things herein alleged, was acting within the scope of such employment and agency.

18.    Defendant **WILLIAM Koo** ("Koo"), whose first name is unknown at this time, is a citizen of the United States, and at all times relevant hereto, was acting individually and in his official capacity as Deputy Sheriff Officer and Bailiff in Family Court at the Superior Court of Los Angeles County, and in doing the things herein alleged, was acting within the scope of such employment and agency.

19.    Plaintiff is unaware of the true names and capacities of the defendants sued herein as Does 1 through 20, inclusive, and therefore sues these defendants by such fictitious names.  Each allegation alleged herein against any named defendant is alleged against each doe.  Plaintiff will seek leave of court to amend this complaint when their identities have been ascertained.  Plaintiff is further informed and believes, and thereon alleges, that each of the defendants fictitiously named herein is legally responsible for the events that have been referred to herein and have proximately caused Plaintiff damages as alleged.

20.    Plaintiff is informed and believes and thereon alleges, that at all times herein mentioned, each of the Defendants were the agents and/or employees of each of the remaining Defendants, and in doing the things herein alleged, were acting within the course and scope of said agency and/or employment, in that the actions of each of the

Defendants as herein alleged were authorized, approved, and/or ratified by each of the other Defendants as principals and/or employers.

## FACTUAL BACKGROUND AND ALLEGATIONS

21.     In 2002, Plaintiff met Olson regarding a condo-conversion project ("the Project") of an eight-unit Historic Westwood Los Angeles residential apartment property (the "Property"), of which Plaintiff was a rental tenant.  Plaintiff's business associate, Max Wilcox, contributed the initial escrow funds to secure the Property's purchase for Project and under contract would have the right to one of the condo units.

22.     Olson purchased the Property as the main investor in the Project and became Plaintiff's landlord.  Olson also hired Plaintiff to be property manager and contracted with her to work on the Project with certain obligations.

23.     Shortly thereafter, Olson began making romantic and sexual advances towards Plaintiff.  Although Olson was married with young children and his wife was expecting their third child, and they lived a few hours' drive away in Orange County, Olson moved into one of the apartment units at the Property, near Plaintiff's unit (about 26 feet).

24.     Plaintiff refused Olson's advances, where upon he became incensed, saying he thought she was "supposed to be part of the deal."  Olson then promptly fired her as property manager, attempted to evicted her, and intimidated and threatened to sue her and evict her puppy.

25.     As Plaintiff was still under contractual obligations, however, she could not just abandon the Project without incurring economic hardships and losing Wilcox's and others investment.  An executive at Olson's real estate company, Nexus Companies, told

Plaintiff that Olson was very angry with her, but that Olson would eventually calm down. The executive advised Plaintiff to avoid Olson and only contact the executive regarding the Property. Plaintiff avoided Olson.

26. In 2005, the Project was complete. Per contract, Olson transferred, by grant deed, a one-bedroom 966 sq. ft. condominium to Wilcox. Wilcox hired Plaintiff as *his* property manager, where she rented it out, rented it to herself, or made it available when Wilcox stayed in Los Angeles.

27. In 2009, Wilcox put his condo into a limited liability company. In 2012, Wilcox arranged for his condo to be placed into an irrevocable trust, ATW Trust ("the Trust"), for its church beneficiary named Ancient Temple of Wings. Plaintiff became a trustee on the Board of Trustees of ATW Trust.

28. Many years passed. Plaintiff rarely saw Olson and things appeared to calm down. Plaintiff moved away from Los Angeles and the Trust's property was rented out to various tenants. In or about 2014, Plaintiff moved back to Los Angeles and when the Trust property became available, Plaintiff made an agreement with the Board of Trustees to rent it as a tenant. At that point, Plaintiff had not seen Olson in years.

29. One late afternoon in May of 2015, Olson, knocked on Plaintiff's front door professing to "extend an olive branch." Olson acted like he had gotten over his past sexual interest in Plaintiff and just wanted to be friendly neighbors. Olson also admitted that he had made a mistake in taking away the residents' legal right of way to access the Property's basement storage spaces, by track-mapping the entire basement to him. Olson apologized and settled this long-standing unresolved matter by informing Plaintiff that all residents now have a legal right of way to use the basement as a

common area.  Pleasantly surprised, Plaintiff let her guard down.  Olson then invited Plaintiff to a social gathering in the courtyard of at the Property.  Disarmed and believing Olson promises, Plaintiff joined the get-together.

30.     Although Olson mentioned something indicating that other residents would also be joining, initially only one resident, Douglas Econn was present.  The gathering then moved to Olson's condo unit.  At some point, Douglas Econn left, but made a comment that he was coming back.

31.     Olson was drinking what appeared to be wine and offered Plaintiff a glass, which she refused. During conversation, Olson told Plaintiff that he is a member of a secret society "old boys' club."  Olson invited Plaintiff to view his "art collection," a book of photographs that turned out to be sexually provocative with violent fetish images.  Doe had no interest in this type of "art."  Olson then showed Plaintiff a YouTube comedy clip called Hot and Crazy Matrix, which Plaintiff did not find funny.

32.     Although Plaintiff expected other residents to show up, no one else showed up, and Plaintiff was left alone with Olson.

33.     Plaintiff began to feel uncomfortable and decided to leave.  Olson, however, sexually attacked her, jumping on top of her and pushing her down onto the sofa.  Plaintiff tried to stop Olson, fell off the sofa onto the floor and escaped.  She reported Olson's sexual assault and battery to the Los Angeles City Police Department (LAPD).

34.     Olson subsequently, with the aid of his co-conspirators, reacted by, inter alia, placing a filming device in Plaintiff's bathroom to procure nude images of Plaintiff and her house guest, a 15-year-old girl ("Doe 2").

