Court of Appeal, Second Appellate District
Daniel P. Potter
Electronically RECEIVED on 7/23/2021 at 11:48:45 PM

Court of Appeal, Second Appellate District
Daniel P. Potter
Electronically FILED on 7/23/2021 by Orlando Carbone, Deputy Clerk

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
## SECOND APPELLATE DISTRICT, DIVISION TWO

FILED
CLERK, U.S. DISTRICT COURT
February 2, 2023
CENTRAL DISTRICT OF CALIFORNIA
BY:        SV        DEPUTY

| | |
|---|---|
| Vidala Aaronoff, | ) 2nd Civ. Nos. B295388 |
| Plaintiff and Appellant and, | ) |
| | ) Los Angeles County |
| Specially Appearing Nonparty Trustee | ) Superior Court Nos. |
| for the ATW Trust, John Walkowiak, | ) 17SMRO00308; |
| Claimant and Appellant U2 | ) 17SMRO00368 |
| v. | ) |
| | ) |
| Curtis Olson, | ) |
| | ) |
| Defendant, Respondent | ) |
| and Cross-appellant. | ) |

Appeal From The Superior Court of Los Angeles County
Hon. Michael Convey, Judge, and Hon. Emily T. Spear, Judge

## APPELLANT AARONOFF'S OPENING BRIEF

V. Aaronoff
9461 Charleville Blvd. #259
Beverly Hills, CA 90212
(310) 498-7975
in *sui juris*
Janedoe4justice@aol.com

TO BE FILED IN THE COURT OF APPEAL **APP-008**

| COURT OF APPEAL  Second **APPELLATE DISTRICT, DIVISION** Two | COURT OF APPEAL CASE NUMBER:  B295388 |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY:  STATE BAR NUMBER:  NAME: Vidala Aaronoff  FIRM NAME:  STREET ADDRESS: 9461 Charleville Blvd. #259  CITY: Beverly Hills  STATE: CA  ZIP CODE: 90212  TELEPHONE NO.: (310)498-7975  FAX NO.:  E-MAIL ADDRESS: janedoe4justice@aol.com  ATTORNEY FOR (name): in sui juris | SUPERIOR COURT CASE NUMBER:  17SMRO00308 |

| APPELLANT/ Aaronoff  PETITIONER: |
|---|
| RESPONDENT/  Olson  REAL PARTY IN INTEREST: |

| **CERTIFICATE OF INTERESTED ENTITIES OR PERSONS** |
|---|
| (Check one): [ x ] INITIAL CERTIFICATE  [ ] SUPPLEMENTAL CERTIFICATE |

**Notice: Please read rules 8.208 and 8.488 before completing this form. You may use this form for the initial certificate in an appeal when you file your brief or a prebriefing motion, application, or opposition to such a motion or application in the Court of Appeal, and when you file a petition for an extraordinary writ. You may also use this form as a supplemental certificate when you learn of changed or additional information that must be disclosed.**

1. This form is being submitted on behalf of the following party (name): Aaronoff

2. a. [ x ] There are no interested entities or persons that must be listed in this certificate under rule 8.208.

   b. [ ] Interested entities or persons required to be listed under rule 8.208 are as follows:

| **Full name of interested  entity or person** | **Nature of interest  (Explain):** |
|---|---|
| (1) | |
| (2) | |
| (3) | |
| (4) | |
| (5) | |

[ ] Continued on attachment 2.

**The undersigned certifies that the above-listed persons or entities (corporations, partnerships, firms, or any other association, but not including government entities or their agencies) have either (1) an ownership interest of 10 percent or more in the party if it is an entity; or (2) a financial or other interest in the outcome of the proceeding that the justices should consider in determining whether to disqualify themselves, as defined in rule 8.208(e)(2).**

Date: June 1, 2021

Vidala Aaronoff

_(TYPE OR PRINT NAME)_ 　　　　　　　　　　　_(SIGNATURE OF APPELLANT OR ATTORNEY)_

Page 1 of 1

| Form Approved for Optional Use  Judicial Council of California  APP-008 [Rev. January 1, 2017] | **CERTIFICATE OF INTERESTED ENTITIES OR PERSONS** | Cal. Rules of Court, rules 8.208, 8.488  www.courts.ca.gov |
|---|---|---|

For your protection and privacy, please press the Clear This Form button after you have printed the form. | Print this form | Save this form | Clear this form

## TABLE OF CONTENTS

Page

INTRODUCTION

      A. Factual and Procedural History ……………...................... 6

ARGUMENT

      I.     Fraud Vitiates Everything ……….........................45

          A.  Lenny Dykstra is the Linchpin…………………...45

          B.  Olson Fraud on the Court …………………………46

      II.    The Trial Court Abused Its Discretion………………49

          A. The Trial Retained Jurisdiction………………...49

          B. The Trial Court Violated Evidence Code 777…..49

          C. The Trial Must Accept Amado Moreno's

             Declarations…………………………………………50

      III.   The Court Must Vacate the Order Entered on

           November 6, 2019. The Court Lacked Subject Matter

           Jurisdiction..………………………………………… 50

      IV.   CCP §187 Requires a Noticed Motion to

           Add Judgment Debtor.............................................. 53

CONCLUSION…………………………… ………………….55

CERTIFICATE OF WORD COUNT ………………………….57

## TABLE OF AUTHORITIES

**Cases**                                                        **Page(s)**

*Danko v Reilly,*

    (2014) 232 Cal. App. 4th 732, 735-36 ....................   52

*Davis v. Washington* (2006) 547 U.S. 813, 822................   52

*Elsea v. Saberi*

    (1992) 4 Cal.App.4th 625, 629............................   52

*Field v. Hughes*

    (1930) 134 Cal.App. 325, 327.............................   52, 57

*Garcia v Santana* (2018) 174 Cal. App 4th 464...............   47

*Gold v. Superior Court*

    (1970) 3 Cal.3d 275, 280     .............................   51

*In re Hultin's Estate*

    (1947) 29 Cal.2d 825, 829–830............................   53

*Mad Dogg Athletics, Inc. v. NYC Holdings,*

    (C.D. Cal. 2008) 565 F. Supp. 2d 1127, 1130...........   53

*Manson, Iver & York v. Black*

    (2009) 176 Cal.App.4th 36, 43............................   54

*Miller v Miller*

    (1945) 26 Cal.2d 119.........................................   49

*Michigan v. Bryant* (2011) 562 U.S. 344, 367, pp. 370-371...   52

*People v. Nelson* (2010) 190 Cal.App.4th 1453, 1466............52

*Quiles v. Parent*

    (2017) 10 Cal.App.5th 130, 144-145.................   42, 53, 57

*Sheley v. Harrop,*

    (2017) 9 Cal.App.5th 1147 ……………………………..  42

*Wells Fargo Bank, NA v. Weinberg.*

    (2014) *227 Cal. App. 4th a 6*…………………………… 53, 54

**Statutes**

Code of Civil Procedure section 527.6. ………16, 17, 29, 30, 31, 53

Code of Civil Procedure section 917.1(d)………………..42, 53, 57

Penal Code, 134 Creation of Evidence………………..  19, 35, 45

Code Civil Procedure § 916(a)…………………………………  52

Code Civil Procedure § 1033.5(10)(B), Chapter 6 of Title 14…. 51

Code Civil Procedure § 187……………………………………51, 52

Code of Civil Procedure sec. 664.6…………………………16, 28, 49

# INTRODUCTION

*There is no crueler tyranny than that which is perpetuated under the shield of law and in the name of justice."* – <u>Baron de Montesquieu</u>

## A. Factual and Procedural History

Plaintiff-Appellant-Petitioner Vidala Aaronoff, ("Aaronoff") is a mix-race woman of color.  Her father came from a hardworking farm family of modest means in South Dakota (28 Jan CT 1563) and her mother was an indigenous orphan. Her mother, against all odds, won a scholastic scholarship to college and law school. As an attorney, the bulk of her practice has been to provide low-cost legal services to poor minorities and immigrants, which she continues today at the age of 84.

Aaronoff's parents had/have a strong work ethic and instilled that in her, (28 Jan CT 1563) which enabled her to have the dedication it takes to train to be a successful ballerina in the competitive world of dance. Unlike some other areas of entertainment, ballet akin to professional sports is the type of activity in which one cannot "sleep their way to the top." Aaronoff became known for her "talent and artistic sensitivity" as a dance teacher and principal-soloist as an Isadora Duncan Dancer. This is evidenced by her positive reviews, including a *New York Times*, review by dance critic, Jack Anderson.  Aaronoff is also a Native American religious dancer and is "considered a world treasure and one of the world's foremost knowledgeable people in the art

of sacred dance," by Fulbright scholar, PhD in art history, dance historian and author, Elena Yushkova. **(**RJN A)

In 1998, Max Wilcox, a classical music producer, became the music director and producer of the Isadora Duncan Academy, a non-profit, founded by the New York Academy of Art in 1991 and also became one of its benefactors.  The Academy was the custodian of Isadora Duncan's choreography, which is performed to classical music. (RJN A 49-50)

Aaronoff worked for Max Wilcox at the Academy as a teacher and performer (RJN A 6, 49-50). The average dance teacher in the United States in 2021 makes a yearly income of $41, 871 as reported by salary.com and $52,914 as reported by indeed.com for the Los Angeles market.

Wilcox had successfully been involved in converting his apartment into a co-op and taught Aaronoff how to do it. (RJN A 50). Wilcox was the original investor contributing funds to open escrow for an eight-unit rental-apartment-to-condominium conversion project in Los Angeles, California in 2001. (30 Apr. CT 1044, 1051; RJN A 6, 50)  The apartment, known as, Chateau Colline, was "a crumbling castle" where Aaronoff was a rent-control resident. (RJN A)  Wilcox had a work agreement with Aaronoff to be the front principal point person on the conversion project. (RJN A 50) She later worked as Wilcox' agent and property manager, where she executed documents under power of attorney and management agreements. (RJN A 6)

In 2002, Defendant-Respondent and Cross Appellant Curtis Olson, aka Curt ("Olson") a multi-millionaire, CEO of Nexus Real

Estate companies (6 Jun CT 465-466) and who comes from a wealthy real estate family, became the majority investor. Olson ultimately acquired the Chateau Colline apartment under the entity, Wilshire Chateau LLC, (RJN A) with a signed agreement ("Agreement") that upon completion of specified work obligations for the condominium conversion; one condominium unit would be granted to Aaronoff's assignee, Max Wilcox, the ("Wilcox Unit"). (30 Apr. CT 1044, 1051 RJN A 7)

Olson's real estate company, Nexus, also hired Aaronoff to be the property manager for the eight-unit apartment building. Aaronoff resided in the Wilcox Unit (RJN A) and Olson became a part-time resident in one of the other units.  Thus, Olson was Aaronoff's landlord, employer, and business associate in the conversion project.