35.     Plaintiff and Doe 2 reported the crimes to the LAPD, who advised Plaintiff to get a restraining order.  Plaintiff, however, was afraid to get a restraining order because she feared it could potentially make matters worse, she could not afford an attorney, and she had no idea how to go about getting a restraining order as she had never done it before.

36.     Olson's harassments continued to escalate, into creeping around Plaintiff's back walkway, peeping into her bathroom, death threats, chasing her around the Property, threats to break into her storage unit and throw her things in the trash, screaming vulgar obscenities, swearing and calling her "crazy psycho-bitch" from his second story window as she walked to and from her front door on the first floor, screaming and harassing Plaintiff's guests, and threatening to put Doe 2 in jail.

37.     On each occasion of these harassments, Plaintiff made frantic calls to the police.  Even the Property manager said Olson was out of control and advised Plaintiff to call the police.  The police also became upset about the situation and frequent calls, and strongly recommended Plaintiff get a restraining order.  After being directed to an advocate, Doe sought and obtained a temporary restraining order.  A detective prepared Plaintiff's case for prosecution by the Los Angeles County District Attorney's (LADA) Los Angeles Sex Crimes Division.  In December 2015, Plaintiff obtained a 3-year "Stay Away" mediated restraining order agreement against Olson.

38.     An LAPD detective involved in Plaintiff's case expressed disappointment when he informed Plaintiff that LADA decided not to press charges.  In the detective's professional opinion, there was enough evidence for a conviction of Olson.  The detective also confided that Olson's wealth and racism appeared to be elements that led

to the refusal to investigate and prosecute her strong case.

39.     Next, Plaintiff sought help through the U.S. Department of Housing and Urban Development (HUD) and the California Department of Fair Employment and Housing, who only take a handful of cases a year.  Upon review of Plaintiff's strong case, HUD took her case and was always available when she called with a question.  However, a few months later, HUD suspiciously shelved her case, refused to return any communications including emails and phone calls and strangely became hostile to Plaintiff's witnesses.

40.     Doe is informed and believes that Olson and/or a subsidiary or strawman of his real estate company entered into construction contracts with HUD, creating a conflict of interest that effectively shut down HUD's investigation into Doe's case and then whitewashed it.

41.     With no options left, Plaintiff (and later Doe 2) proceeded with their filed a civil complaint against Olson and his co-conspirators, *Doe v Olson,* Case No. SC126806/SC128027 on December 9, 2016.  This is more fully documented in the state Amended Complaints, with causes of action: possession/ transmission of child pornography, sexual battery, sexual harassment and defamation among other claims (hereafter referred to the "Sex Abuse Civil Action" or "SACA").

42.     After the SACA began to be served, in February 2017, Olson utilized his vast wealth and network connections to strategize nefarious plots to destroy Plaintiff's life and contingency plans to influence or buy his way out of accountability with the judicial court system.

43.     Also, in or about early 2017, Olson had about seven video surveillance

cameras installed at the Property.  Plaintiff protested their installation because she was concerned he would use them to spy on her and her friends' comings and goings.

## FACTS COMMON TO ALL CAUSES OF ACTION

### PART I.  Unlawful Retaliation Schemes

### <u>Plan A.   Intimidate-Threaten Plaintiff</u>

44.     The insurance company representing the Property's homeowners association (HOA) hired an attorney, **Lamdien Le ("Le")** of **Slaughter Regan and Cole**, to represent Olson in the SACA matter.  Le emailed Plaintiff insisting she "voluntarily" dismiss the SACA.  On March 8, 2017, Le also contacted Plaintiff on the phone to intimidate and threaten her to dismiss the SACA.  Plaintiff told Le she was afraid of Olson because he had already threatened her that "he would make her stop breathing."  She was afraid that if she dismissed the SACA, she would be wide open for Olson to kill her by having her run over with a car.

45.     Le threatened, "Well If you are worried about Curt hurting you, it is more likely that he *will* do something to you –*ah hurt you* –if You Do Not Dismiss the Case!"  Stunned, Plaintiff was traumatized by Le's unethical intimidation on behalf of Olson and could not sleep.  On March 9, 2017 at 11:02 p.m., Plaintiff emailed Le and his law firm regarding the incident, but no one responded.

46.     Plaintiff reported Le's threats to the police and presented her restraining order agreement against Olson. The LAPD made a report and informed Plaintiff that (1) the restraining order agreement was *an agreement* instead of an actual restraining order, thus the police could not enforce it.

47. Although fearful for her life, Plaintiff refused to dismiss the SACA.  When Le's threats, on behalf of Olson, failed, Olson employed Plan B.

### Plan B.  Olson's SLAPP Cross-Complaint

49.     Next, Olson hired **Buchalter** attorney **Eric Kennedy**, who filed a cross-complaint on or about, May 18, 2017, to dismiss the SACA.  Kennedy lied to Plaintiff that his process server had a signature from Plaintiff from service at the Property. Plaintiff never signed a receipt for Olson's cross-complaint. Kennedy, who had never met Plaintiff in person, argued that he "*watched her on the surveillance cameras, sign a receipt.*"  First, neither Olson nor Kennedy were supposed to have access to the Property's video cameras to spy on Plaintiff.  Plaintiff asked Kennedy to provide a copy of her supposed signature, to date Kennedy has never provided this purported forged signature. Nevertheless, not dodging service, Plaintiff requested Kennedy simply mail her the cross-complaint and she would accept service.

50.     The cross-complaint contended that the restraining order agreement was akin to a business contract meant to stop one's right to speak in a civil suit for damages, even though there was no release of claims, and it was without prejudice.

51.     The mediator during the restraining order proceeding said that he could add standard non-disparage language meant only to defuse parties' intrapersonal speech and prohibit Olson's verbal onslaughts.  The mediator assured Plaintiff that the non-disparage clause could in no way bar her right to sue for damages or limit in any way, her litigation privilege for the very same acts that the restraining order agreement was sought.