Shortly thereafter, Olson, a married man with children, began making romantic advances towards Aaronoff, (30 Apr. CT 1070, 1044,1052; 28 Jan CT 1441)  "Olson would sneak over in the middle of the day when Aaronoff's husband was a work and offer to take her on shopping sprees and upscale restaurants." (28 Jan CT 1442)    Olson's diabolical misogynistic attitude that subscribes to notions of white supremacy assumed that because Aaronoff was a low-income minority, she would be his "mistress material." (28 Jan CT 1442-3)

Aaronoff rejected his advances every time.  Olson angrily complained to Aaronoff, "I thought you were part of the deal!" 28 Jan CT 1441)  Aaronoff never agreed or discussed any type of "quid pro quo" romantic /sexual arrangement with Olson in

exchange for his funding of the deal or giving her a job.  Olson
had an unrealistic expectation of affection from Aaronoff and he
took great offense at her rejection. He became irrationally angry
and acted "pathologically furious" at Aaronoff (28 Jan CT 1442-3)
Blinded by lust, Olson retaliated by immediately firing Aaronoff,
and he began nefarious actions to cancel the Agreement.

 Olson yelled at Aaronoff to "get out" of the Wilcox Unit and
threatened a frivolous fraud lawsuit, in which his previous
attorney (not Eric Kennedy) refused to represent him. (28 Jan CT
1442)  Olson unreasonably pressured Wilcox to forfeit his
financial investments and contributions and to ignore the signed
Agreement. (30 Apr. CT 1044, 1052-3 1190; 28 Jan CT 1441)

When Olson's initial extortions failed, he became more
sinister.  He dismantled the water values in the Wilcox Unit's
shower, so no water would come out of the shower.  Then Olson
refused to turn the water back on in the shower and just
continued to demand Aaronoff "get out" of the Wilcox Unit. (28
Jan CT 1442)  Olson also dismantled the front door handle so the
door could not close or lock, allowing Olson to walk in on Aaronoff
at any time. (28 Jan CT 1442)

Wilcox instructed Aaronoff to contact the Los Angeles City
Housing Authority, who after inspection filed about 32 violations
against Olson and ordered him to repair the Wilcox Unit, stating:
"Replace handle, stem, seats whatever required to make shower
valves (hot cold) operate properly," and "Front door must be made
to open and close properly."  (RJN A 17-18, 40-47)

"Olson masterminded a conspiracy with his wealthy white "
friends and agents …to punish Aaronoff" and "Run her out of
town." (28 Jan CT 1433)    Olson and his co-conspirators also
began a smear campaign, defaming Aaronoff as a "prostitute,"
who would accept expensive gifts from "sugar daddies" in
exchange for sex (28 Jan CT 1443-5; 1575-1579) and various
untrue "false light" statements, including that she was a violator
of the property rules. (28 Jan CT 1550, 1560-1, 1572; 28 Jan CT
1443-5) This is a typically-known strategy of abusers to falsely
accuse, discredit and blame the victim while shifting
accountability away from themselves and their crimes.

In 2005, the condo conversion was complete and Olson
begrudgingly severed his ownership and granted Max Wilcox
title, to the Wilcox Unit, a one bedroom, one bathroom 966 sq. ft.
condominium, on April 7, 2005 per the Agreement with an official
recording No. 050801693.  (30 Apr. CT 1052).

Aaronoff managed the Wilcox Unit, at times renting it to
others or herself and made it available for Wilcox when he came
to Los Angeles. (30 Apr. CT 1072, 1190 RJN A 50)

After Olson and his cronies' pattern of years-long
harassment, discrimination and defamation against Aaronoff (28
Jan CT 1575-1579) she moved out of the Wilcox Unit in 2009. (30
Apr CT 1052; *See* general allegations in Aaronoff's civil
complaint,  28 Jan CT 1343-1492)

Olson, who bragged to Aaronoff that he was above the law
as a leading member of a certain influential old boy's "club." (28
Jan CT 1433)  Olson's wife also warned Aaronoff that she would

never get justice because Olson could and would bribe police and judges. (28 Jan CT 1359)

The "club," which goes by various names was the in-depth subject of the General Assembly of Rhode-Island's Legislative Investigation. They reported that it "requires secrecy and certain mysterious obligations and penalties, to bind together rogues, desperadoes, thieves, robbers and pirates, who could have nothing else to pledge each other [but] mutual fidelity in crime." The report also noted, their oaths supersede the United States and other state Constitutions, such that they consider themselves sovereign and may lie under penalty of perjury to protect fellow club members.

Supporting this behind the scenes network of co-conspirators i.e. the "Olson Club,"  Aaronoff learned, that Olson and his company Nexus were sued by the City of Palm Springs for corruption by bribing the Mayor of Palm Springs, in about 2017. (28 Jan CT 1863-1873). The news reported that Olson's representatives lied, when they falsified that key employee, Richard Meaney never worked for Nexus. (28 Jan CT 1870) (28 Jan CT 1873)

In 2009, Wilcox put his condominium in a Limited Liability Company ("LLC"), named the Isadora Duncan Academy LLC, which "was initially chosen to affiliate it with the nonprofit organization of the same name of which Wilcox continued to be the music director and producer" and later renamed it the Devon Chateau LLC for long-term rentals. (6 Jun CT 982, RJN A 49-50) Wilcox held 99.98 percent of the LLC member shares and put a

fractional 0.02 percent shares into Aaronoff's name as an accommodation for management purposes. (30 Apr. CT 1051, 1190)

Initially, Aaronoff had hoped to purchase the Wilcox Unit. However, Aaronoff was never able to make enough money nor qualify for a loan nor was she given the money to purchase the Wilcox Unit. (RJN A)  None of Aaronoff's family or friends has ever had either the financial means to loan her the money or the kind of relationship with her, such that they would give her the money to purchase the Wilcox Unit.

Wilcox never gifted or sold the LLC, which held the Wilcox Unit to Aaronoff in 2009, nor anytime thereafter. (RJN A 50) There is no evidence whatsoever that Wilcox gifted or sold the Wilcox Unit to Aaronoff in any entity. (RJN A 50) Wilcox and Aaronoff never dated or had the type of relationship "sexual or romantic" where he would gift her real estate. (RJN A 50)

However, Olson would like to tarnish Aaronoff's reputation and have this Court misbelieve that Wilcox simply **gave** Aaronoff the Wilcox Unit as her "sugar daddy," which is an outrageous lie and more of his abusive, defamatory prostitution smear campaign. (6 Jun CT 702, 759, 911)

In 2009, Aaronoff secured a long-term renter for the Wilcox Unit. Also she remarried and moved to France in 2009. (30 Apr. CT 1052)

Further in 2009, Aaronoff owed extensive attorney fees regarding a case in which she won a unanimous civil jury verdict in her favor, in pro per.  The verdict was handed down in a

lawsuit styled *Markoff v Aaronoff,* SC080757 in 2007 and was the lead story reported on June 13, 2007 by the Los Angeles Daily Journal titled, <u>Keeper of the Castle Has No Fool for a Client,</u> <u>Tenant Trying to Buy Her Building Takes on Developers and</u> <u>Wins Her Case in Pro Per,</u> and states, "Steven C. Markoff, sued [Aaronoff] for breach of contract, claiming she sold the property to a third-party buyer [Olson]…Facing $1.7 million in potential damages, Vidala [Aaronoff] had no choice but to represent herself at trial after she no longer could afford to pay an attorney to handle her case.

To repay a friend [Wilcox] who loaned Vidala [Aaronoff] money for escrow, Vidala [Aaronoff] sold him the contractual right to her unit. If she ever has the money to pay him back she can buy it from him."

In 2011, Wilcox changed the name of the LLC to Devon Chateau LLC; Aaronoff resigned as a member shareholder and was replaced by Justus Senftner, who became the member shareholder of the 0.02 percent. (6 Jun CT 988; 30 Apr CT 1052 RJN A 50-1)

On January 1, 2012, Devon Chateau LLC shareholders, Wilcox, and Senftner transferred the condominium to a private irrevocable trust entitled the ATW Trust ("Trust") and also by deed. (30 Apr. CT 1052, 1071)  The LLC was closed and dissolved in December 2012 showing Wilcox and Senftner as the only member shareholders (6 Jun CT 989-990).  The beneficiary was the church, Ancient Temple of Wings, which supports and promotes sacred and indigenous music and dance. (30 Apr CT

1051, 1071) Aaronoff and two other trustees were placed on the Board of Trustees to manage the assets for the beneficiaries. (30 Apr CT 1072) Trust documents were signed and notarized. The original deed created in 2012 was misplaced or lost and was not recorded at that time. Later, upon legal advice a replacement deed was prepared with the effective transfer date of January 1, 2012 and recorded on February 15, 2017, but was rejected for scrivener errors. An amended deed was recorded on June 6, 2017. (6 Jun CT 992, 995) but this deed also had errors.

In 2013, after a car accident and health problems, Aaronoff became indigent. (30 Apr CT 1051, 1070) Aaronoff returned to the United States and when the Wilcox Unit became available, she rented it with the right to sublet and she maintained her fiduciary obligations as trustee to the Trust.

May 2015, Olson, who had since become president of the homeowners' association (HOA) board, invited Aaronoff to meet with him offering an "olive branch" and to "bury the hatchet." (30 Apr. CT 1052; 28 Jan CT 280; 28 Jan CT 1445)  During that meeting, Olson tricked her: What was supposed to be a social gathering, turned into a "private date" with Olson having expectations of affection. (28 Jan CT 1446) Olson "forced himself" onto Aaronoff and "grabbed [her] hair, face and breasts." (30 Apr. CT 1052-3.) Aaronoff fought back and escaped.  The following day, Olson accosted Aaronoff in the building courtyard and harangued her about her refusal to have sex with him. (28 Jan Ct 1447) Over the ensuing months, Olson continued to harass Aaronoff by, among other things, peeping into her rental home,

threatened to "stop Aaronoff from breathing" and using his long-time contractor friend (also referred to as the handyman) David Feder to photograph and/or videotape her and a minor girl, Plaintiff May Doe (28 Jan CT 1343) through bathroom and bedroom windows.  (28 Jan CT 1343-1492 *See* generally the factual allegations *Doe v Olson,* case No. SC126806 and related case SC128027)

On October 13, 2015, Aaronoff petitioned for a restraining order pursuant to Code of Civil Procedure section 527.6 bearing case No. SS025790 against Olson. (28 Jan CT 451-478)  Olson did not request a restraining order.  On December 10, 2015, Aaronoff was directed to mediation with the court's volunteer mediator. (RJN F) Aaronoff did not have a hearing.  Aaronoff received a three-year restraining order agreement, in which Olson agreed not to contact or communicate with her, except in writing and/or as required by law and should he encounter her in a public place or in the common areas near their residences, Olson shall seek to honor this agreement by going his respective directions away from Aaronoff ("2015 restraining order agreement") (28 Jan CT 23, 290). Aaronoff agreed to mutually avoid Olson.