52.     On June 6, 2017, Olson moved to dismiss the SACA.  Kennedy gloated, stating that it was a "*done deal*, as soon as the hearing starts it would be over for your

case."

53.     The Judge, however, Judge Karlan, denied the motion to dismiss and encouraged a settlement.

54.     Around this time, Le offered Plaintiff a settlement, which she accepted, and they began discussing the details.  Then, shortly thereafter, Le suddenly pretended that he had never mentioned a settlement offer.  Later via conversations with Le, he admitted Kennedy had taken over and was controlling Olson's litigation strategy and had stopped the settlement as there was no financial benefit for Buchalter to settle when Olson was paying them.

### Plan C.   Lenny Dykstra

55.     In 2017, Plaintiff, as trustee for the Trust, was renting out its Property on Airbnb.  She lived nearby and during the day often stopped by to take care of the Property.  She had set up an office area in the living room with all her files to work on the SACA.

56.     On or about May 20, 2017, Leonard "Lenny" Dykstra contacted Plaintiff under the name of "Kyle" via Airbnb to rent a bedroom. However, Airbnb service was supposed to ensure that renters were using their real full names by checking government identification.  Plaintiff always further screened potential renters and spoke at length with Dykstra before finally agreeing to let him rent the bedroom.

57.     At first, Dykstra was extremely kind, charming and ingratiated himself to Plaintiff. He played the part of a sincere religious person, who said he attended bible study classes and invited Plaintiff to join him.

58.     On the first or second day, Dykstra noticed Plaintiff in the living room at

her desk working on some legal documents and he asked her in casual conversation, what she was working on. Plaintiff told Dykstra she was involved in a lawsuit. Dykstra said he knew a lot about lawsuits and offered to help Plaintiff. Plaintiff showed Dykstra her SACA against Olson. Dykstra read some of it, but he never mentioned that Olson was his close friend and "golf buddy."

59.     Dykstra asked Plaintiff how she was going to prove various elements in her case. Plaintiff showed Dykstra some of her evidence. Dykstra also asked Plaintiff, about the owner of the condo property.

60.     Dykstra then became very negative, saying the SACA would get thrown out on summary judgment, it was a waste of time and that she should "just drop it." Dykstra could never give Plaintiff any specific reason why it would get thrown out. Plaintiff emailed a legal advisor and inquired about Dykstra's comments. The legal advisor replied to generally ignore non-attorneys, as they don't know the law.

61.     Dykstra continued to repeat to Plaintiff, multiple times, every day, with increasing insistence, that she should "drop the *stupid* lawsuit!" Dykstra encouraged Plaintiff to do something else more positive then sue. Plaintiff mentioned to Dykstra that she wanted to write a book and Dykstra encouraged her to do so, mentioning that he knew some good publishers and would help her—but first, she needed to "drop the stupid lawsuit!"

62.     Also, around the second day of Dykstra's rental he asked Plaintiff if he could hire her to be his personal assistant. Plaintiff asked what that would entail; Dykstra said getting him a cup of coffee and helping him with purchasing incidentals like ice. Plaintiff agreed to get Dykstra coffee, but he did not have any money on him and offered

to pay her back later.  Later, Dykstra texted Plaintiff, "Ok got you that money."

63.     The next day, Dykstra believed the rental had water damage and told Plaintiff he could help her get an insurance policy that would pay out $5,000 to $7,000 a month for one year for water damage repairs.  Dykstra asked Plaintiff to take down an insurance adjustor's name and contact him.  Plaintiff asked Dykstra to just email her the information. Dykstra said he could not.  Doe said, please text it. Dykstra said he could not do that either.  Then Dykstra said, "I can't have anything from my devices to your devices."

64.     Confused about this special insurance policy, Plaintiff contacted a friend, who was retired from the insurance business.  Plaintiff explained in detail what Dykstra was attempting to arrange with this insider insurance adjustor.  The friend said it sounded like insurance fraud and advised she have nothing to do with it.  Plaintiff told Dykstra she appreciated his concern, but she did not want to get involved.

65.     Dykstra appeared to take it personally and got upset.  He began berating Plaintiff that he only wanted to "help her have great cash flow," but that she was "blocked" and "full of self-sabotage."  Plaintiff thanked Dykstra for his interest again in wanting to help her, but she continued to decline getting involved with his insurance scheme.  Insistent and acting frustrated, Dykstra continued to insist she get the policy even though she continued to say that she was not interested.

66.     Then while Plaintiff was at the Trust's Property, working on the SACA, Dykstra brought the insurance man to the Property courtyard and attempted to force a meeting between them.  Plaintiff made an excuse and left the Property to get away from Dykstra's insistent demands to "help her."

67.    The following day, Dykstra switched tactics and said this rental was "a dump" and needed renovating.  He said that he had a friend, who could loan about $300,000 against the property.  Plaintiff told Dykstra the Property could not take a loan for various reasons including not qualifying.  Dykstra said it didn't matter he could still get a loan.  He said, "Think of all the things you could buy."

68.    Plaintiff mentioned Dykstra's loan to a friend, who asked her to find out the lender because Doe's friend wanted to get a "non-qualifying" loan.  When Plaintiff inquired a few times, who could give this loan, without any qualification, Dykstra became evasive, changed the subject and would never tell her the lender's name or lending institution.  Although Plaintiff repeatedly told Dykstra she did not want to do the loan, he continued to harangue her to "get the loan." Then Dykstra would soften and say he cared about her, and he was just trying to help her but that she was destroying her life with "self-sabotage."