The Court Order states,  "[t]he case was dismissed without prejudice.  The Court retains jurisdiction to enforce the terms of the settlement agreement pursuant to Code of Civil Procedure sec. 664.6."  (RJN F)  Pursuant to 664.6 (a) (b) (1) Olson, himself signed the 2015 restraining order agreement. (28 Jan CT 23, 290)

The police reports of the sexual assault, the battery, the peeping, etc., that chronicled Aaronoff's abuse at Olson's hands

were bundled and sent to Deputy DA Emily Spear's Los Angeles Sex Crimes Division for review to prosecute the criminal case. A police officer visited Aaronoff to tell her how disappointed they were that the DA had decided not to prosecute, even though there was strong evidence. (30 Apr CT 1596-1603)

On December 9, 2016, Aaronoff filed a civil lawsuit for damages, *Doe v Olson*, case No. SC126806 based on Olson's sexual harassment and discrimination against her including the sexual assault, infliction of emotional distress and prostitution defamation, among others claims. (28 Jan CT 1432-1492;1575-1579) Aaronoff filed under the pseudonym Jane Doe, pursuant to Civil Code § 1708.85. This code is not available for restraining orders under Code of Civil Procedure section 527.6). That aside, Aaronoff began serving the civil complaint on or about mid February 2017.

Olson's first violation of the <u>2015 restraining order</u> agreement occurred when Olson's attorney, Dien Le began pressuring Aaronoff to dismiss her civil lawsuit against Olson, sending her an email with dismissal documents to sign. (28 Jan Ct 1597-1599)  On March 8, 2017, Le called Aaronoff on her cell phone and warned her that Olson would escalate matters to physically harm her if she did not dismiss her civil suit, *Doe v Olson*, case No. SC136806. (28 Jan CT 383, 388)

Aaronoff expressed her fears, that Olson would kill her by having someone run her over while walking her dog and that if she dismissed her case she would be "wide open for Curt to kill [her]" (28 Jan CT 383) Le delivered Olson's threat on Aaronoff's

life, stating, *"Well, if [Aaronoff] was worried about Curt hurting [her] it is more likely that he will do something to [her]—**ah— hurt [her]**—if [she does] not dismiss the case."* Aaronoff filed a police report (28 Jan CT 1604 ); put Le on notice that his comments were in violation of the <u>2015 restraining order agreement</u> and the HUD investigation, that his statements traumatized her, such that she could not sleep, and she asked for an apology and for Le to recuse himself. (28 Jan CT 389, 393; 1602-3)  Le acted as Olson's mouthpiece and admitted the call occurred, yet trivialized it as his "sense of humor." (28 Jan CT 389, 404-405)  Aaronoff discussed the Le matter with legal advisors. (28 Jan CT 1600-1, 1605-7, 1690-1)  Aaronoff did not dismiss her civil lawsuit.

Olson then hired rogue attorney Eric Kennedy, who has exposed himself as being criminally corrupt. After he filed a series of desperate illegal maneuvers on behalf of Olson, Kennedy committed multiple frauds upon the court in cover-up-schemes in violation of Penal Code 134, dragging this litigation "down a rabbit hole of wild accusations that bore little semblance to reality," (RJN A) as noted above and evidenced herein.

Also after Aaronoff refused to dismiss her civil lawsuit, the Olson Club devised several attack strategies.  On May 18, 2017, Olson (represented by Kennedy) filed a breach of contract cross-complaint against Aaronoff's civil lawsuit, purporting that she was not allowed to file a civil suit for damages because her 2015 Restraining Order limited her litigation priviledge to do so. (28 Jan CT 1384)

Then on June 5, 2017, Olson filed an *ex parte* application to shorten time and simply throw out Aaronoff's civil lawsuit.  In the court hallway while waiting, Kennedy strangely looked at Aaronoff cross-eyed and boasted that he was definitely throwing-out Aaronoff's lawsuit. He continued on basically indicating that he and/or through Olson's "club" power had somehow conspired with Judge Karlan.  It was very strange.  Kennedy gloated and carried on that this was a "*done deal*, and that as soon as the hearing started it would be over for Aaronoff's lawsuit."

Interestingly, just before Aaronoff and Kennedy crossed the bar, entering the court's ship, Judge Karlan announced, "This is a Court of Law."  To Kennedy's utter unexpected surprise, Judge Karlan denied Olson's *ex parte* and gave Aaronoff a chance to file an anti-SLAPP.

Olson's second violation of the 2015 Restraining Order, began from about May 19, 2020, when he or his agents conspired with the former professional baseball player and felon, Lenny Dykstra ("Dykstra") to act as a spy or "plant."  The plan was for Dykstra to infiltrate Aaronoff's life as an Airbnb renter, under a fake name and personality to hide his true identity, and to frame Aaronoff as a prostitute so Olson could use that as a defense in Aaronoff's civil suit. Dykstra also would go on to steal documents as well. (28 Jan CT 1553-1569; 1581) Again, at that time, Aaronoff had moved out of the Wilcox Unit and sublet a bedroom to Dykstra on or about May 20, 2017. (28 Jan CT 1563)

Aaronoff stored her lawsuit files in an office area at the Wilcox Unit and often came back during the day to work on her

civil lawsuit.  Dykstra pretending to be a "Bible-study-Christian" initially ingratiated himself to Aaronoff. (28 Jan CT 1562) Dykstra became overly interested in Aaronoff's lawsuit offering to help by reviewing her documents, asking how are you going to prove this?  (28 Jan CT 1563)  Strangely in the face of increasingly strong evidence against Olson, Dykstra became irrationally negative and began harassing Aaronoff that her lawsuit was "a stupid case," "a waste of time," that it would be thrown out on summary judgment and that Aaronoff should "drop it!" (28 Jan CT 1563)

Next, Dykstra started complaining that the Wilcox Unit "was a dump that needed repairs" and advised Aaronoff to get a $300,000 home loan from a wealthy friend of Dykstra's whom he refused to identify by name. (28 Jan CT 1564) Dykstra's (28 Jan CT 1564)  Then Dykstra stopped being nice and began harassing Aaronoff to (a) smoke pot [marijuana], (b) engage in an insurance fraud scheme, (c) offered $10,000 a month for Aaronoff to be his "girlfriend" and he continued to constantly demand she "drop the stupid lawsuit!" (28 Jan CT 1564, 1587)

On May 25, 2017 at 9:12 p.m. Aaronoff sent an email Prayer Request to Pastor Amado to help her because Dykstra's behavior became "horrible." (28 Jan CT 1587)  Given all the harassing and suspicious statements and actions by Dykstra, Aaronoff began to suspect that Dykstra was a "plant" for Olson. Dykstra pretended he did not know Olson.  On or about May 27, 2017, Aaronoff became physically sickened and afraid of Dykstra and asked him to leave immediately and not contact her—seven

19

days after meeting.  Dykstra sent Aaronoff a threatening text on May 29, 2017 stating, "Its all good I'm not done with you yet" (28 Jan CT 1565, 1587, 1591) and continued to ask Aaronoff if she would be his "paid girlfriend" and attend a promotional business "dinner" that Aaronoff later discovered was supposed to be a "mock orgy," where Dykstra wanted Aaronoff with other women to be recorded pretending that they had sex with Dykstra.

Evidencing these events, Aaronoff reached out to a legal advisor in email exchanges on May 29, 2017 stating, how "in hind sight [Dykstra] seemed too interested in 'helping' me regarding my lawsuit against Curt.  He told me, after review that I did not really have a case..." (28 Jan CT 1583)

On May 31, 2017 at 1:28 p.m. Aaronoff still extremely fearful of Dykstra and wanting to de-escalate the situation, sent Dykstra the following final text message:
"Ok Lenny Here you make arrangements directly w/them [the actresses hired to pretend the mock orgy] I will not be going to the dinner I misunderstood what this dinner originally was and after thinking about it I cannot do it.  Also, my pastor said I cannot be involved with this either as it's against my morals... I was very insulted that you proposed a financial arrangement as I am NOT that kind of woman..." (28 Jan CT 1585, 1687) The plot to use Dykstra to frame Aaronoff as a prostitute to derail her civil lawsuit defamation claims failed. However, the trauma remains.

Shortly after Dykstra left the Wilcox Unit, Aaronoff discovered important legal evidence had disappeared from her

personal files concerning the civil lawsuit against Olson. Dykstra
was the only other person in the property. (28 Jan CT 1565)
(11-16-18 RT-2 pp. 68-69)

Unbeknownst to Aaronoff, shortly after Dykstra left he
contacted Aaronoff's girlfriend, titled Confidential Witness No. 1.
("Witness 1"), who stated the following in her declaration,
(paraphrasing) Dykstra contacted her to go to a promotional
business dinner in which he attempted to talk about Aaronoff.
Later they met and Dykstra attempted to ply her with drugs and
alcohol. She refused.  Then Dykstra began an insistent campaign
to convince Witness No. 1 that Aaronoff civil lawsuit was
frivolous, baseless and stupid.  No matter how much Witness No.
1 tried to change the subject, Dykstra kept coming back to attack
Aaronoff's civil lawsuit.  Dykstra became increasingly angry and
frustrated regarding her refusal to agree that Aaronoff's civil
lawsuit was frivolous. Then in a last ditch effort Dykstra revealed
a very private matter concerning Aaronoff that Witness No. 1
was surprised to hear and wondered how Dykstra would know
this information, knowing that Aaronoff would not discuss it with
a someone she had met for a little more than a week.

However, Aaronoff knew how Dykstra would know private
information about her—from Olson of course.  Flashback to 2005,
Olson's former wife lamented to Aaronoff that Olson had "wasted
$30,000 on a private investigator to dig up dirt" to blackmail
Aaronoff  "but found nothing but a clean record" (28 Jan CT 1553)
and certain sensitive private matters that effected Aaronoff in
her childhood. (28 Jan CT 1553, 1562)

21

Witness No. 1. became concerned at the illogical desperation Dykstra had regarding the dismissal of Aaronoff's civil lawsuit. It did not make sense. Witness No. 1 felt tricked that the meeting was only a ruse to discuss Aaronoff's civil lawsuit, so Witness No 1 could use her influence to get Aaronoff to drop her lawsuit against Olson. Witness No. 1. notes that Dykstra was extremely motivated, "--as if one had a financial stake in convincing me to influence Aaronoff to drop her civil action." (28 Jan CT 1609-1612) Witness Loren Marken also helps connect the dots on "plant" Dykstra. (28 Jan CT 1683-1687)

On or about mid June 2017, Aaronoff noticed a purported tourist walking around with a camera photographing her. Also she began to noticed new people showing up at a locate café, which she frequented across the street from the Chateau Colline building.  These new people sat directly behind her with a notebook taking notes.  Other neighbors also commented about seeing these events in June 2017.