69.    At some point, Plaintiff discovered that Kyle was actually Lenny Dykstra, the former professional baseball player for the New York Mets and Philadelphia Phillies. Plaintiff mentioned to a friend named Loren Marken that through Airbnb she was renting a bedroom to Dykstra.  Coincidently, Loren Marken knew Dykstra.  Plaintiff told Dykstra that Loren Marken was her friend and she mentioned to him that Dykstra was renting. Dykstra became very upset and insisted that Plaintiff not mention to anyone that he was renting a room from her or even that she knew him.

70.    On or about May 26, 2017, the sixth day of Dykstra renting the bedroom, he invited Plaintiff to dinner at a nearby restaurant and she agreed.  After dinner, Plaintiff went back to the rental with Dykstra to get some paperwork.  She blacked out.  Plaintiff

does not remember what happened, but felt disoriented, confused and fearful the following day when she woke up on the couch in the living room of the Trust property. Plaintiff was and is deeply traumatized and to this day does not know what happened.

71.    The next day, May 27, 2017, Dykstra began making provocative sexual comments to Plaintiff and sent her similar text messages. Plaintiff texted Dykstra back that he was dreaming.  Also, Dykstra then began soliciting Plaintiff to be his paid "girlfriend experience," offering $10,000 a month to have sex with him.  Dykstra offered to continually pay Doe $10,000 a month indefinitely.  Shocked, frightened and confused by the entire situation, and emotionally traumatized and drained, Plaintiff asked Dykstra to leave immediately.

72.    Dykstra moved out on or about May 27-28, 2017.  On or about May 29, 2017, however, Dykstra unexpectedly showed up and uninvited walked right into the Trust Property living room, where Plaintiff was working. In a menacingly dark tone, Dykstra said, that he would not leave until Plaintiff wrote and signed a confidentiality agreement that he dictated, stating that she would not disclose any info about him from this day forward.  Plaintiff told him she did not want to write this and that she was not allowed to sign anything without having an attorney review it. Dykstra took an extremely aggressive stance, demanding she do it.  Dykstra grabbed a small notebook and pen and forced it into Plaintiff hands. Plaintiff gauged to see if she could run around him to get out, she but could not.  Plaintiff was trapped and continued to say she could not sign anything.  Dykstra became more forceful and accosted her forcing her down into a chair to write it as he stood over her.  Afraid, Plaintiff feared for her life because Dykstra was overwhelming and overpowering in his size and stature, thus under duress, Plaintiff wrote

down the few words Dykstra dictated on a small piece of paper and signed it. Dykstra gabbed the notebook, ripped the paper out and left.

73.     Up until the last moments that Plaintiff spoke with Dykstra, he continued to insist she "drop the stupid lawsuit." After Dykstra left, he texted an ominous statement, "I'm not done with you yet."  Plaintiff sent Dykstra a text that she was "…very insulted that [he] proposed a financial arrangement as [she is] NOT that kind of woman…" Further, Plaintiff told Dykstra she did not want to communicate with him in any way going forward.

74.     Unbeknownst to Plaintiff, Dykstra contacted Plaintiff's girlfriend (Doe-GF) about a week after he left and tricked her to meet him.  At this meeting, Dykstra's primary motive was to get Doe-GF to help him convince Plaintiff to drop the SACA. Doe-GF told Plaintiff that all he wanted to talk about was "getting Doe to drop the SACA."  Doe-GF tried to change the subject, but Dykstra continually brought the subject back to the SACA.  Doe-GF finally defended it, saying that she thought it had merit, but Dykstra disagreed and said Plaintiff was "crazy."  Doe-GF said that Dykstra seemed financially motivated to get her to help convince Doe to drop her suit against Olson.

75.     Dykstra did succeed in profoundly inflicting emotionally distress upon Plaintiff.  This distress was compounded when Plaintiff discovered that some of the legal documents stored in the home office had gone missing.  Since no one else had been there, the only person who could have taken any legal documents was Dykstra.

76.     Olson admitted on the witness stand, November 16, 2018, that yes, he was friends with Dykstra.

77.     When the Dykstra Plan to derail the SACA by criminally framing her as a

prostitute, insurance fraudster, and/or to pressure/manipulate/drug her to drop it failed, the Olson conspirators upped the ante and moved to Plan D employing thugs to stalk Plaintiff.

### Plan D.   Stalkers

78.     During the month of June 2017, Plaintiff and others witnessed strange men, often "dressed in black" as if in a work clothing like a driver, stalking around Plaintiff's neighborhood and at local café that Plaintiff frequented for lunch, taking photographs of her.

79.     At one point in late June 2017 a concerned eyewitness, waiter named Amado Moreno ("Moreno") at the café, warned Plaintiff to leave Los Angeles immediately and go into hiding because he had witnessed Olson with thugs, at this local café, discussing things that made him feel Plaintiff's life was in danger.

80.     In fear of her life, Plaintiff left Los Angeles and went into hiding for months.  Moreno continued to overheard Olson discussing something nefarious regarding Plaintiff.  Moreno continued to see Olson show up at the café with the thugs during lunch times. Moreno believed that Olson was there to identify Plaintiff to the thugs.  Later, Moreno witnessed Doug Econn, Olson's crony, who knew Plaintiff's appearance, also begin showing up with the same sort of thugs in tow.  After a while the thugs would show up alone one at a time at lunchtime.  One thug admitted to Moreno that he was hired to look for/keep tabs on a young woman who lived across the street at the Property.  Plaintiff was the only young-looking woman who lived at the Property among the six residents total.  Moreno would overhear him say on the phone, "No she's not here."  Other men dressed in black also showed up at the quiet café, that rarely had

any business aside from hotel guests or locals.  These men would case around the café, patio, lobby, store, swimming pool as if looking for someone. Then they would sit in the café for a short time and always make the same phone call saying, "No she is not here." Moreno called Plaintiff and spoke on a conference call with her attorney, giving twice weekly updates continually warning Plaintiff and her attorney that it was not safe to return to Los Angeles.