Amado Moreno worked at that café across the street from the Chateau Colline. He also held a degree from a religious seminary and a California State clerical license.  Aaronoff knew Moreno, from lunches at the café and food deliveries.

On or about June 25, 2017, Aaronoff received a concerning phone call from Moreno that she needed to go into hiding because he had witnessed Olson at the café with thugs and overheard parts of their conversation such that he became very worried for Aaronoff's personal safety that they were going to do something nefarious to her. Moreno knew Olson by face and his name via his

credit card. Moreno continued to advise Aaronoff not to come back because he continued to witness either Olson with thugs or Douglas Econn (a club friend of Olson's) with thugs on almost a weekly basis since June 2017 until September 2017. These men, dressed like working private detectives in all black clothing, and made comments "she's not here" or told Moreno they were hired to look for a young woman who lived at the Chateau Colline building, who they had heard frequented the café.

Aaronoff fit the description, and in fear of her life went into hiding.

Then in about August 2017, Dykstra suddenly began showing up at the café doing the same thing the others had done. A common factor among the Olson/thug group and the Econn/thug group and Dykstra is that at least one person in the group knew how to identify Aaronoff and these groups never showed up on the same day.  Dykstra also specifically asked Moreno, "When do the locals show up?"

After Moreno's declarations were filed with the court, he became the target of the Olson Club, who threatened his life with a gun. In fear for his life, Moreno suddenly quit his job and fled the State of California, afraid to testify. (28 Jan CT 885-894, 1624-1642, 1692-3) (Tagged Exhibits 10, 12,13,14, 26)

On or about June 30, 2017, Titus Fotso suddenly and unexpectedly moved into the Wilcox Unit and resided there for about six months. (11-15-18 RT-2 p.71) Fotso, who told no one he was living at the Wilcox Unit. Fotso immediately witnessed stalkers stationed for hours in their cars around the Chateau

23

Colline with cameras that appeared to be filming in the direction towards the Wilcox Unit. (11-15-18 RT-2 pp.78-83)  Fotso also witnessed suspicious activity on July 28, 2017 when he saw people on the back alley walkway of the Wilcox Unit near "the window,"  "the back door" and "looking into stuff." Fotso made a police report (11-15-18 RT-2 pp. 82-89, 104; Tagged Ex. 10, 27)

Aaronoff requested the video footage of the surveillance cameras on July 28, 2017 from the HOA of Chateau Colline.  The HOA and Property Manager, Elsa Monroy, initially pretended that Aaronoff could see the surveillance camera footage at their office but a problem arose such that the video could not be viewed. They even called in their company "IT guy" to fix the Internet connection so the video could be viewed –but he could not fix it.  Later Monroy admitted on the witness stand on November 15, 2018 that they knew the Internet was "really slow with downloads" at the office such that they reasonably knew the video footage would not be viewable. (11-15-18 RT-3 p.130) Inviting Aaronoff to view the footage was just for show. (11-15-18 RT-3 p.129)

The ingenuous "gaslighting" to allow Aaronoff to view the footage in question was soon dispelled because when other remedies to view the video footage were requested the Olson Club suddenly refused to allow Aaronoff or her attorney any access to see the video footage in question, even though they had been served a valid subpoena and offered to pay any costs.  Why the need to hide video footage that is supposed to protect residents?

Further, evidence showed that Olson had access to the video footage hardware that was stored in his locked basement storage unit and via an Internet passcode in which he could watch Aaronoff remotely on the Chateau Colline surveillance videos at any time, even though he was not allowed to have this access, the Olson Club shilled for him.  As evident in the Monroy audio recording (Tagged Ex 1. audio-recording), which is contrary to her testimony on the witness stand on (11-15-18 RT-3 p.140)

The Olson Club appeared to have an agenda to hide and protect, those who had access to the surveillance cameras and who could potentially tamper with the video footage, because they are all represented by the same insurance law firm, Slaughter Regan and Cole and attorney Dien Le.

Consequently, Aaronoff had to file a motion to compel release of the original video footage on July 28, 2017. Aaronoff's motion was granted. However, the Olson Club's video footage was not the original video footage and it was obviously tampered.  The spoilage of video footage clearly shows the video stops for almost four minutes then jump cuts to the suspicious people rushing away as they see witness Fotso arriving. (Tagged Ex 2 tampered video) After the suspicious people suddenly leave, Fotso took a photograph of them all walking out of Olson's condominium. (Tagged Ex 27)

David Silver is the expert cameraman and installer of the Chateau Colline video surveillance system  Silver is the owner and president of Integrate, a company that specializes in security cameras. (11-15-18 RT-1 p.11 )  Silver was hired by Feder and

they have known each other for about six years prior through Feder's brother. (11-15-18 RT-1 p. 19) Silver is also represented by Olson's attorneys Kennedy (11-15-18 RT-1 p. 42) and Dien Le (11-15-18 RT-1 p. 43) Silver authenticated the video footage evidence (11-15-18 RT-2 pp. 27-28) (Tagged Ex 2) Silver testified that the surveillance system is set up to "record on motion only" and if a frame froze it would indicate something was wrong ( 11-15-18 RT-1 pp. 29-33)

**Q** is Attorney Kanani and Witness **A** is David Silver

**Q.** And the cameras are meant to pick up movement?

**A.** Yes. They record motion….

**Q.** If the motion were to cease or if there were no motion at all that the camera would capture, what would happen to the camera? Would it turn off?

**A.** The Camera does not turn off. The DVR  -- -- **It records on motion only. On motion only**

Mr. Kennedy: Objection. Calls for expert testimony

The Court: Overruled

**Q**. All Right. The basic question, Mr. Silver, any reason why the video footage stopped for approximately four minutes or so at the timestamp that you mentioned earlier, which I believe you said 1:15:55?

**A.** I have no idea.

Mr. Kennedy: Calls for expert testimony.

The Court: Overruled

**Q.** Have you seen that [video footage freezes when people are moving in the frame] in other video retrieved for the homeowner's association?

**A.** Honestly, I do not spend time reviewing the footage

**Q.** So you have not seen it happen personally?

**A**. No.

**Q.** Has any of your employees told you about this happening with any other video footage that you have installed or serviced?

**A.** It hasn't been called out. No.

**Q.** Do you believe that this video was been edited before you retrieved it from the DVR?

**A.** It was not, No, it was not edited.

**Q.** How do you know that?

**A.** Because –Because I don't' think there's any way to do it.

**Q.** So you don't believe that it's possible to edit footage from a DVR before you retrieve it?

**A.** I have no idea--- that is beyond my expertise.

Several times The Court had to stop blatantly obvious coaching or "club" gestures that were being signaled. For example, while Silver was on the witness stand giving testimony, the Court had to stop, interrupted the proceedings, stating,

**The Court:** Let's watch the nonverbal reactions to testimony as I said in the beginning.  I noted it.  It caused me to look up. Drew it to my attention. Don't do it again. (11-15-18 RT-1 pp. 41-42)

**Man in the audience:**  Yes, Sir. (11-15-18 RT-1 42) The man in the audience appeared to be Olson's attorney Dien Le.

On July 28, 2017, David Feder was with the purported unknown people and viewable on the tampered video. Feder testified that these people were from an "unknown architectural firm" Feder and Monroy testified they did not know their names or what firm they came from although a purported email was sent to residents prior to the visit. (11-15-18 RT-3 pp. 156-162) Aaronoff never received this email but only after the fact as a cover-up email on August 2, 2017, without any firm name. (28 Jan CT 1786) Curiously, these complete unknown strangers can be viewed exiting Olson's condominium from photos taken by Fotso. (Tagged Ex 27)

Although, Feder also testified, "these individuals ... were looking at issues relative to building the building." (11-15-18 RT-3 p. 161) No construction of any sort has ever began on the vacant lot, next door. It is still a vacant lot as of, July 23, 2021.

In direct contradiction to Feder's testimony that he never took pictures of Aaronoff or anyone inside Aaronoff's home (11-15-18 RT-3 p. 163) are the declarations of Feder's child pornography victim, May Doe, who stated that Feder filmed her on numerous occasions inside the Wilcox Unit, including while she was taking off her clothes in the bathroom. (28 Jan CT1764-5)  Also, May Doe stated that Olson threatened her to be silent. (28 Jan CT1764-5; 1343, 1372-1375) As a consequence of Olson's witness tampering, May Doe was afraid to come forward at the 2015 Restraining Order hearing, which pressured Aaronoff into accepting the 2015 Restraining Order agreement as opposed to facing a trial with no witnesses.

From later June 2017 to September 2017 Aaronoff lived in hiding which was extremely difficult. On or about early September 2017, Aaronoff was advised to put the court on notice that Olson was in violation of the 2015 Restraining Order agreement, and to reinforce its terms, pursuant to Code of Civil Procedure section 664.6,  (RJN F) by filing a second restraining order, which she did on September 6, 2017, *Aaronoff v Olson* case No. 17SMRO00308 ("2017 Restraining Order") (28 Jan CT 17-31)

After Aaronoff had Olson served, he retaliated with a SLAPP restraining order for the one-time event of service of process, filed on September 26, 2017. (28 Jan CT 111-117). The court's Orders below state that Olson's case 17SMRO00368 is CONSOLIDATED with case 17SMRO00308, this request is a cross-petition pursuant to CCP 527.6 (h). (28 Jan CT 113)

On September 14, 2017, Aaronoff, in her civil lawsuit *Doe v Olson*, she won her anti-SLAPP motion to strike Olson's cross-complaint, pursuant to California's anti-SLAPP statute (Code Civ. Proc., § 425.16 on the basis that Olson's cross-complaint was "retaliatory litigation" designed to chill Aaronoff's "rights of freedom of speech and right to petition the courts and the executive branch for redress of grievances."