81.     Moreno then reported that Dykstra began coming to the café in August and began asking staff if they knew when a particular woman, who fit Plaintiff's description might stop by the café.  Dykstra directly asked Moreno, "When do the locals show up?" Further, Moreno overheard Dykstra on his cell phone numerous times saying, "She's not here."  Moreno knew Dykstra because years earlier he had stayed at that hotel, and he had met him and he was able to verify Dykstra and Olson by their names on their credit cards.

82.     While Doe was in hiding, she sublet the Trust Property to tenants.  During this same time, July of 2017, one tenant, who was usually at work, unexpectedly came back to the Property during the day.  He witnessed a group of people at the back door of Plaintiff's rental, looking through the trash. When Plaintiff attempted to get the Property's surveillance video of the incident, the Property management and HOA attorneys fought tooth and nail to prevent Plaintiff from having a copy.  Finally, after filing a motion to compel for evidence spoilage, Judge Karlan ordered Olson's co-conspirators to turn over an original copy of the video.  However, what they turned over had over two hours missing, with a three-minute freeze and jump cut as the strangers walked towards the back door of Plaintiff's rental.  The video then cut to the strangers

leaving.

83.     Moreno told Plaintiff that he recognized one of the men in the video as the same man who frequented the café and who specifically said he was hired to find Plaintiff.  As the tenant unexpectedly approached the back door the strangers suddenly left. Concerned, the tenant went to look for these strangers, but they appeared to disappear. Then suddenly he witnessed them emerge from Olson's condominium back door and began taking several photos of them exiting.

84.     Later, the Property manager and staff again sent an after-the-fact notice that architects would be visiting the Property.  Notices were always sent prior and when asked on the witness stand who these people were, no one knew anything about them, not their first or last names, what company, even though they were in Olson's condominium.  Further, even the Property surveillance camera installer said that the video was not supposed to freeze when people are in the frame moving.

85.     Further, the tenant and another friend witnessed men parked for hours on the back alley or side street of the Property.  One was able to take a photo and it was sent to the waiter Moreno, who identified him as one of the thugs he witnessed at the café during lunch, and telling someone on his cell phone, "She's not here."

86.     Because Olson was violating the 2015 three year  "Stay Away" agreement, the Los Angeles Police recommended she file a second civil harassment restraining order ("2nd CHRO") to encompass Olson use of third parties. On September 6, 2017, Plaintiff obtaining a Temporary Restraining Order (TRO) and returned to Los Angeles. After this was served on Olson, he filed a retaliatory restraining order against Plaintiff, for process of service.

**Plan E.   Witness Tampering**

87.     After Plaintiff filed declarations in the restraining order case from the waiter, Moreno regarding what he had witnessed, Moreno became the target of Olson's army of thugs.  Moreno was harassed at work and in his neighborhood by strange people, who made threatening comments.  Moreno was followed while driving numerous times and finally a thug put a gun in his face and threatened to kill him.  Moreno was able to escape and filed a police report.  Finally, in June of 2018, Moreno suddenly quit his job and disappeared.  Intimidated and in fear for his life, Moreno told Plaintiff he had to get out of California.  Moreno failed to appear to testify at the November 14-19, 2018, restraining order hearing, even though he had been subpoenaed and warned that a bench warrant would be issued for his arrest, for failure to appear.

**PART II.  UNLAWFUL JUDICIAL COVER-UP SCHEMES
AND SYSTEMIC BIAS
Judge Michael Convey
Lenny Dykstra - Judicial Cover-up Scheme**

88.     From November 14 to 19, 2018, Judge Convey presided over the 2nd CHRO hearings.  To receive the protection of a restraining order against Olson, Plaintiff had to prove that Olson had used any third party to threaten, stalk or harass her with a clear and convincing burden of proof.

89.     When Plaintiff's attorney Benjamin Kanani asked Olson if he knew Lenny

Dykstra, Convey took a keen interest. The court-room turned into a sport's bar with the excited men in the room talking about Dykstra's famous plays.  Kennedy asked if Convey was a Mets or Phillies fan, and Convey replied no, he was a Chicago Cubs fan.

90.     Olson admitted that he was friends with Dykstra, stating that they were "golf buddies" and had played golf together in Mexico.

91.     Kennedy immediately became extremely agitated moving his arms up and down in an insider secret club gesture "of distress" to Judge Convey and objected twice to any more questions regarding Dykstra. Plaintiff's attorney attempted an offer of proof, but Convey noting Kennedy's signal sustained the objection.

92.     Shortly thereafter, Judge Convey announced that there would be an extra-long break before the court would reconvene.  During this extended break, Plaintiff reasonably believes, Judge Convey, court reporter Marlene Burris, Olson's attorneys Eric Kennedy, Ryan Vogt-Lowell, Dien Le and possibly others conspired to counterfeit the official court transcript. Defendants removed 24 words and replaced them with 44 words destroying the official reporter's transcript evidence of the Olson-Dykstra "golf-buddy" friendship testimony and replaced it with different testimony that the golf friendship never took place and essentially that Olson really did not know Dykstra. Further, court reporter, Marlene Burris's transcript removed Kennedy's objections and Judge Convey's sustained ruling to prevent Plaintiff from challenging the ruling on appeal.

93.     On November 19, 2018, Judge Convey denied both Plaintiff's restraining order as well as Olson's.  Plaintiff immediately ordered an expedited transcript. However, calculatingly, the court reporter Burris had a convenient delay that she could

not give Plaintiff the transcript for months because she was busy with a purported appeal that took precedence.