After Aaronoff's anti-SLAPP motion win throwing out Olson's cross-complaint in its entirety, Olson appealed and the Court of Appeal partially reversed, setting up Aaronoff's complaint to be dismissed on a future summary judgment motion—just as Dykstra had coincidentally previously predicted. (28 Jan CT 1563) On the precipice of the #MeToo movement, the

community became outraged and rallied against the injustice. Numerous amici letters were filed on Aaronoff's behalf, including a Superior Court restraining order judge, John K. Mitchel, who stated, "the Court of Appeal's ruling violated California State law CCP 527.6(w)" and urged the Supreme Court to give Aaronoff "her day in court." (RJN )

Aaronoff won review by the California Supreme Court, *Doe v Olson* case No. S258498. The law firms of Sidley Austin LLP and Bryan Cave Leighton Paisner LLP jointly represent Aaronoff before the California Supreme Court on a *pro bono* basis and do so after each firm determined that Aaronoff satisfied the American Bar Association's standards related to low-income/ indigence, for *pro bono* services. (RJN A)

Also, Olson sought ways to retaliate against Aaronoff through the HOA by attacking the Trust's economic property rights.  Trust advisors recommended joining the civil lawsuit as a co-plaintiff with Aaronoff and discussed funding options to support the Trust's interests in the litigation, including a lien to help secure litigation funding and lien documents were prepared.

Both Aaronoff's and Olson's 2017 Restraining Order cases were combined and heard as one "overlapping" case on November 14 -19, 2018, in Family Court, a court of equity. The Trust was not a party to the restraining order action nor could they have been because CCP 527.6 does not allow restraining orders by or against corporations, trusts or churches.  Restraining orders are only allowed against individuals in their personal capacity.

In preparation for the restraining order hearing, Aaronoff

subpoenaed, the HOA attorney, Dien Le, as a witness. It was very difficult to serve Le because he continually dodged service.  Le filed a motion to quash on the theory that because he represents Olson, all his actions are shielded from any abuses –no matter what he illegal actions he does for Olson, even outside of the bounds of his professional duties and ethical oath of office. Aaronoff strongly opposed. Le danced around and evaded the questions of Judge Hank Goldberg. Le's tactic of confusing the issues, resulting in the lower court granting motion to quash.  (4-2-18 RT pp. 11-14)

Thus, Aaronoff's attorney, Kanani, reasonably did not prepare any documents for the hearing regarding Le, which was heard much later before a different Judge, Michael Convey, who did not have the benefit of understanding in-depth the previous court's rulings with regard to witness Le.  Further, at the beginning of the hearing, the lower court, asked, "Are there any persons in the audience who are witnesses or **potential witnesses in this case?** I ask counsel to look and parties to look back and tell me because I wouldn't know. No?" (11-14-18 RT 2)

The Court then put in place "an order at the outset that under Evidence Code 777, all nonparty witnesses remain in the hallway until they are called and until they are excused. "All in agreement, the court orders pursuant to CCP 777 all nonparty witnesses are excluded."(11-14-18 RT 2) However, Dien Le sat in the audience-gallery during the entire four-day hearing and signaled the witnesses. As happens, as the testimony comes out, Aaronoff spoke about the trauma and fears she experienced by

the Le threats-incident, in a shaken voice.

The lower court erroneously thought that because these allegations were not in any of the trial papers, because they had been removed, it was a mere "throw in."  The lower court noted that "[Le's threats] were the most succinct, clear evidence of a threat to the safety of Aaronoff."  (11-19-18 RT p. 43)

On November 16, 2018, Aaronoff's attorney Kanani called, Olson to the stand and asked him if he knew Lenny Dykstra. There was quite a commotion in the courtroom because Judge Convey and some other men in courtroom including the bailiff-deputy were big baseball fans and for a moment the courtroom turned into a sports bar with great excitement remembering the plays of "Nails" Lenny Dykstra.  There was a lot of cross talk such that the court reporter could not get all the conversation down, but she got some of it.  (11-16-18 RT-1 pp. 37-38) After the courtroom settled down all eyes were on Olson. Did Olson know Dykstra?

**Accurate True Testimony, November 16, 2018**

**Page 37**

**Q** is Attorney Kanani and A is Witness Olson

18. **Q.**   I'm going to – have you ever met an

19.    individual named Lenny Dykstra?

20. **A.**  The baseball player?

Deleted line **The Court:** The baseball player?

21. **Q.**  I don't know if he is a baseball player.  I

22.    believe he might be.  Just by that name.

23. **The Court:**   He may be dating some people in the

24.    courtroom.

25.  **Mr. Kennedy**:  Phillies Fan

26**. The Court:**   No Chicago Cubs Fan.  Are you talking about

27.        Lenny Dykstra the

28.        former baseball player?

**Page 38**

1. **Mr. Kanani**:   I believe so

2. **The Court:**   Or someone else with the same name

3. **Mr. Kanani:**  Or someone else with the same name

4. **The Court:**   Do you know someone---

5. **The Witness:**  Yeah, He's a golf-buddy—I played golf with

6.                 Lenny Dykstra in Mexico

7.  **Mr. Kanani:**  When -- ---

8. **Mr. Kennedy:**  Objection Relevance

9. **Mr. Kanani**:  Your Honor -- --

10. **Mr. Kennedy:**  Objection Relevance

11. **The Court:**   Sustained

Aaronoff noticed that Kennedy became extremely animated raising his arms in the classic distress gesture, a well know club signal as he called out "Objection." Aaronoff was so shocked that

Olson admitted knowing Dykstra, immediately at the first courtroom break she began excitedly calling and texting her friends and family, within an hour of Olson's admission. The big question was finally answered.  Dykstra was indeed Olson's "plant."  But the draconian mechanisms of injustice were already at play.  Aaronoff just didn't understand it yet.  The fact that Judge Convey refused to allow Kanani to question Olson about Dykstra, sustaining Kennedy's objections was already an appealable issue.  At the first break, the court took a suspicious extended break… The Olson Club conspired with court reporter, Marlene Burris, submitted this counterfeit transcript altering lines 5 through 16. (11-16-18 RT-1 p.38)

**Altered Counterfeit Transcript, November 16, 2018**

5.  **The Witness:**  In Mexico I met Lenny Dykstra

6.  **The Court:**  The baseball player? (originally page 37 line 21)

7. **The Witness:** Yeah, He was a golfer.

8. **By Mr. Kanani:**

9.  **Q.**   Are you friends with Mr. Dykstra currently ?

10.  **A.**  No

11.  **Q.**  Do you maintain any sort of relationship

12.    with him

13.  **A.**  No.

14.  **Q**.  Did you ever maintain any sort of

15.      relationship with Mr. Dykstra?

16. **A**.  No.

The replacement testimony does not ring true. They probably schemed they should keep the word "golfer" and "Mexico" in the transcript.  But Dykstra is not a "golfer" although he does golf and so does Olson.

Even before the corrupted court reporter's transcript was submitted, accusation of a corrupted transcript began to fly. After numerous delays, the fix was in, the court reporter's transcript was altered in violation of Penal Code 134 and the conspiring actors in the courtroom are in violation of Title 18 Section 4, Misprision of Felony.   The evidence of the alter court reporter's transcript is found in the following:

1. Aaronoff's Motion for New Trial and Reconsideration and Replies (28 Jane CT 1546-1789, 1846-1889)
2. Aaronoff's excited utterances (28 Jan CT 1618, 1622, 1620)
3. Declaration of Loren Marken (28 Jan CT 1683-1692)
4. Declaration of Benjamin Kanani, Esq. (28 Jan CT 1854-1855) Suspiciously, the critical evidence on page two of Kanani's declaration has been deleted from the Clerk's Transcript. The old boy's club is in full force.

I declare under penalty of perjury under the laws of the State of California that the attached declaration of Benjamin Kanani is a true and correct copy, and that this declaration is executed on July 23, 2021 at Los Angeles, California.

Dated July 23, 2021                         By: /S/ Vidala Aaronoff

Vidala Aaronoff

1  Vidala Aaronoff
   9461 Charleville Blvd #259
2  Beverly Hills, CA 90212
   Tel: (310) 498 - 7975
3
4  Petitioner in Pro Per

5          SUPERIOR COURT OF THE STATE OF CALIFORNIA

6        FOR THE COUNTY OF LOS ANGELES – NORTHWEST DIVISION

7

8  Vidala Aaronoff,                    )  Case No. 17SMRO00308
                                       )  Assigned to the Hon. Michael J. Convey
9          Petitioner,                 )
                                       )  **DECLARATION OF BENJAMIN**
10         v.                          )  **KANANI IN SUPPORT OF**
                                       )  **PETITIONER'S MOTIONS FOR**
11 Curtis Olson,                       )  **RECONSIDERATION AND FOR NEW**
                                       )  **TRIAL**
12         Respondent.                 )
                                       )  Date: January 16, 2019
13                                     )  Time: 10:00 a.m.
                                       )  Dept.: U
14                                     )
15

16 I, Benjamin F. Kanani, Esq., declare as follows:
17

18     1.  I am over the age of 18 and I have personal knowledge of the facts contained herein
19         and if called upon, I would and could competently testify as follows.
20     2.  I previously represented the Petitioner in this case and did so throughout the 4-day
21         evidentiary hearing that took place from November 14-16 – 19 of 2018.
22     3.  On the third day of that hearing, November 16, 2018, Respondent, Curtis Olson
23         ("Olson" or "Respondent") took the stand as part of Petitioner's case-in-chief.  As
24         part of my direct exam, I asked Olson if he knew a man named Lenny Dykstra
25         ("Dykstra").
26     4.  Without waiving the attorney-client or work-product privilege, I have been authorized
27         to disclose that I am absolutely certain my direct examination included questions to
28

                                          1
                        **DECLARATION OF BENJAMIN KANANI**

Olson if he knew a man named Dykstra because Petitioner and I had discussed the topic previously on multiple occasions and it was included in my outline of questions to ask Olson.

5. According to my recollection and notes taken at the time, Olson replied evasively to my question by asking me, "You mean the baseball player?"

6. I was unsure the man I had asked Olson about (i.e. Dykstra) was a baseball player or not, at which point the Court noted Dykstra was a baseball player. The Court helped clarify the question instructing Olson to answer if he knew Dykstra.

7. I am absolutely certain Olson then went on to say that he had played golf with Dykstra in Mexico. I also made a written note of Olson's affirmative answer.

8. Though I do not remember the exact words Olson used in saying so, I remember the answer clearly because it was the first definitive confirmation we received that the two men knew each other personally.

9. I also found it peculiar (and not credible) that Olson would have to ask if Dykstra were a baseball player, if he had played golf with him fairly recently and given that Dykstra is a famous professional baseball player. As such, and given Olson's confirmation that he and Dykstra knew each other, I began to follow up with additional questions.

10. After approximately 2 or 3 more questions, however, Respondent's counsel objected to my line of questioning, which was sustained. I believe Respondent's counsel objected on the basis of relevance.