94.    Plaintiff moved for reconsideration and a new trial, and requested an extension to hear her motions pending receipt of Burris' reporter's transcript with Olson's critical testimony of his "golf-buddy" friendship with Dykstra. Judge Convey refused to wait, forcing Plaintiff to proceed "in the dark" with her motions. Thus, Plaintiff's attorney, Kanani, who personally questioned Olson, provided a declaration signed under penalty of perjury in the State of California before the altered transcript was provided.  Since the trial had just happened it was fresh in Kanani's memory and he had his trial notes. Thus his declaration verified in detail that Olson had answered the Dykstra question affirmatively, and that he knew Dykstra because they played golf in Mexico, together, where Olson owns a home.  Further, Kanani's declaration states that Judge Convey sustained Kennedy's objections, shutting down an inquiry into the matter.

95.    Furthermore, Plaintiff's was so surprised at Olson's "golf-buddy"- Dykstra admission, at the first break, she emailed, texted and called her friends and family to tell them. This evidence was brought before Judge Convey in her motions.

96.    Convey denied Plaintiff's motions. Shortly thereafter, Plaintiff finally received Burris's court-certified transcript and was devastated to witness Burris' altered and counterfeited transcript, effectively destroying the evidence and facts of Olson's testimony. Plaintiff appealed.

97.    However, when Plaintiff went to cite Kanani's declaration in the Bates-stamped record of her appeal, the Superior Court, through the acts of Clerk Cindy Kim and other unknown Doe court staff, omitted the second page of Kanani's declaration

with these pertinent facts.

98.     Olson then moved for attorney's fees even though he was not the prevailing party. Plaintiff opposed and moved for fees in defense. The next time, Plaintiff was before Judge Convey was the attorney's fees hearing on April 16, 2019

99.     Plaintiff questioned Judge Convey about the altered transcript where he had such a keen interest in Lenny Dykstra and was an avid fan of baseball.  Further, Plaintiff notified him that there would be an investigation and that he would be a witness.  Thus under the rules of court, he was required to recuse himself.  Judge Convey played dumb, gaslighting Plaintiff and refusing to answer any questions about the altered transcript.  Plaintiff under oath requested Judge Convey to recuse himself. He refused. Plaintiff then filed a notice to disqualify Judge Convey, which he denied. Then the attorney's fees hearing proceeded.

100.     Olson's submitted attorney's fees reply brief omitted the true and correct Grant Deed transferring the property's title to Max Wilcox and replaced it with fraudulent deed documents (Fidelity National Title Company, chain of title document and a declaration from attorney Ryan Vogt-Lowell acting as a real estate expert)  that obfuscated the chain of title and framed Jane Doe, who was/is an indigent qualified fee waiver litigant, as the personal owner of the ATW Trust's property.  Further, Kennedy filed fraudulent documents that falsely inflated the Trust's property's market value misrepresenting that Plaintiff was "worth seven figures."   Jane Doe objected to Olson misrepresenting that she was an "alter ego" or that the Trust was a "sham."  Plaintiff was never the personal owner of the Trust's property; she had only been a trustee and was never a beneficiary.  Further at the time of the attorney's fees hearing, Plaintiff had

previously stepped down from her trustee position, thus she had no capacity whatsoever to represent the Trust. Further even if she had still been a trustee, since she was not a licensed attorney, she could not represent a Trust in a court of law, because that would be practicing law without a license to represent the Trust's beneficiaries.  Judge Convey knew, Plaintiff was not an attorney and thus had no authority whatsoever to represent a Trust and their beneficiaries.

101.    Furthermore, restraining orders, pursuant to Code of Civil Procedure 527.6 are limited to only individuals, a corporation or trust entity cannot file or receive a restraining order. Thus the ATW Trust was never a party to any restraining order pre-trial hearing, trial hearing or post-trial hearing.  And no attorney ever made a general appearance for the Trust.  Although the court and Judge Convey knew they had a complete absence of jurisdiction over the non-present, non-represented, non-party ATW Trust, and as such the Trust was unable to defend itself, in violation of procedural due process, Judge Convey made a ruling against ATW Trust (and Jane Doe) in Olson's favor, for about an eighty thousand dollar ($80,000).  Judge Convey acted with no jurisdiction whatsoever.

102.    Therefore, in the dueling restraining orders, even though Olson did not win a restraining order—the same result as Plaintiff, Judge Convey made Olson the de facto prevailing party, by awarding him attorney's fees against the non-party Trust.  Judge Convey knew indigent Plaintiff would never be able to pay $80,000. This was step one in their scheme to continually add attorney's fees against the non-party Trust.  Olson conspiring with Judge Convey other judges had effectively weaponized the court wherein each subsequent judge would refused to overrule Judge Convey's order and

continue to add more and more attorney's fees against the nonparty Trust.  Indeed, later

Judge Wendy Wilcox stated on the record that although there was nothing in the record

showing that the court had ever obtained any jurisdiction over the Trust, because the

previous Judges did not care about jurisdiction, she could not overrule a previous

judge's order. The court never obtained personal jurisdiction or subject matter over the

nonparty Trust. Eventually the judges ruled over half a million dollars in attorney's fees

and sanctions against the non-party Trust with a complete absence of jurisdiction. Their

conspiracy to steal the Trust's property led to Olson unlawfully acquiring the majority

interest in the Trust's property on April 1, 2022.

## **Judge Emily T. Spear**

### **Conspires with Deputy Sheriff Koo to use**
### **Excessive Force and Intimidation Against Plaintiff**

103.    On December 11, 2019, Judge Spear signaled **Deputy Sheriff William**

**Koo** as Plaintiff made her oral arguments.  Koo walked over and stood about 12 inches

directly behind Plaintiff.  He put one foot forward, lunged into a ready-to-shoot stance,

removed the strap from his weapon, put his hand on the grip of his gun, cocked his

arm/elbow back and up high and held this stance directly behind Plaintiff as she tried to

speak.  The situation impaired Plaintiff's ability to speak freely.  In a rogue move, Judge

Spear used the Sheriff to aggressively intimidate Plaintiff.