11. If Olson had not confirmed that he knew Dykstra, I would not have followed up with additional questioning to Petitioner, when she took the witness stand to testify, about her involvement with Dykstra, as I would have had no viable theory to directly link Olson to Dykstra as part of Petitioner's case-in-chief.

///

///

**DECLARATION OF BENJAMIN KANANI**

1      I declare under penalty of perjury and the laws of the State of California that the

2 foregoing is true and correct. Executed at Los Angeles, California on January 9, 2019.

3

4

5                           Respectfully submitted,

6

7

8                           Benjamin Kanani

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

**DECLARATION OF BENJAMIN KANANI**

The trial court denied both Olson's "process service" restraining order application and Aaronoff's restraining order application on November 19, 2018. (28 Jan CT 1536)   The Court noted that Aaronoff did not prove her case by the civil harassment restraining order's clear and convincing burden of proof.

Disturbingly, Aaronoff discovered in closing arguments that her attorney, Kanani was in the wrong burden of proof. He had prepared Aaronoff's restraining order case based on "preponderance of evidence," which is Domestic Violence's much lower standard of evidence compared to "clear and convincing" Civil Harassment's higher standard. (11-19-18 RT p.9) Kanani later told Aaronoff that he had meant to make a motion to move her case to a Domestic Violence case based on the fact that for years Olson attempted to court Aaronoff for a sexual relationship. Olson's interest in Aaronoff continued and grew in intensity to the point that he invited her to his condominium for which he had arranged it to be a private date and in which he had an expectation of affection.

Aaronoff made a motion for new trial pursuant to *Code of Civil Procedure* 657 and 656 et seq and reconsideration pursuant to *Code of Civil Procedure* 1008 and Family Code 210 on the following grounds: newly discovered evidence and circumstances, error in law, abuse of discretion and ineffective assistance of counsel. (28 Jan CT 1546-1719)

Olson moved for attorney's fees and Aaronoff sought her own fees in defense. (6 Jun CT 17)  The court combined Aaronoff's and Olson's cases into one "overlapping" case and ruled there were two prevailing parties and awarded both parties attorney's fees.  The trial court rejected Aaronoff's contentions that both parties could **not** be prevailing parties.

Aaronoff noted that indigent fee waiver litigants, such as her could not be burdened with attorneys' fees. The court below agreed that they could not award attorney's fees against an indigent litigant.  Aaronoff informed the court she lacked the means to pay for Olson's high-priced counsel. Aaronoff has had two fee waiver examination hearings, at the Los Angeles Superior Court and was granted fee waivers.

However, on April 9, 2019, Olson and his real estate company in-house counsel Ryan Vogt-Lowell and counsel of record Eric Kennedy submitted over 50 pages of documents of fraudulent "new evidence" in their attorney's fees reply brief. (6 Jun CT 701-752) (Unbeknownst to Aaronoff at the time and only just recently discovered and verified in April 2021, Olson's reply brief contained (1) fraudulent and misleading declarations based upon a fraudulent Fidelity National Title Report, (2) fraudulently created inflated property value documents showing the Trust property was valued as high as $1,459,000 when the property was actually valued far below $900,000, (6 Jun CT 759, 781), (3) fraudulent industry housing market charts showing an upswing in home values when, in fact, the property home values in the area were dropping, (6 Jun CT 782) and (4) omitted property deed

documents evidencing the sale of the Wilcox Unit from Olson to Wilcox on April 7, 2005, rewritten as a fake "Access, ingress, egress…document using the same recording date and official recording number: 05-0801693 as the grant deed from Olson to Wilcox.(6 Jun CT p. 710 #14.)  Further, those purposely omitted deed documents prove that Aaronoff worked for Wilcox and was therefore not an owner of the Wilcox Unit.

The Fraudulent documents and omissions were all calculated to motivate the Court to find (counterfactually) that title of Wilcox Unit in 2009 had transferred personally to Aaronoff (when it did not) and, second and based on the first finding, that when title transferred to the Trust it was an alter ego of Aaronoff.  Next, Kennedy's falsified property values over a million dollars- $1.200,000, made it appear that Aaronoff was a millionaire and hiding an asset. (6 Jun CT 759, 760, 781-810),

This is a Fraud Upon the Court, which misled the trial court to award attorney's fees against Aaronoff because Olson's fraudulent documents made it appear that Aaronoff was wealthy and able to pay because she was a purported millionaire and worse that *she* had misled the court on her financial statement. (6 Jun CT 811-817)

Real estate expert Eric Forster concluded, upon review of documents, deeds as well as information provided by the California Secretary of State that these have "not shown Doe [Aaronoff] to have any ownership interest in any of the entities that held title to the [Wilcox Unit],  with the exception of the previously-disclosed fractional interest [0.02%] Aaronoff held in

one entity and which was terminated prior to 2012." (6 Jun CT 743-5) (RJN A 18-21)

Further, Olson's award procured by fraud distorted the truth, alarming the courts to believe that Aaronoff was an untrustworthy, unethical liar, who was hiding and dissipating assets since 2009. Aside from friendly loans from family and friends and medical bills from a car accident, Aaronoff has never had a creditor and never had a court order judgment against her. (6 Jun CT 818-821)

Furthermore, Olson's concocted Fraud Upon the Court misled the trial court and Court of Appeal to believe Aaronoff posed a serious risk of "asset dissipation" such that Aaronoff was not entitled to the automatic stay pending attorney's fees and costs judgments only, per *Quiles v. Parent* (2017) 10 Cal.App.5th 130, 144-145. Thus, Aaronoff's motion enforcing the automatic stay CCP 917.1(d) was denied by both the court below and her Writ of Supersedeas by the Court of Appeal. Consequently, Aaronoff was forced to litigate on three fronts, (1) numerous post-trial motions, (2) her appeal and (3) Olson's new lawsuit against her, purporting that she had fraudulently transferred the Trust's condominium asset, when in fact it was all based on Olson and his attorneys' frauds and lies. Furthermore, funding litigation via a lien on the Trust's own asset is a protected activity. (See *Sheley v. Harrop*, (2017) 9 Cal.App.5th 1147)

On April 14, 2019 Aaronoff stepped down from the Trust Board of Trustees and turned over Trust documents to William Welty.

On April 17, 2019 the lower court found that Aaronoff had the means to pay because of Olson's Fraud Upon the Court and awarded both parties their attorney's fees. Thus the lower court subtracted Aaronoff's attorney's fees from Olson's high-priced counsel and ordered Aaronoff to pay Olson the net sum of $80184.78 on April 17, 2019. (30 Apr CT 1092)   Aaronoff could not afford expensive counsel; she had a single practitioner who had modest fees on contingency, whereas Olson's fees dwarfed Aaronoff's fees. The lower court contended that Olson is entitled to the counsel he choses. Although both parties won attorney's fees, because Olson's fees were significantly higher Aaronoff was unjustly made to pay a rich man's fees even though they achieved the same result. How much of Olson's attorney's fees were used to create his fraudulent documents—that Aaronoff is supposed to pay?  According to Olson's billing statement from Buchalter approximately $15,737 was spent on the attorney's fees motion in which the fraudulent evidence was created in violation of penal code 134. Further, Olson snuck in billings for other cases including, *Doe v Olson* SC126806, *Olson v Aaronoff,* 19STCV46503, a Vexatious Litigant and Res Judicata research, well over $6000 in extra billings (6 Jun CT 65-95), for example note, June 6, CT p.93 $2557.50 re: "Basement Storage" that was regarding Aaronoff's civil case against Olson, which had nothing to do with this restraining order.

On June 6, 2019, Aaronoff timely filed a notice of appeal from the attorney's fees order. (6 Jun CT 1057)

In July 11, 2019, William Welty suddenly passed away and

the Trust documents in his possession have not been located. (30 Apr CT 1141, 1142, 1145).

Olson sought immediate enforcement of the attorney's fees and costs judgment through discovery demands and records requests to Aaronoff, her family, and associates in post-trial motions before Judge Emily Spear, the same Emily Spear who had worked as a Deputy District Attorney for the County of Los Angeles California between the years 2007 and 2018 and was assigned to the special victims unit focusing on sex crimes and child molestation, that handled the Aaronoff and May Doe sexual assault, child pornography crime case. (30 April CT 1596-1605)

Because Judge Spear had been involved with "priors" Aaronoff requested she recuse herself. She refused and assisted Olson in bypassing procedural due process ordering Aaronoff and/or the specially appearing Trust attorney to turn over all Trust documents under seal via an improper order. Judge Spear also improperly ordered Aaronoff to file the specially appearing Trust's objections as a ruse to get them to lose their specially appearing legal rights. However, Aaronoff (1) did not have the authority to represent the Trust in court as she is not a licensed attorney and (2) she didn't have the money to pay any first appearance fees, nor was she authorized to do so.

On September 4, 2019, the lower court ordered Aaronoff to a debtor's exam where she verified under oath that she had stepped down as trustee from the Trust on April 14, 2019 and had no access or rights to the Trust's documents. (12-11-19 RT p.13)

44

On November 6, 2019, Olson's submitted an *ex parte* application (399 pages) to add ATW Trust as a judgment debtor, however he never noticed or served anything on the Nonparty Trust. The lower court made an order in chambers granting Olson's *ex parte*. (30 Apr CT 1251)  Since the lower court granted alter ego there should have been no more need to demand Trust documents, because purportedly the alter ego was proven.  However, the lower court continued to demand the specially appearing nonparty Trust turn over documents improperly under seal, by passing procedural due process and added a total of $10,000 in sanctions against the Trust for failure to turn over Trust documents. The Trust was sanctions $5000 at a hearing on January 15, 2020 to which Aaronoff did not attend because she was excused from attending because she was not a trustee of the Trust. (1-15-20 RT)  The Trust continued to assert that they were never served or properly brought as a party to the action, the lower court never obtained jurisdiction over them to lawfully obtain Trust documents or information personally or subject matter because the action was on appeal.

On February 28, 2020, the lower court ruled in an order that because no Trust documents were turned over, the Trust did not exist. Olson did not object, appeal or file a motion to reconsider or vacate the lower court's ruling or order. The Trust also did not object or appeal the lower court's ruling. Aaronoff did not object or appeal that lower court's ruling.