104.    After this incident, Plaintiff sought help and from an ADA advocate,

Cynthia Brown.  Plaintiff found she was afraid to go back into Judge Spear's courtroom

without the support of Brown.

105.    Later, Plaintiff saw Koo in the courtroom hallway and asked him why he did that to her.  Koo told Plaintiff that he had had the courtroom surveillance videos erased, so there would be no evidence of his illegal and abusive actions.  Plaintiff made a report with the head Sheriff of the department, who said he would follow up and get back to Doe. He has not followed up as of yet.

## Violations of the ADA

106.    On January 22, 2020, Plaintiff requested ADA accommodations in Judge Spear's courtroom and filed a confidential ADA medical document.  Judge Spear allowed the ADA hearing and cleared the courtroom to discuss the matter. Every person sitting in the courtroom galley left including Olson's attorney Kennedy.  Everyone exited the courtroom and did not come back into the courtroom until the hearing had completely ended and Deputy Koo reopened the courtroom door.  Only court staff, the Judge, Deputy, Plaintiff and her ADA advocate Cynthia Brown were present. Plaintiff has two medical conditions, PTSD and Dyslexia that constitute disabilities according to the ADA general definition of disability as these substantially limit the major life activity of reading and writing. Together these disabilities make it impossible for Plaintiff to read accurately, take notes and comprehend what is happening in the normal stresses of a courtroom. Of course these are compounded when the court is not following the law, basic due process procedures and/or is discriminating. Due to Plaintiff's disabilities she requested to take notes via an audio recorder.

107.    Judge Spear refused Plaintiff's accommodations requests, putting Doe at a serious disadvantage for a level playing field as a non-attorney.  Judge Spear asserted that she did not understand her ADA request.  However, in the past, two other California

Superior Court Judges have granted in full, the exact same requests Plaintiff requested of Judge Spear.

108.   Upon learning of Plaintiff's medical condition, Judge Spear purposely and maliciously acted against her medical condition to undermine Plaintiff's ability to litigate and acted in way to aggravate Plaintiff's existing medical condition.

109.   In a subsequent hearing, another Buchalter attorney, **Ashley Milnes**, appeared for Olson.  Milnes brought up matters concerning Plaintiff's confidential ADA requests, indicating that she knew what they were and wanted to make sure Judge Spear would not to grant the requests.

110.   Because the courtroom was closed, this indicated that Milnes learned about the ADA requests from unauthorized ex parte communications with Spear and/or Kennedy.  To hide Judge Spear's disclosure, court reporter **Debra Rivera** ("Rivera") altered the official court transcripts to state that Kennedy was allowed to come back into the courtroom and attended Plaintiff's private ADA hearing.

111.   Further, Judge Spear's court clerk, Cindy Kim, sent Kennedy Doe's private medical records, which Kennedy promptly posted on the internet to Doe's great humiliation.  When Plaintiff tried to discuss the matter with Kim, the new department Judge Wendy Wilcox, or the Stanley Mosk Courthouse ADA coordinator, Plaintiff initially was told it was not the court's mistake.  However, it later was discovered that Kim secretly took Plaintiff's confidential medical documents and U.S.-mailed them to Kennedy.  The ADA coordinator assured that they would do an investigation, but every time Plaintiff contacted them to follow up, she was brushed off.

**Judge Spear Conspired with Court Reporter Debra Rivera and Olson's**

**attorneys Kennedy and Milnes to alter official court transcripts.**

112.    There are numerous alterations in Debra Rivera's court transcripts, and court minute orders, which hide the truth for the benefit and enrichment of Olson and the detriment of Plaintiff. For Example, Judge Spear had unauthorized *ex parte* communications with Kennedy notifying him, that she did not receive the Trust's documents under seal.  Judge Spear was improperly using her judicial powers to procure Trust documents under seal to unlawfully hand over to Kennedy instead of him going through the normal process of a subpoena. Kennedy personally admitted to Jane Doe on the phone that he knew no Trust documents were found so he was canceling her deposition. However, there was no court hearing for Kennedy to discover this information as the Trust information was given to the court under seal.

**Judge Spear Framing Plaintiff to Illegally Arrest Her**

113.    Spear and Kim concocted a defamatory falsehood that Plaintiff had come to her courtroom after hours and had "banged" on the heavy wood locked courtroom door to such an extent it frightened her courtroom staff. This event never took place.  On February 28, 2020, Judge Spear with a raised voice went on to scold and humiliate Plaintiff that she must not disrespect her courtroom, or she will be in contempt and will be arrested and put in jail.  Doe was shocked at the unfounded allegation.  Kim duly noted Judge Spear's comments on the Minute Order.

114. Judge Spear using her judicial powers conspired with Olson to continue the scheme started with Judge Convey to steal the Trust's property by Judge Spear making a

series of rulings and orders against the nonparty Trust with a complete absence of jurisdiction, and in violating the automatic stay for attorney's fees only judgments, per 917.1(d) *Quiles v. Parent*, 10 Cal. App. 5th 130, including but not limited to ordering Plaintiff to be Olson's free process server and serve the Trust, (Plaintiff refused), ordering Trust documents to be delivered to her under seal, ruling that the Trust was a judgment debtor, adding attorney's fees via Jane Doe onto the Trust, sanctioning the Trust $10,000 and nullifying and voiding the transfer to of title of real property to the Trust.