On February 28, 2020, the lower court had an order to show cause for the specially appearing Trust. Trust attorney Robert

Gentino challenged jurisdiction. The lower court, Judge Spear unusually emotional and angry illegally and unlawfully dumped the Trust's $10,000 in sanctions on Aaronoff for a sanctions hearing for the Trust.  (30 Apr. CT 1934-38)

Judge Spear appears to have been wrongfully influenced by Olson's Fraud Upon the Court. In deed, Judge Spear speculated that *if* Trust documents were ever produced, she assumed they would prove a fraudulent transfer because Olson had already convinced her, *via his fraudulent documents* that Aaronoff had been hiding the <u>Wilcox Unit since 2009, even though Aaronoff had no creditors to hide from</u> (aside from friendly family and friends' loans and medical bills from car accidents, which some were eventually settled or later dismissed via insurance claims). (2-28-20 RT)

## ARGUMENT

### I.    Fraud Vitiates Everything.

**A.  Lenny Dykstra**, **is the Linchpin** to this altered transcript Fraud Upon the Court of judicial officers and attorneys, who conspired to protect wealthy sexual abuser **Curtis Olson,** from facing accountability to one of his victims, Aaronoff, an *in forma pauperis* litigant and disabled woman of color, who dared speak truth to power by exercising her first amendment right to redress her grievances in a court of law.

The scheme to defraud was for the purpose of depriving Aaronoff's equal protection under the law by denying her rights

to fair and impartial court hearings this is proven by the fact the Olson Club conspired to illegally and fraudulently prevent Aaronoff from questioning Olson about Dykstra, then to hide that appealable lack of due process, the judicial officers conspired to counterfeit a court transcript that destroyed evidence by removing words that proved and supported Aaronoff's restraining order case against Olson. Then adding and altered words that changed the meaning of sentences that not only exonerated Olson but hid the truth of their Lenny Dykstra plot and protected the judicial officers illegal and unlawful bias rulings against innocent Aaronoff, which could have granted her the protection of a restraining order against Olson and her attorney's fees and costs.

Then the lower court omitted the second page of Kanani's declaration, which evidences what was truly and actually said during the trial— again illegally destroying evidence.

Aaronoff's excited utterances of text messages and emails immediately following Olson's true admissions on the witness stand, prove that she heard Olson admit he was more then causal acquaintances with Dykstra in Mexico, but actually friends that played golf together, thus these are the exception to the hearsay rule and must be admitted. *Davis v. Washington* (2006) 547 U.S. 813, 822.*; People v. Nelson* (2010) 190 Cal.App.4th 1453, 1466.

The evidence proves a Fraud Upon the Court, necessitating granting a restraining order in Aaronoff's favor or in the alternative a new trial.  "Fraud Vitiates Everything," *United State v Throckmorton (1878)* 98 U.S. 61 25 L. Ed. 93;  "There can be no question as to the inherent power of the court to set aside

the final decree if obtained by fraud." *Miller v Miller* 26 Cal.2d 119. [S. F. No. 16963. In Bank. Mar. 6, 1945.]

Further, the rigged hearings allowed Olson to file an attorney's fees motion, which in a subsequent Fraud Upon the Court, Olson was falsely granted thousands of dollars of attorneys' fees, costs and sanctions against Aaronoff.

### B. Olson's Attorneys Fees Fraud Upon the Court

Olson's Fraud Upon the Court to unlawfully obtain attorney's fees, cost and sanctions must be vacated for justice sake. Olson's attorney's fees reply submitted on April 11, 2019 contains misleading declarations based on a fraudulent Fidelity National Title Report and documents as evidenced in the Aaronoff's *ex party* filed April 16, 2021 and motion for reconsideration filed April 26, 2021 (**RJN. A**).  That Fidelity title report **misleadingly omitted** the transfer of title in 2002 from the St. John Family to Wilshire Chateau LLC (Olson's company) and the transfer of title of one condominium from Olson to Max Wilcox on **April 7, 2005**, instead it shows Olson's LLC above the recording date of **April 7, 2005** with an official records No. 05-0801693, which is actually the grant deed transfer date and number from Olson to Wilcox. Further omitted were the "publically available" property deed documents showing Olson's transfer to Wilcox and Wilcox' notarized special power of attorney **proving** Aaronoff was not the condominium owner but actually the agent /employee of Wilcox, signing property documents on Wilcox' behalf.

48

This constitutes a **Fraud on the Court** because the misleading submissions were calculated to motivate the Court to find (counterfactually) first that title had passed to Aaronoff (when it did not) and, second and based on the first finding, that the trust was an alter ego of Aaronoff.

It makes no difference that Olson's attorneys solicited the document from Fidelity and submitted it to the Court because Olson himself (and perhaps his attorneys too) would know the report and Vogt-Lowell's and Kennedy's declarations submitted on his behalf to be misleading because the Max Wilcox omission, omits transactions to which Olson was himself a party.

The Court should vacate the attorney fees, cost and sanctions orders against Aaronoff because the Court was misled to believe Aaronoff, a valid fee waiver litigant had the means to pay, when in fact she did not. See *Garcia v Santana* (2018) 174 Cal. App 4th 464, "Tenants brought action against landlords, and indigent tenant filed motion to intervene. The Superior Court, Los Angeles County, No. BS095187 Mary Ann Murphy J , granted landlords' unopposed motion for summary judgment but awarded no attorney's fees in light of tenant's financial condition. Landlords appealed. Zelon J., "held that [the] court could consider tenant's financial condition when considering award of attorney's fees, and the trial court was required to consider all factors—"Litigation costs are not intended to be used as a tool to deny access to the courts, nor to deter persons from asserting." their rights at the cost of their ability to provide for the necessities of life.

Both the Dykstra altered court reporter's transcripts and the fraudulent Fidelity report call for a New Trial.  Fraud Vitiates Everything, …a judgment obtained directly by **fraud**, and not merely a judgment founded on a **fraudulent** instrument… We think these decisions establish the doctrine on which we decide the present case; namely, that the acts for which a court of equity will on account of fraud set aside or annul a judgment or decree, between the same parties, rendered by a court of competent jurisdiction, have relation to frauds, extrinsic or collateral, to the matter tried by the first court, and not to a fraud in the matter on which the decree was rendered. *United State v Throckmorton* (1878) 98 U.S. 61

Fraud vitiates everything, which it touches, and when fraud has been committed by a party in whose favor a judgment was rendered, it may be vacated at any time upon proper showing made by injured party. "(1, 2) 34 **C.J.**, p. 260, n. 1, p. 267, n. 37." " 14 **Cal. Jur.** 1032, 1064; 15 **R.C.L.** 693."  There can be no question as to the inherent power of the court to set aside the final decree if obtained by fraud.  *Miller v Miller* 26 Cal.2d 119. [S. F. No. 16963. In Bank. Mar. 6, 1945.] FRCP Rule 60(b)(3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, or to grant relief or to set aside a judgment for fraud upon the court.

50

The November 6, 2019 *ex parte* order granting alter ego determination against Aaronoff arises from Olson's Fraud Upon the Court and must be vacated.

## II.    The Trail Court Abused Its Discretion Necessitating A New Trial

### A.   The Trial Court Retained Jurisdiction.

The court below abused its discretion when it refused to allow any evidence or mention of the <u>2015 Restraining Order Agreement</u> or matters in violation of the December 10, 2015 court order that the "Court retains jurisdiction to enforce the terms of the settlement agreement pursuant to Code of Civil Procedure sec. 664.6." (RJN F). (28 Jan CT 23, 290) Olson's actions were in violation, of the spirit of the <u>2015 Restraining Order Agreement.</u> The Court could not properly assess the situation without understanding the history and pattern of abuse.  Aaronoff was thus not able to obtain a fair 2017 Restraining Order hearing, which necessitates a new trial in which evidence from the 2015 Restraining Order incidents are allowed in.

### B.   The Trial Court Violated Evidence Code 777

Aaronoff became victim to multiple judges' orders that hamstrung her through no fault of her own. Judge Goldberg had earlier granted Le's motion to quash in which Le mislead the court regarding its importance. Le wanted it both ways, which

prejudiced the court against Aaronoff. Since Le was granted a motion to quash he should not have been allowed to testify. Aaronoff supplemented evidence regarding Le in her motions for new trial and reconsideration.

## C.   Amado Moreno's Declarations Are Evidence of Olson Using Third Party Stalkers, Exception to Hearsay Rule.

Amado Moreno's declarations evidence Olson with thugs who were stalking Aaronoff in violation of the spirit of the terms of the 2015 Restraining Order Agreement, pursuant to *Code of Civil Procedure* sec. 664.6, which necessitates a restraining order be granted in Aaronoff's favor against Olson.  The Court erred when it did not take into consideration that the reason Moreno did not show up to testify was because he threatened multiple times and in great fear of his life, even having had a gun pointed at him, thus his declarations should be accepted and considered an exception to the hearsay rule. *Michigan v. Bryant* (2011) 562 U.S. 344, 367, pp. 370-371; *Davis v. Washington* (2006) 547 U.S. 813, 822.*; People v. Nelson* (2010) 190 Cal.App.4th 1453, 1466.

## III.   The Court Must Vacate the Order Entered on November 6, 2019. The Court Lacked Subject Matter Jurisdiction

Petitioner Aaronoff filed and perfected an appeal on attorney's fees i.e. "costs" on June 6, 2019, in this action bearing case No. B298224, which was consolidated to case No. B295388. "Generally speaking, the taking of an appeal deprives the trial court of jurisdiction of the cause." *Gold v. Superior Court* (1970) 3

Cal.3d 275, 280.  "As a general rule, 'the perfecting of an appeal stays the proceedings in the trial court upon the judgment or order appealed from or upon the matters embraced therein or affected thereby . . ..'" *Elsea v. Saberi* (1992) 4 Cal.App.4th 625, 629, quoting C.C.P. § 916(a). "A trial court has no authority to **modify, correct**, vacate or set aside its judgments pending an appeal therefrom to a reviewing court." *Field v. Hughes* (1930) 134 Cal.App. 325, 327. (Emphasis added) Once a judgment is appealed, the trial court loses jurisdiction of all matters "affected by the judgment, together with the validity thereof." *Id.* "The purpose of the rule depriving the trial court of jurisdiction during the pending appeal is to protect the appellate court's jurisdiction by preserving the status quo until the appeal is decided." *Elsea*, at 629.

Here, the Court amended the judgment entered on April 17, 2019 by an Order after an ex-parte application brought by the Olson.  This *ex parte* application, Order and Amend Judgment were both in November of 2019, during the pendency of the appeal, dated June 6, 2019.  At the time of the *ex parte* application, the granting Order and Amend Judgment, the Court had no jurisdiction to modify or correct the judgment in any way. As a result, the Order and Amend Judgment, as amended on November 6, 2019, is void on its face and must be vacated.