115. **Judge Spear's Conflict of Interest and Appearance of Impropriety** On December 11, 2019, Jane Doe filed a verified notice to disqualify Judge Spear under CCP 170.1 because Jane Doe discovered a reasonable conflict of interest, that Judge Spear had been the Deputy District Attorney for the Sex Crimes Division for the County of Los Angeles that reviewed Jane Doe's sex crimes case against Olson in which Olson violently sexually assaulted Jane Doe and put video cameras in her bathroom filming her and a 15 year old minor in 2015. Further, even though the LAPD detective said there was enough evidence to get a conviction, it was Emily Spear's division, that refused to prosecute Olson.

1. Refusing to recuse herself from the bench, Judge Spear quibbled that even if she had been involved with Jane Doe's sex crimes case against Olson, she simply did not remember it. However, the standard is not **if** Judge Spear remembers –but the appearance of impropriety:

> An **appearance of impropriety** occurs when reasonable minds, with
> knowledge of all the relevant circumstances disclosed by a reasonable inquiry,

would conclude that the **judge's** honesty, integrity, impartiality, temperament, or fitness to serve as a **judge** is impaired.

## FIRST CAUSE OF ACTION

### DEPRIVATION OF CIVIL RIGHTS

42 U.S.C. § 1983 and 14th Amendment: Substantive and Procedural Due Process, and Equal Protection

(Against Convey, Spear, Burris, Rivera, and Kim)

116.    Plaintiff repeats and re-alleges all the preceding allegations as if fully set forth herein.

117.    The aforementioned allegations against these Defendants were committed by said Defendants acting under the color of state law, as they committed the acts and omissions complained of while acting in their capacities as employees of the State of California.

118.    Said acts and omissions deprived Plaintiff of her Substantive and Procedural Due Process, and Equal Protection Under the Law as guaranteed by the Fourteenth Amendment.  Said acts and omissions denied Plaintiff a fair trial or hearing, and were done in a complete absence of jurisdiction over ATW Trust and on the basis of Plaintiff's status as a disabled, single female of mixed race.

## SECOND CAUSE OF ACTION

### CONSPIRACY TO VIOLATE CIVIL RIGHTS

(Against all Defendants)

119.    Plaintiff repeats and incorporates by reference all facts alleged above.

120.    As noted supra, the aforementioned allegations against the state actor Defendants were committed by said state actor Defendants acting under the color of state law, as they committed the acts and omissions complained of while acting in their capacities as employees of the State of California.

121.    Said acts and omissions deprived Plaintiff of her Substantive and Procedural Due Process rights and Equal Protection of the law as guaranteed by the Fourteenth Amendment.  Said acts and omissions denied Plaintiff a fair trial or hearing, and were done on the basis of Plaintiff's status as a disabled, single female of mixed race.

122.    Plaintiff is informed and believes and thereon alleges that here, functioning as a well-coordinated single force, all Defendants collectively planned, agreed and acted to deprive Plaintiff of her constitutional rights under the Seventh Amendment, as well as the Substantive and Procedural Due Process and Equal Protection guaranteed by the Fourteenth Amendment.

123.    Therefore, all Defendants are jointly and severally liable to Plaintiff for a Conspiracy to Violate her constitutional rights.

### THIRD CAUSE OF ACTION

### VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

(Against Defendants Spear, Rivera, and Kim)

124.    Plaintiff repeats and re-alleges all the preceding allegations as if fully set forth herein.

125.    Plaintiff is a disabled person within the meaning of the ADA in that she has been diagnosed with PSTD and Dyslexia.

126.   Plaintiff's PSTD and Dyslexia is a physical and mental impairment that substantially limits one or more major life activities, including reading, writing, learning, and working.

127.   Defendants own, lease, or operate a place of public accommodation, in that the courtrooms of the State of California are places of public accommodation. Defendants operated the courtrooms in which Plaintiff sought an ADA accommodation in that they were in charge of the proceedings therein as employees of the State of California assigned to work in those courtrooms.

128.   Defendants denied Plaintiff meaningful access to said public accommodation because of her disability, in that Defendants' denial of Plaintiff's ADA request was the equivalent of a denial of her ability to access the courtroom. Plaintiff had requested a reasonable accommodation for her disability. Thus denial of her accommodation constituted an illegal discrimination.

129.   Further, Plaintiff provided information concerning her disability to Spear and Kim when she made the ADA request.

130.   Spear disclosed said information to Olson and/or one of his attorneys Kennedy and/or Milnes, as Milnes learned about it not having been at the request hearing.

131.   Kim disclosed said information to Kennedy by sending it to him in the U.S. Mail.

132.   Said disclosure caused Plaintiff a tangible injury by exposing her to embarrassment and ridicule from the public.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and equitable relief against Defendants as follows:

1.  For compensatory and special damages, including liquidated damages in appropriate amounts to be proven at trial;

2.  For general damages according to proof, plus interest thereon at the legal rate paid in full;

3.  For punitive and exemplary damages against Defendants in an amount necessary to punish and/or set an example of Defendants;

4.  For prejudgment interest at the maximum allowable legal rate; and

5.   For declaratory and injunctive relief and any such other and further relief as this Honorable Court deems just and proper.

6.  For reasonable attorney fees, as allowed by statute, in amounts to be documented at trial.

7.  DEMAND FOR TRIAL BY JURY Plaintiff hereby demands a trial by jury on all issues so triable, including all issues of fact.

DATED: June 13, 2022

By: /s/ G. Scott Sobel
Attorney for Jane Doe

SWORN AFFIDAVIT AND VERIFICATION

by Plaintiff

1) I am Jane Doe, Plaintiff. I have made a careful review of the complaint now before this Honorable Court. I have personal knowledge of each and every fact I allege within the complaint, and I solemnly swear that each one is true.

2) As to those matters alleged outside my personal knowledge, I believe them to be true, based on reasonable inference.

3) If called before any court, I could and would testify competently about the matters herein alleged.

4) I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct. Executed in Los Angeles, California on June 13, 2022.

*Jane Doe*
Plaintiff