Moreover, even if the trial court's amendment to the April 17, 2019, were solely for collection of the judgment, the Judgment must still be vacated as collection is stayed.  An exception to the general rule provided in C.C.P § 917.6(a), is that when the

judgment is for "money or the payment of money. . ." the trial court must order an undertaking. C.C.P. § 917.1(a)(1). An exception to the requirement of an undertaking, however, is when the judgment is "solely for costs awarded under Chapter 6 (commencing with Section 1021) of Title 14." C.C.P. § 917.1(d). C.C.P. section 917.1(d) applies where the costs at issue is "awarded pursuant to [C.C.P] sections 1021 to 1038" even if the costs "are nonroutine, discretionary, and/or nonreciprocal." *Quiles v. Parent* (2017) 10 Cal.App.5th 130, 144-145. Here, the judgment is solely for attorney's fees awarded pursuant to C.C.P. § 527.6. This is a judgment for costs pursuant to C.C.P. § 1033.5(10)(B), which is in Chapter 6 of Title 14. As a result, collection of the judgment is automatically stayed pending the outcome of the appeal.

The process of amending a judgment to add a debtor is grounded in a statute California Code of Civil Procedure Section 187 that contains procedural steps to amending a judgment by **noticed motion**, not *ex parte* as done in this instant action at Olson's November 6, 2019 *ex parte* order enjoining the Nonparty Claimants to Petitioner Aaronoff.  See *Danko v Reilly*, 232 CAL. App. 4th 732, 735-36 (2014).

Further, a judgment creditor seeking to amend a judgment to add additional judgment debtors *must still effectuate proper service and establish that the court has the requisite jurisdiction over the judgment debtor to be.  Wells Fargo Bank, NA., 227 Cal. App. 4th a 6: Mad Dogg Athletics, Inc. v. NYC Holdings*, 565 F. Supp. 2d 1127, 1130 (C.D. Cal. 2008).  In this action, the

54

Nonparty Claimants were not given due process to oppose their addition as parties to the judgment since they were not given notice of the *ex-parte* application to do so and the pursuant to CCP Section 187 an *ex parte* application was an improper procedural step to amending a judgment debtor as it *must be done by noticed motion*.

## IV. CCP §187 Requires a Noticed Motion to Add Judgment Debtor

Olson's November 6, 2019 *ex parte* application sought to amend a judgment to add an additional judgment debtor under C.C.P. § 187. Although "**Code of Civil Procedure section 187 contemplates a noticed motion**", *Wells Fargo Bank, N.A. v. Weinberg* (2014) 227 Cal.App.4th 1, 9, Olson, with trial court assistance, simply bypassed this jurisdictional requirement by filing an *ex parte* application.

> "It has been held repeatedly that an order correcting a clerical error in the record of a judgment may be made by the court ***ex parte without notice*** and on the court's own motion. * * * [¶] On the other hand there are cases indicating that where a clerical error does not appear on the face of the record but must be proved by evidence aliunde, ***notice of a motion to correct such an error is necessary if substantial rights are involved***."

*In re Hultin's Estate* (1947) 29 Cal.2d 825, 829–830 (emphasis added).

> "***A trial court lacks jurisdiction to amend a judgment***

*ex parte in a manner not prescribed by statute*." *Manson, Iver & York v. Black* (2009) 176 Cal.App.4th 36, 43 (emphasis added). The November 6, 2019 Order adding any trustees and ATW Trust as a judgment debtor to prior judgments obviously involves substantial rights.

In *Mason, Ivers & York*, the court held that a ***judgment amended without notice was void*** where judgment debtor's name was simply changed from "Pamela Black" to "Paula Black", signifying two different individuals. "Where the judgment is amended without notice to a party whose rights are substantially affected by the amendment, the judgment may be set aside." *Id.*, 176 Cal.App.4th at p. 44. "Consequently, the judgment against Paula was void on the face of the record and could be set aside at any time." *Id.*, 176 Cal.App.4th at p. 47.

On November 6, 2019, after failing to give notice or service to any trustee of the ATW Trust, Olson, to avoid substantive opposition, proceeded by *ex parte* application. Despite Aaronoff's uncontroverted evidence that no trustee of the ATW Trust had received notice (Petitioner Opp., filed 11-6-19, Aaronoff Decl. pages 6-9), Judge Spear granted the defective *ex parte* application. Absent proper notice to a trustee of the ATW Trust whose substantive rights were affected, the November 6, 2019, Order and Amend Judgment adding any trustee and the ATW Trust as Judgment Debtor is void *ab initio*.

Olson freely admits he never served *any* trustee. Further, Olson knew that Aaronoff had stepped down from her trustee position on or about April 14, 2019, before the attorney's fees

judgment against her and thus she could not be substitute served on behalf of the Trust.  Olson never argued that he was serving Aaronoff as the trustee because he knew she was not a trustee on November 6, 2019.   Olson only contention is that he should not have to abide by laws and rules that regular folks must abide by i.e. Olson believes he is entitled to be above the law and can forego procedural due process.  Olson contends that he shouldn't have to "chase trustees" or "play musical chairs" with changing trustees.

However, this is a red herring because Olson had the name, phone number, email and address of Milder Arroliga who worked for the Trust.  Olson also was informed that the Trust was situs in South Dakota, but he did not want to serve the Trust proper notice because he did not want to give the Trust the opportunity to quash service for inconvenient forum and move the litigation to their situs in South Dakota, which is the lawful place to litigate a South Dakota Trust.

### V.  Aaronoff's Ineffective Assistance of Counsel

Aaronoff's attorney, Kanani's presentation of Petitioner's case was so fundamentally flawed that it effectively nullified Petitioner's right to a fair trial**.** Kanani failed to prepare and present her case to meet a "clear and convincing" standard of proof.  Instead, Mr. Kanani mistakenly believed that Petitioner case was in the lower standard of proof a "preponderance of evidence." (11-19-18 RT)  Given her counsel's misunderstanding

of the requisite burden of proof, Petitioner was completely prejudiced at every turn.

## CONCLUSION

Olson's Frauds Upon the Court misled the trial court to not grant her an restraining order and to order attorney's fees, cost and sanctions against Aaronoff and finding she owned the Wilcox-Unit as an alter ego. The Court has inherent power to vacate and set aside judgments based on fraud of an injured party. Any amount of money judgment in attorney's fees, costs and sanctions against the Aaronoff is indeed an injury.

Olson's Fraud Upon the Court also mislead the trial court and the Court of Appeal to deny Aaronoff the right to an automatic stay per CCP 917.1(d) *Quiles* because Olson had alarmed the courts with his lies that Aaronoff was dissipating an asset (that she never owned) and therefore was the exception to the automatic stay and could continue to allow Olson to enforce judgment collection.  Further, trial court had lost subject matter jurisdiction,  "A trial court has no authority to **modify, correct**, vacate or set aside its judgments pending an appeal therefrom to a reviewing court." *Field v. Hughes* (1930) 134 Cal.App. 325, 327. (Emphasis added). Therefore, all attorneys' fees, cost and sanctions that have arisen out of Olson's Fraud Upon the Court must be vacated and reversed.

58

## Historic Opportunity to Address Systemic
## Bias & Corruption

Aaronoff's experiences are the same as other victims of powerful men chronicled by *New York Times* investigative reporters Jodi Kantor and Megan Twohey, who said, "Institutions looked the other way…, people bend to power…, there is a boarder abuse of power, **the basic structures and systems are *still* in place** and it is not clear that we have yet found a way to solve this problem."

In 2020, it has become an accepted fact that American institutions, including the justice system, are plagued by systemic race, gender, class and other biases that allow the privileged few to operate above the law, while inflicting horrific abuses upon the unfortunate others who cross their paths (hereafter "Systemic Bias").

Once seemingly taboo, the issue of Judicial Corruption was thrust into the mainstream news with the June 30, 2020 publication of the Reuters News Special Report, "Thousands of U.S. judges who broke laws or oaths remained on the bench."[1]

The national conversation has now shifted from, "Does Systemic Bias exists?" to "What are we going to do about Systemic Bias?"

Dated July 23, 2021                    By: /S/ Vidala Aaronoff

                                       Vidala Aaronoff

                                       In *sui juris*

---

[1]  Thousands of U.S. judges who broke laws or oaths remained on the bench

**Certificate of Compliance**

Pursuant to California Rules of Court rule 8.204 (c) I hereby certify that this Appellant's Opening Brief contains 13375 words, in making this certificate, I have relied on the word count of the computer program used to prepare this motion.

Dated July 23, 2021

By: /S/ Vidala Aaronoff
Vidala Aaronoff

Proof of Service

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. On July 23, 2021, I electronically served the foregoing document described as:

**Appellant Aaronoff's Opening Brief**

on the interested parties in this action.

Eric Kennedy for Curtis Olson          G. Scott Sobel
Buchalter, APC                                    Law Offices of G. Scott Sobel
1000 Wilshire Blvd., Ste. 1500        1180 S. Beverly Dr. Ste. 610
Los Angeles, CA 90017                     Los Angeles, CA 90035
ekennedy@buchalter.com                  gscottsobel@gmail.com

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this July 23, 2021, at Lawndale, California.

By: /S/ Gilbert Romero
Gilbert Romero

Court of Appeal, Second Appellate District
Daniel P. Potter
Electronically FILED on 7/23/2021 by Orlando Carbone, Deputy Clerk

| STATE OF CALIFORNIA<br>California Court of Appeal, Second Appellate District | *PROOF OF SERVICE*<br><br>**STATE OF CALIFORNIA**<br>California Court of Appeal, Second<br>Appellate District |
|---|---|

| | |
|---|---|
| Case Name: | **Aaronoff v.**<br>**Olson** |
| Case Number: | **B295388** |
| Lower Court Case Number: | **17SMRO00308** |

1. At the time of service I was at least 18 years of age and not a party to this legal action.

2. My email address used to e-serve: **JaneDoe4Justice@aol.com**

3. I served by email a copy of the following document(s) indicated below:

Title(s) of papers e-served:

| Filing Type | Document Title |
|---|---|
| BRIEF - APPELLANTS OPENING BRIEF | Vidala Appeal B295388 last PDF BOOKMARKED |

Service Recipients:

| Person Served | Email Address | Type | Date / Time |
|---|---|---|---|
| Jane Doe | JaneDoe4Justice@aol.com | e-Serve | 7/23/2021 11:48:45 PM |
| Eric Kennedy<br>Buchalter, A Professional Corporation<br>228393 | ekennedy@buchalter.com | e-Serve | 7/23/2021 11:48:45 PM |
| G. Sobel<br>Court Added | gscottsobel@gmail.com | e-Serve | 7/23/2021 11:48:45 PM |

This proof of service was automatically created, submitted and signed on my behalf through my agreements with TrueFiling and its contents are true to the best of my information, knowledge, and belief.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

7/23/2021

Date

/s/Jane Doe
_____
Signature

Doe, Jane (Pro Per)
_____
Last Name, First Name (PNum)

_____
Law Firm